```
 1                 IN THE UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                          TAMPA DIVISION

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5                   Plaintiff,       )
                                      )
 6                                    ) Case No.
             vs.                      ) 8:18-CR-00234-MSS-SPF-3
 7                                    )
                                      )
 8   ALLAN BURT GUINTO,               )
                                      )
 9                   Defendant.       )

10

11

12   _____

13                      SENTENCING HEARING
             BEFORE THE HONORABLE MARY S. SCRIVEN
14              UNITED STATES DISTRICT JUDGE

15                    SEPTEMBER 17, 2019
                   COMMENCING AT 10:38 A.M.
16                       TAMPA, FLORIDA
     _____

17

18

19

20         Proceedings recorded by mechanical stenography,
     transcript produced using computer-aided transcription.
21   _____

22              DAVID J. COLLIER, RMR, CRR
              FEDERAL OFFICIAL COURT REPORTER
23          801 NORTH FLORIDA AVENUE, 7TH FLOOR
                  TAMPA, FLORIDA  33602
24

25
```

1    **APPEARANCES:**

2

3    **FOR THE GOVERNMENT:**

4

5            *Carlton Gammons*

6            *Natalie Hirt Adams*

7            United States Attorney's Office

8            400 N. Tampa Street, Suite 3200

9            Tampa, Florida  33602

10           (813) 274-6000

11

12

13   **FOR THE DEFENDANT ALLAN BURT GUINTO:**

14

15           *Benjamin Stechschulte*

16           Stechschulte Nell

17           1105 West Swann Avenue

18           Tampa, Florida  33606

19           (813) 280-1244

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                     – – – o0o – – –

3          THE COURT:  Good morning.  Call the case, please.

4          COURTROOM DEPUTY:  Yes, Your Honor.

5          This is Case Number 8:18-CR-234-T-35SPF, United

6   States of America versus Allan Burt Guinto.

7          THE COURT:  Will counsel state their appearances,

8   please.

9          MR. GAMMONS:  Good morning, Your Honor.

10  Carlton Gammons and Natalie Adams on behalf of the

11  United States.

12         THE COURT:  Good morning.

13         MR. GAMMONS:  Also seated at counsel table is

14  Agent Austin Blake Childress.

15         MR. STECHSCHULTE:  Good morning, Your Honor.

16  Ben Stechschulte representing Allan Guinto.

17         THE COURT:  Good morning.

18         MR. STECHSCHULTE:  Good morning, Your Honor.

19         THE COURT:  Please swear the defendant.

20         COURTROOM DEPUTY:  Please stand and raise your

21  right hand.

22         Do you solemnly swear or affirm under penalty of

23  perjury that the statements you will give in this cause

24  shall be the truth, the whole truth and nothing but the

25  truth, so help you God?

```
 1              THE DEFENDANT:  Yes.

 2              COURTROOM DEPUTY:  Please state your name for the

 3    record.

 4              THE DEFENDANT:  Allan Guinto.

 5              COURTROOM DEPUTY:  Thank you, sir.  You may be

 6    seated.

 7              THE COURT:  Mr. Guinto, you're under oath.  You

 8    have to give truthful answers.  If you give false answers,

 9    you face penalties of perjury, false statement and

10    obstruction.  Do you understand that?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  At the same time, it is not my purpose

13    to induce you to give false answers or mislead you, so if at

14    any time you don't understand something that I'm saying or

15    if you need a chance to speak with your lawyer, just let me

16    know and you'll be given the clarification that you require

17    and you'll be allowed to speak with your lawyer.  Do you

18    understand that?

19              THE DEFENDANT:  Yes, Your Honor.

20              THE COURT:  Sir, on January the 17th you entered a

21    plea of guilty to Counts One, Two and Eight of the second

22    superseding indictment.  Count One charges you with

23    conspiracy to commit murder in aid of racketeering, in

24    violation of 18 U.S.C. Section 1959(a)(5); Count Two charges

25    you with murder in aid of racketeering, in violation of
```

1    18 U.S. Code Sections 1959(a)(1) and 2, which is aiding and

2    abetting; and Count 8 charges you with accessory after the

3    fact, in violation of 18 United States Code Section 3.

4             The Court has already adjudicated you guilty based

5    upon the plea that you have entered, and now it is the stage

6    in the proceedings where it's my job to decide what your

7    sentence will be.  I make that decision by talking to you,

8    your lawyer and counsel for the Government, and reviewing

9    the submissions the parties have made in advance of this

10   hearing, as well as considering any argument and witnesses

11   presented at the hearing.  Do you understand that?

12            THE DEFENDANT:  Yes, Your Honor.

13            THE COURT:  Counsel, does the defense have any

14   objection to the factual statements in the presentence

15   report?

16            MR. STECHSCHULTE:  No, Your Honor.

17            THE COURT:  Any objection to the guideline

18   calculations?

19            MR. STECHSCHULTE:  No, Your Honor.

20            THE COURT:  Has the Government had an opportunity

21   to review the presentence report?

22            MR. GAMMONS:  Yes, Your Honor.

23            THE COURT:  Any objections as to its factual or

24   legal accuracy?

25            MR. GAMMONS:  No, Your Honor.

1          THE COURT:  Mr. Guinto, have you had a chance to

2   review the presentence report?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Are the facts in it, sir, true to the

5   best of your knowledge and belief?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Have you discussed the guidelines with

8   your lawyer?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Do you feel you understand those

11   guidelines?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  There being no objections to the

14   factual statements and guideline calculations in the report,

15   the Court adopts the facts as its findings of fact and

16   determines the guidelines to be as follows:  This defendant

17   faces a total offense level of 40.  He has a criminal

18   history category of I.  The guidelines would call for a term

19   of incarceration of life, a one to three year period of

20   supervision as to Counts One and Eight, a two year to five

21   year term of supervision as to Count Two, and no

22   restitution, the fine range is between 50,000 and $500,000,

23   and there is a $300 special assessment, which is $100 for

24   each offense.

25          Are there any victims or victims' family members

1  present in the courtroom?

2          MR. GAMMONS:  No, Your Honor.

3          THE COURT:  Were they given an opportunity to be

4  here?

5          MR. GAMMONS:  Yes, Your Honor.

6          THE COURT:  The Government has filed a motion in

7  this case.  Do you wish to be heard on your motion?

8          MR. GAMMONS:  Yes, Your Honor.

9          Your Honor, the United States is requesting a

10  six level downward departure in Mr. Guinto's offense level

11  for his cooperation with the United States.  Mr. Guinto was

12  arrested in December of 2017 and he began cooperating with

13  law enforcement officers almost immediately.  He sat down at

14  a sworn statement with State prosecutors in February 2018

15  when this case was still with the State of Florida, in

16  April 2018 he testified in grand jury in this matter in

17  Federal Court, and as the Court knows, he testified at the

18  trial of Christopher Cosimano and Michael Mencher.

19          Throughout the process Mr. Guinto has been

20  forthcoming, he's been truthful, he's been reliable, and

21  I think his testimony was important in securing the

22  convictions of his co-defendants, Mr. Cosimano and

23  Mr. Mencher.

24          In addition, I will add that throughout this

25  process there have been a number of threats made to several

1    of the cooperating defendants in this case, including

2    Mr. Guinto, and he still has stood fast with his

3    cooperation, and because of that we request a six level

4    decrease in his offense level in this case.

5              THE COURT:  What's the nature and character of the

6    threats to this defendant?

7              MR. GAMMONS:  Your Honor, specifically, we kept

8    Mr. -- at one point we changed Mr. Guinto's facility where

9    he was being housed due to individuals involved in the

10   motorcycle community or individuals who believe that because

11   he was cooperating with law enforcement, that they were

12   unhappy with this, so we relocated where he was staying.

13             THE COURT:  What was the specific or general

14   threat to the defendant?  Did somebody hit him, accost him?

15             MR. GAMMONS:  No, Your Honor.  There were threats

16   of violence, no physical contact.

17             THE COURT:  Such as what?

18             MR. GAMMONS:  Specifically, I don't -- I don't

19   have that information with me, Your Honor.

20             THE COURT:  How was it communicated to

21   law enforcement?

22             MR. GAMMONS:  It was made known to me through the

23   case agent.

24             THE COURT:  All right.  Does the case agent know

25   what the threats were?

1          MR. GAMMONS:  May I have a moment to consult,

2    Your Honor?

3          THE COURT:  Yes.

4          MR. GAMMONS:  Your Honor, my understanding is that

5    the threats were made, people affiliated with the Outlaws

6    were making threats to Mr. Guinto and his family, it was

7    communicated to the jail staff, the jail staff notified the

8    case agent, the case agent notified me.

9          THE COURT:  All right.  I just need to know what

10   the threats were.  I heard the word "threat."  Who said what

11   to whom about what?

12         Can the case agent be sworn.

13         MR. GAMMONS:  Yes, Your Honor.

14         THE COURT:  Please swear the witness.

15         COURTROOM DEPUTY:  Do you solemnly swear or affirm

16   under penalty of perjury that the testimony you're about to

17   give shall be the truth, the whole truth and nothing but the

18   truth, so help you God?

19         THE WITNESS:  Yes, I do.

20         THE COURT:  Please state your name for the record.

21         THE WITNESS:  Austin Blake Childress.

22         THE COURT:  Mr. Childress, sir, you indicate that

23   at some point it came to your attention that threats have

24   been made to Mr. Guinto and his family.  Can you tell me

25   about those threats in detail.

1          THE WITNESS:  As far as specifics, I don't

2    remember the name of the person who made threats.  They were

3    supposed to be a member of a friendly white supremacist

4    group that was familiar with the Outlaws known as

5    The Unforgiven.  It was, I believe, a co-defendant in

6    another case that ATF has currently moving forward, and they

7    were -- he was told that if -- I believe if he --

8          THE COURT:  "He" whom?

9          THE WITNESS:  If Mr. Guinto persisted in his

10   cooperation with the Government, that he would -- that

11   physical harm would come to him and/or his family,

12   specifically his fianceé.

13         THE COURT:  This is what this individual

14   supposedly said to whom?

15         THE WITNESS:  To Mr. Guinto, I believe.

16         THE COURT:  Was this a recorded conversation or

17   just reported to you by Mr. Guinto?

18         THE WITNESS:  It was not recorded, to my

19   knowledge.  It was reported by Mr. Guinto as well as

20   jail staff, after I believe he reported it to jail staff as

21   well.

22         THE COURT:  This person was incarcerated?

23         THE WITNESS:  Yes.  Correct.

24         THE COURT:  But in the same housing facility as

25   Mr. Guinto?

1        THE WITNESS:  I know they had contact with one

2   another.  I believe they had contact with one another.

3   Whether he was housed in the same housing unit or they

4   passed in the halls, I'm not certain.

5        THE COURT:  Any other threats, to your knowledge?

6        THE WITNESS:  Not that I can recall at the time.

7        THE COURT:  And this was dealt with by moving

8   Mr. Guinto to another facility?

9        THE WITNESS:  Yes.

10        THE COURT:  All right.  Thank you.

11        Do you wish to be heard in response to the motion?

12        MR. STECHSCHULTE:  Yes, Your Honor.

13        Your Honor, with respect to the threats that the

14   Court had questions on, I can provide some specifics that

15   were referenced in our sentencing memorandum that was under

16   seal.  Specifically there's two instances that we were aware

17   of.

18        THE COURT:  Is there any part of this proceeding

19   that needs to remain under seal for purposes of this

20   disclosure to the Court?

21        MR. STECHSCHULTE:  Your Honor, I would ask that

22   this portion be under seal, Your Honor.

23        THE COURT:  All right.  Then I'll ask everybody

24   who is in the courtroom that is not with law enforcement or

25   with the parties, please step out, including family members

1    and friends.  You'll be able to step back in in a few

2    minutes.  Counsel can remain in the courtroom.

3              Is there any reason Ms. Borghetti has to be out of

4    the courtroom for this part of the proceeding?

5              MR. STECHSCHULTE:  No, Your Honor.

6              THE COURT:  You can remain.

7              MS. BORGHETTI:  Thank you very much, Your Honor.

8              THE COURT:  She represents a co-defendant.

9              MR. STECHSCHULTE:  I'm aware of that, Your Honor.

10                          - - - - -

11    (Court entered a sealed session at 10:47 a.m.  Transcript

12                filed under seal under separate cover.

13       Proceedings in open court resumed at 10:53 a.m. and

14                      continued as follows:)

15                          - - - - -

16             THE COURT:  In regard to the Government's motion

17    for six levels, which as I understand it was an amendment to

18    its original motion, is the defense requesting any

19    additional levels beyond the six proposed by the Government?

20             MR. STECHSCHULTE:  Yes, we are, Your Honor.

21    Specifically -- Your Honor, I want to wait for his family to

22    come in before I make my argument.

23             THE COURT:  It's not a spectator sport.  Go ahead.

24             MR. STECHSCHULTE:  I know, Your Honor.  I know

25    they care, so -- Your Honor, pursuant to 5K1.1, obviously

1  the Court is well-aware of the five reasons that the Court

2  can review when determining whether -- the level -- the

3  appropriate level reduction.  I think there's two or three

4  that are of particular importance in this case.

5           THE COURT:  Just for the record, I think all of

6  the spectators are back in the room.

7           Continue.

8           MR. STECHSCHULTE:  Your Honor, the Court's

9  evaluation of the significance and usefulness of the

10  defendant's assistance, obviously taking into consideration

11  the Government's evaluation, and the reli -- and the second

12  reason, the reliability of any information or testimony

13  provided by the defendant.  As referenced in our sentencing

14  memorandum, after reviewing the trial transcripts,

15  specifically reviewing Mr. Guinto's direct and

16  cross-examination testimony and the Government's and defense

17  closing arguments, Mr. Guinto's testimony was --

18           THE COURT:  What level of reduction are you asking

19  for?

20           MR. STECHSCHULTE:  Your Honor, we would ask for

21  the reduction to be ten levels, to ten.

22           THE COURT:  And based upon a reduction to

23  ten levels, this would be from essentially a 42-I to a 32-I;

24  is that right?

25           MR. STECHSCHULTE:  I believe --

1           THE COURT:  He guidelines out at 40.

2           MR. STECHSCHULTE:  That's correct.

3           THE COURT:  But the first place at which life is

4    an available sentence is 42.

5           MR. STECHSCHULTE:  So that would put him at

6    offense level 32.  That would be -- well, if he guidelines

7    out at 42 -- I admittedly don't have my guidelines with me.

8           THE COURT:  42-I is the first place at which life

9    is an available sentence, and under your proposal he would

10   then guideline out at 32-I, which is a 121 to 151.  Under

11   the Government's current proposal he would guideline out at

12   188 to 235.

13          MR. STECHSCHULTE:  That's correct, Your Honor.

14          THE COURT:  So this is a question of 10 or

15   15 years, give or take a few months.

16          MR. STECHSCHULTE:  Yes, Your Honor.

17          THE COURT:  All right.  Continue.

18          MR. STECHSCHULTE:  Your Honor, going back to the

19   reasons for -- under 5K1.1, specifically looking at the

20   Government -- after reviewing the Government's closing

21   argument, it was referenced -- Mr. Guinto's testimony was

22   referenced on multiple occasions to basically -- the

23   Government to convey the argument to the jury that his

24   testimony was consistent with the evidence.

25          If you also look at the trial itself, the first

 1    witness that was called was Mr. Guinto.  As anyone knows

 2    who -- when you conduct a trial and you're determining the

 3    order of your witnesses, obviously you're not going to put

 4    your worst witness as your first witness, Your Honor.  The

 5    Government believed it was important, Mr. Guinto's

 6    testimony, and he was the number one witness that they

 7    called in order to start its case.  But more importantly,

 8    what did he specifically testify to that was so important?

 9    There were four specific instances that the Government

10    referenced in its closing argument that I would like to

11    point out to the Court that shows how significant his

12    testimony was, Your Honor.

13          Number 1, Your Honor, Mr. Guinto's account of the

14    James Costa or what is a/k/a known as the Jimbo shooting was

15    consistent with the other evidence.  Mr. Guinto, as the

16    Court was aware, disposed of the firearm involved in the

17    shooting; however, the information he provided regarding

18    that shooting was consistent with the other evidence, and

19    that was according to the Government's argument that it made

20    during the closing argument, Your Honor.

21          THE COURT:  Do you think that one of the reasons

22    that the defendant was acquitted of the shooting was the

23    inconsistency of the evidence with respect to who bumped the

24    victim's car, whether it was Mr. Guinto who may have done

25    that versus Mr. Cosimano?

1    MR. STECHSCHULTE:  Obviously, Your Honor, just to
2  be frank, I can't -- that would be -- I would be speculating
3  at this point.  I wasn't present other than reviewing the
4  transcript, so I can't --
5    THE COURT:  Well, who bumped the car, Mr. Guinto
6  or Mr. Cosimano?
7    MR. STECHSCHULTE:  Who bumped the car?
8    THE COURT:  Yes.
9    MR. STECHSCHULTE:  It was my understanding -- it
10  wasn't Mr. -- it wasn't Mr. Guinto, that's my understanding,
11  Your Honor.
12    THE COURT:  Mr. Guinto maintains that he was not
13  the person who bumped into -- what's the victim's name?
14    MR. STECHSCHULTE:  Are you talking about
15  Paul Anderson or James Costa, Your Honor?
16    THE COURT:  Mr. Costa's car.
17    MR. STECHSCHULTE:  That's our understanding
18  Your Honor.  Yes, that's our position.
19    THE COURT:  All right.
20    MR. STECHSCHULTE:  Second, Your Honor, the
21  recovered shell casings that were recovered on the crime
22  scene match the firearm that the Defendant Cosimano handed
23  Mr. Guinto to dispose of after the murder.
24    THE COURT:  Was Mr. Guinto there at the time of
25  the incident?

```
 1              MR. STECHSCHULTE:  At the time of the incident
 2    of --
 3              THE COURT:  Mr. Costa.
 4              MR. STECHSCHULTE:  Are we talking about --
 5              THE COURT:  The shooting.
 6              MR. STECHSCHULTE:  The shooting, not the murder,
 7    Your Honor?
 8              THE COURT:  That's correct.
 9              MR. STECHSCHULTE:  Okay.  I would, frankly, have
10    to review the discovery, but from my recollection, I do not
11    believe he was present for that.
12              THE COURT:  Well, the Government couldn't place
13    him there, but the Government didn't go back and look at the
14    video to see if a black car matching his car's description
15    went to that venue, even though Mr. Costa said, I think,
16    that there was a black car in the vicinity.
17              MR. STECHSCHULTE:  And, Your Honor, whether there
18    was a black car or not, that's a very -- frankly, a very
19    vague description, a black car.  There are many black cars.
20              THE COURT:  I know, but we're here on a plea, so
21    the facts are what they are, not what the Government can
22    prove them to be.  But you maintain the position that
23    Mr. Guinto was not there and that his role in securing that
24    weapon was significant to the Government's case?
25              MR. STECHSCHULTE:  That's correct, Your Honor.
```

1        THE COURT:  And testifying about his ability to

2   secure the weapon.

3        MR. STECHSCHULTE:  That's correct, Your Honor.

4        THE COURT:  All right.

5        MR. STECHSCHULTE:  The third issue specifically

6   is that Mr. Guinto's testimony regarding the enterprise's

7   drug trafficking was corroborated by the evidence.  That was

8   an argument the Government made during its closing argument

9   and clearly the jury believed the Government's argument and

10  was -- and that the evidence supported Mr. Guinto's account

11  of the enterprise's drug trafficking.

12        Fourth, and lastly, Mr. Guinto's testimony that

13  the co-defendant Mencher was planning on making a heroin

14  delivery was consistent with the other evidence, Your Honor.

15        So in our estimation there's four specific

16  instances that the Government relied on in its closing

17  argument that helped the Government and that was important

18  for the Government in securing a conviction of the two

19  defendants that chose to go to trial, Your Honor, and we

20  would ask that the Court evaluate -- this isn't just the

21  normal cooperation where somebody pleads guilty as a result

22  of cooperation.  Mr. Guinto, placing himself and his family

23  in danger, testified in our estimation truthfully, honestly,

24  and more importantly, he was significant and it helped

25  and/or contributed to the convictions of the two

1  co-defendants that chose to go to trial, and we would ask

2  that the Court consider that in making a determination of

3  the appropriate downward departure levels, Your Honor.

4          THE COURT:  Thank you.

5          Any response from the Government?

6          MR. GAMMONS:  No, Your Honor.

7          THE COURT:  Do you disagree with anything the

8  defense said about Mr. Guinto's significance to the

9  Government's case?

10          MR. GAMMONS:  I have no disagreements.  I will

11  clarify that the Government is comfortable that Mr. Guinto

12  was not present at the time of the shooting of James Costa,

13  however.

14          THE COURT:  What is the basis for that comfort?

15          MR. GAMMONS:  Based on the Government's review of

16  the evidence, based on my proffers with Mr. Guinto, based on

17  the statements that he made to Sean Leonard before he knew

18  Sean Leonard was cooperating with law enforcement, based on

19  my estimation of the evidence, I don't believe that

20  Mr. Guinto was present.

21          THE COURT:  Thank you.

22          Do you wish to be heard any further in regard to

23  the 3553 factors and in mitigation, and does the defendant

24  wish to allocute, which is his right?

25          MR. STECHSCHULTE:  Yes.  Excuse me.  Yes,

1    Your Honor.

2            THE COURT:  Let me hear from you.

3            MR. STECHSCHULTE:  Okay.  Your Honor, would you

4    prefer that we make an argument and call our witnesses, our

5    character witnesses first, then have --

6            THE COURT:  It's your preference.

7            MR. STECHSCHULTE:  Okay.  Your Honor, I'll make an

8    argument and then we'll have our witnesses come forward.

9            Your Honor, Mr. Guinto respectfully requests the

10   Court consider the 18 U.S.C. 3553(a) factors as it imposes a

11   sentence that is sufficient but not greater than necessary

12   to comply with the goals of sentencing as set forth in

13   18 U.S.C. 3553.  Your Honor, specifically we would like to

14   point to the nature and circumstances of the offense and the

15   history and characteristics of Mr. Guinto.

16           As evidenced by the numerous letters that have

17   been provided to the Court in the presentence investigative

18   report, Mr. Guinto throughout his life has been a caring,

19   selfless individual.  He's shown a willingness to help other

20   people, whether it be through his military service,

21   classroom participation in St. Pete College, and

22   unfortunately, as we stated in our memorandum, to his own

23   detriment, his participation in a motorcycle gang.

24           This misplaced sense of brotherhood with his

25   co-defendants led him to follow the co-defendant Cosimano's

1    orders without obviously considering the consequences of his

2    actions; however, today and throughout this case dating back

3    to December of 2017 he immediately accepted responsibility

4    and now is ready to accept the consequences of his actions.

5         Regarding Mr. Guinto, as we stated before and as

6    we've heard, Mr. Guinto was in the military in Afghanistan,

7    he served on the front lines and he was an infantryman.

8    During -- and as an infantryman he actually was on the front

9    lines, it wasn't like he just served in a noncombat theater,

10   he actually was there, and unfortunately when he came back

11   he struggled to adjust to civilian life and he developed

12   PTSD, post-traumatic stress disorder.

13        That doesn't excuse his actions, in no way, shape

14   or form, but it provides some information or provides some

15   context as to why Mr. Guinto may have joined or felt the

16   need to join a biker gang, because he was used to a group

17   setting and he was used to a situation where they were his

18   brothers and his sisters and he needed and craved that

19   support.  It doesn't excuse his actions, but that kind of

20   explains and provides a little bit of context of why he

21   would join the motorcycle gang.

22        He understands his actions towards Paul Anderson

23   are -- there's no justification even based on what happened

24   to him and what Paul Anderson did to him previous to his

25   murder.  He's accepted responsibility for his actions.

1          Your Honor, I would also like to point -- not with

2    respect to the 3553 factors, but regarding a departure,

3    pursuant to United States Sentencing Guidelines 5H1.1,

4    we believe the evidence shows Mr. Guinto's military service

5    is present to an unusual degree and distinguish his case

6    from the typical cases covered under the guidelines.

7          As previously stated, he was an infantryman,

8    but -- and he received numerous decor -- numerous medals for

9    his service, but what's of particular note is that he

10   received the combat infantry badge, and that's for

11   individuals who participate actively in ground combat as an

12   infantryman, and those individuals, as cited in the

13   presentence investigation report, are disproportionately

14   more likely to be killed or wounded during combat, and our

15   belief, and based upon our witnesses that are going to

16   testify before Your Honor, is that his service to the

17   country ultimately resulted in him suffering from PTSD and

18   led him down the path which is why Mr. Guinto sits here

19   before Your Honor.  We would ask that the Court consider

20   that in determining a just sentence.

21          Your Honor, we do have five witnesses, character

22   witnesses, we would like to call on Mr. Guinto's behalf

23   along with -- obviously Mr. Guinto is going to provide his

24   allocution.

25          Your Honor, our first witness --

```
1            THE COURT:  These are witnesses different than the
2   ones who provided witness statements?
3            MR. STECHSCHULTE:  No, they're not, Your Honor.
4   They would just want to -- we have -- and just so the Court
5   is aware, we have his family here.  His mom and his dad flew
6   in from Seattle, Washington, they're present here.
7            He has significant family and friends.  He
8   actually had -- one of his character witnesses actually flew
9   in from Guantanamo Bay, Cuba to testify here before
10  Your Honor.  So he's got a lot of loved ones that are going
11  to bat for him, and they clearly understand what Mr. Guinto
12  did was wrong but they want the Court to know that he's an
13  individual that can be rehabilitated, that --
14           THE COURT:  Call your witnesses.
15           MR. STECHSCHULTE:  Okay.  Your Honor, our first
16  witness will be Stephanie Ferrara, Your Honor.
17           THE COURT:  Please come forward to be sworn.
18           COURTROOM DEPUTY:  Please raise your right hand.
19           Do you solemnly swear or affirm under penalty of
20  perjury that the statements you're about to give shall be
21  the truth, the whole truth and nothing but the truth, so
22  help you God?
23           THE WITNESS:  Yes, ma'am.
24           COURTROOM DEPUTY:  Please state your name for the
25  record.
```

1          THE WITNESS:  Stephanie Nicole Ferrara.

2          THE COURT:  And spell your last name.

3          THE WITNESS:  F-E-R-R-A-R-A.

4          COURTROOM DEPUTY:  Thank you, ma'am.  You may take

5    the witness stand.

6          THE COURT:  Ms. Ferrara, you're under oath.  You

7    have to give truthful answers.  If you give false answers,

8    you face penalties of perjury, false statement and

9    obstruction.  Do you understand that?

10         THE WITNESS:  Yes, Your Honor.

11         THE COURT:  How are you related to or connected to

12   Mr. Guinto?

13         THE WITNESS:  I met Allan black in 2009 through

14   some mutual friends.  We've been friends ever since.

15         THE COURT:  And where was that?

16         THE WITNESS:  At a Starbucks in Brandon.

17         THE COURT:  All right.  And you're military

18   active?

19         THE WITNESS:  Yes, ma'am.

20         THE COURT:  In what capacity?

21         THE WITNESS:  I'm in the United States Navy.  I'm

22   an E-5.  I'm a Master At Arms, which is the Navy's version

23   of military police.

24         THE COURT:  And do you have any felony

25   convictions?

1         THE WITNESS:  No, ma'am.

2         THE COURT:  Counsel.

3         MR. STECHSCHULTE:  Yes.

4             **DIRECT EXAMINATION OF STEPHANIE FERRARA**

5    **BY MR. STECHSCHULTE:**

6    Q    Ms. Ferrara, can you describe -- why don't we just kind

7    of cut to the chase.  Why are you here today?

8    A    Allan -- Allan has been one of my best friends for over

9    a decade now.  Throughout both of our travels through the

10   military and through wherever our lives have taken us, he's

11   always been there.  We've kind of always tried to be there

12   for each other.

13           Even when he was in Afghanistan, going through

14   everything he was going through, I was stationed in Florida

15   and he still managed to find a way to make myself feel

16   happy, and he was just always there for me, even though he

17   was going through the roughest times.  He's just always been

18   a very loyal friend.  Even my son looks up to him.  It's

19   just -- he's just always been there for me.  He's my best

20   friend.  I would trust him with my life.  Everything he's

21   done in his life up until now has been very respectable to

22   me.  I wouldn't trade our friendship for anything.  And even

23   though we are in rival branches of the military, we still

24   love each other, and I know that friendship will never die.

25   He has been there for everything for me, through every duty

1  station we've ever been at, even when he was in Afghanistan,

2  in Kentucky, and I was stationed overseas, we still never

3  lost touch.  He's just always been there for me.

4  Q    And, Ms. Ferrara, based upon you knowing Mr. Guinto for

5  so long, can you tell the Court why you think he can be

6  rehabilitated and could be a productive member of society.

7  A    I truly believe that he's always been a good person.

8  I've known him since we were teenagers and I've never known

9  him to do anything foul or anything against anyone else's

10 morals, especially his own, up until this.  I do believe

11 this was an isolated incident.

12          As he spoke earlier, I think he had a false sense

13 of brotherhood and he got caught up in the wrong group.

14 I understand that he did crave that, that sense of

15 brotherhood.  I do believe that this was an isolated

16 incident.  He can grow from this experience and learn from

17 his mistakes and grow from that.

18 Q    Is there anything else you would like to tell

19 Judge Scriven before you're done with your testimony?

20 A    That's pretty much it.

21 Q    All right.  Thank you.

22 A    Thank you.

23          THE COURT:  Any questions of this witness from the

24 Government?

25          MR. GAMMONS:  No, Your Honor.

1    THE COURT:  How do you square your

2    understanding -- you can have a seat.

3    How do you square your understanding of Mr. Guinto

4    with the conduct that he engaged in in this case?

5    THE WITNESS:  Can you repeat that, ma'am?

6    THE COURT:  How is it consistent with this person

7    you're describing that somebody would load up in a car and

8    track down an individual for the purpose of shooting him

9    dead in cold blood in the middle of the daytime?

10    THE WITNESS:  The Allan that I knew and that

11    I grew up with is not that Allan.  When I heard of this

12    event, I was extremely shocked, just as much as I'm sure his

13    family was as well.  That's not the Allan that I know and

14    that's why I believe this is an isolated incident.  The

15    Allan that I know, this is very out of character for him, to

16    go out and be a part of something like this.  This is --

17    THE COURT:  Did you know he was part of this gang?

18    THE WITNESS:  I knew he drove motorcycles.  I knew

19    he was part of motorcycle clubs.  I wasn't aware of the

20    extent of the exact gangs and their forecomings (sic) and

21    what they were about.  That I was not aware of.

22    THE COURT:  All right.  Thank you.

23    THE WITNESS:  You're welcome.

24    THE COURT:  Please call your next witness.

25    MR. STECHSCHULTE:  Yes, Your Honor, I'd like to

1    call Ms. Kristina Rainey.

2            COURTROOM DEPUTY:  Please raise your right hand.

3            Do you solemnly swear or affirm under penalty of

4    perjury that the testimony you're about to give shall be the

5    truth, the whole truth and nothing but the truth, so help

6    you God?

7            THE WITNESS:  I do.

8            COURTROOM DEPUTY:  Please state your name for the

9    record and spell your last name.

10           THE WITNESS:  It's Kristina Rainey.  Rainey,

11   R-A-I-N-E-Y.

12           COURTROOM DEPUTY:  Thank you, ma'am.  You may take

13   the witness stand.

14           THE COURT:  Ms. Rainey, you're under oath.  You

15   have to give truthful answers.  If you give false answers,

16   you face penalties of perjury, false statement and

17   obstruction.  Do you understand that?

18           THE WITNESS:  Yes, ma'am.

19           THE COURT:  Ms. Rainey, how are you connected to

20   this defendant?

21           THE WITNESS:  We met when we were going to

22   Hillsborough Community College together.  We were taking a

23   math class and that's how we -- how we met.

24           THE COURT:  And what is your relationship to him

25   now?

1              THE WITNESS:  Friendship.  He's one of my closest

2      friends.

3              THE COURT:  Do you have any felony convictions?

4              THE WITNESS:  No, ma'am.

5              THE COURT:  You may proceed, Counsel.

6              MR. STECHSCHULTE:  Thank you, Your Honor.

7                  **DIRECT EXAMINATION OF KRISTINA RAINEY**

8      **BY MR. STECHSCHULTE:**

9      Q    Ms. Rainey, what would you like to tell the Court about

10     Mr. Guinto's character?

11     A    He is loyal.  He is a dedicated person who is very

12     caring and he wants to make sure that you are having like

13     the best day possible, and he would make sure that he would

14     like either crack jokes or just do something to make you

15     feel better.  He was always very compassionate, like I said,

16     dedicated with his studies, with friendships, and just

17     always made -- always looking out for other people.

18     Q    And have you had communications with Mr. Guinto since

19     his arrest?

20     A    Yes.

21     Q    Can you explain.

22     A    It took us a while to finally connect, because he was

23     arrested, I didn't know where he was, but we finally -- he

24     finally was able to call me, and he was very, very

25     remorseful, he just kept apologizing and kept apologizing,

 1  kept apologizing, that he was -- to me he sounded like

 2  scared for -- and remorseful for what -- his part of the

 3  incident.  And I think it's, again, an isolated incident.

 4  He's not somebody who is out to fight somebody, you know

 5  what I mean?  He's always -- like I said, he's always the --

 6  like the de-escalator.  If you're in a bad mood, he'd try to

 7  do something to make you laugh.  He's not a vindictive,

 8  malicious person by what -- by no means whatsoever.

 9  Q    Now, what do you think Mr. Guinto's capacity is for

10  rehabilitation?

11  A    I think he's very good for rehabilitation.  We have

12  spoken at lengths on the telephone about what our futures

13  hold in regards to, you know, what he wants to do once he

14  gets out.  We have talked at lengths about getting

15  counseling, because I had noticed like when we were in

16  school together that he did have some triggers for PTSD.

17  I am intimately familiar with PTSD, I have that myself,

18  which I seek therapy for that.  My dad is a Vietnam vet, so

19  I pretty much grew up with the PTSD triggers, I know what

20  they are, and I'm a strong, adamant person who advocates for

21  getting mental health treatment.  I think he is very

22  compliant at this point in his life with being locked up and

23  having his life changed like this.  I think he would be very

24  compliant and would be willing to look for -- to seek help.

25  Q    Now, you've heard the previous testimony of our first

1    witness, Ms. Ferrara --

2    A    Um-hum.

3    Q    -- correct?

4         Judge Scriven had asked how does Mr. -- how do you

5    square Mr. Guinto's conduct with why he's here today with

6    the person that you know.

7    A    Again, like I said, he's very loyal.  When we were in

8    school together we've spoken at great lengths about the

9    military.  I told him what branch my dad had served in in

10   Vietnam, and he was like, whoa, that was tremendous, and he

11   had an utmost respect for my family and what, you know, we

12   went through, because again, it's a different -- different

13   era for war, but he -- I'm sorry.

14   Q    That's okay.

15   A    He spoke at lengths about the brotherhood, about the

16   trust, about the -- having each other's backs, and he missed

17   that greatly in the military, and he had -- you know, we'd

18   go back and forth, if he wanted to go back into the military

19   to continue serving, but his disabilities with his injuries,

20   that was not an option for him, so I told him that basically

21   he needed to look at seeking therapy and try to get back to

22   civilian life, because I didn't feel like he was in civilian

23   life, I think he was still --

24   Q    Were you aware, did he seek therapy?

25   A    At the time that we were talking about it, no.

1   Q    Okay.

2   A    But I know he did later on.

3   Q    Okay.  Is there anything else that you would like to

4   tell Judge Scriven about Mr. Guinto that you haven't already

5   said?

6   A    I have like another letter, if you don't mind.

7             THE COURT:  Different than the one you already

8   submitted?

9             THE WITNESS:  Yes, ma'am.

10            THE COURT:  I'll take it and read it.

11            THE WITNESS:  Okay.

12            THE COURT:  Thank you.

13  BY MR. STECHSCHULTE:

14  Q    Ma'am, is there anything else that you would like to

15  add other than the letter that you provided the Court?

16  A    Just again I want to restate, I think he would be very

17  compliant in getting help with mental health therapy to help

18  him move forward with his PTSD and to make a better life for

19  himself and make better decisions and let go of that

20  brotherhood from the motorcycle family and gain a new family

21  of having supportive friends.

22            THE COURT:  Thank you.

23            MR. STECHSCHULTE:  Your Honor, I don't have

24  anything further of this witness.

25            THE COURT:  Any questions from the Government of

1    this witness?

2              MR. GAMMONS:  No, Your Honor.

3              THE COURT:  Thank you.  You may step down.

4              Call your next witness.

5              MR. STECHSCHULTE:  Yes, Your Honor.  I would call

6    Ms. Allison Shenofsky.

7              THE COURT:  Please come forward to be sworn.

8              COURTROOM DEPUTY:  Please raise your right hand.

9              Do you solemnly swear or affirm under penalty of

10   perjury that the testimony you're about to give shall be the

11   truth, the whole truth and nothing but the truth, so help

12   you God?

13             THE WITNESS:  I do.

14             COURTROOM DEPUTY:  Please state your name for the

15   record and spell your last name.

16             THE WITNESS:  Allison Shenofsky,

17   S-H-E-N-O-F-S-K-Y.

18             COURTROOM DEPUTY:  Thank you, ma'am.  You may take

19   the witness stand.

20             MR. STECHSCHULTE:  Good morning, Ms. Shenofsky.

21             THE COURT:  Ms. Shenofsky, you're under oath.  You

22   have to give truthful answers.  If you give false answers,

23   you face penalties of perjury, false statement and

24   obstruction.  Do you understand that?

25             THE WITNESS:  Yes, ma'am, I do.

1              THE COURT:  What is your relationship with this

2    defendant?

3              THE WITNESS:  I met Allan when I was a student

4    support advisor at the St. Petersburg College and I was his

5    student support advisor.

6              THE COURT:  And since then you've become a

7    Veterans Service Coordinator for St. Pete College?

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  Is that a different role?

10             THE WITNESS:  Yes, ma'am.

11             THE COURT:  And are you here in your personal

12   capacity or are you here in your capacity as a Veterans

13   Support Specialist?

14             THE WITNESS:  That is actually a little unclear to

15   me.  I have not had my presence here sanctioned by the

16   institution; however --

17             THE COURT:  So then you're here in your personal

18   capacity.

19             THE WITNESS:  Then yes.

20             THE COURT:  I mean, the St. Pete College hasn't

21   sent you over here to speak on its behalf --

22             THE WITNESS:  Correct.

23             THE COURT:  -- in regard to Mr. Guinto; is that

24   right?

25             THE WITNESS:  Correct.  They have not.

1          THE COURT:  All right.  Let me hear from you.

2          THE WITNESS:  Okay.

3              **DIRECT EXAMINATION OF ALLISON SHENOFSKY**

4  **BY MR. STECHSCHULTE:**

5  Q    Ms. Shenofsky, can you describe how you know

6  Mr. Guinto.

7  A    Yes.  I met Allan when I was a student support advisor.

8  I was in that role for approximately six years, just over

9  six years, at both the Gibbs and Seminole campuses.  He came

10 to me just after the Veteran's Day celebration in 2015.

11 I immediately liked him.  I liked his ability and his drive

12 to help other students.  So when he began -- that was

13 obviously in November, for anybody who doesn't know when

14 Veteran's Day is.

15          Several months later, in January, when he actually

16 began school with us -- excuse me.  During November to

17 January he continued to visit the campus, make friends at

18 the campus, even though he was not enrolled, which is quite

19 unusual, and then in January, when he actually began his

20 classes, I hired him as a V.A. work study student assistant

21 and he worked for me for quite a long time helping students

22 to achieve their educational goals.

23 Q    And what can you describe about your experience with

24 Allan and specifically his character?

25 A    Allan has always shown himself to be all these other

 1   things that everybody else has said.  He's always been

 2   extremely caring.  He's always been fun and helpful.  He was

 3   actually functioning quite a bit as my ambassador for the

 4   Student Veterans Association while he worked for me, which

 5   is a national chapter of the Student Veterans Association,

 6   and that is a big part of our model at St. Pete College, to

 7   try and get our students involved.  There are many, many

 8   students at St. Petersburg College who miss their

 9   brotherhood and sisterhood, if you will, that they had while

10   they were in the military, and this club functions as a

11   substitute for that while they're doing their education and

12   then getting into their career, and he was so positive and

13   wonderful that I had him working mainly for that, to bring

14   people in, into the fold, if you will.

15   Q    And have you maintained contact with Mr. Guinto since

16   his incarceration?

17   A    Sporadically.

18   Q    Okay.  What can you tell -- obviously you've heard

19   Judge Scriven, some of her questions.  How can you square

20   what Mr. Guinto's actions were for what he's here for today

21   with the character that you know and the person that you

22   know?

23   A    I cannot square it.  I have enough experience with him

24   and with other people that deal with PTSD issues that what

25   everybody else has said about the lack of brotherhood and

ALLISON SHENOFSKY – SEPTEMBER 17, 2019        37
Direct Examination by Mr. Stechschulte

1    the deep need for a brotherhood is exactly the only way

2    I can square this.

3    Q    Based upon your knowledge and knowing Mr. Guinto for a

4    long time, what do you think his capacity is for

5    rehabilitation upon his release from the Bureau of Prisons'

6    custody?

7    A    I'll go over that.

8    Q    Okay.

9    A    Okay.  So I'd like to first go over my credentialing,

10   because I think that's important to me being able to speak

11   to this particular question.

12          I have been in the student support advisor role

13   for over six years when I was in it.  That role is quite a

14   bit like a guidance counselor.  My specialty is in the

15   strategic use of GI Bill --

16          THE COURT:  Are you calling this individual as an

17   expert, Counsel?

18          MR. STECHSCHULTE:  No, I am not, Your Honor.

19          THE COURT:  All right.  Just tell me from your own

20   personal perspective, not in your expert capacity, because

21   you're not here as an expert.

22          THE WITNESS:  Okay.  I believe that with the

23   programs that are available to Allan as an ex-con and with

24   the programs that are available to Allan as a veteran,

25   because this conviction does not exempt him from his veteran

 1   status, I believe that he is -- he has an excellent path at

 2   rehabilitation.

 3          I've done the work into the programs that could be

 4   available to him, of which there are several in

 5   Pinellas County.  I can only guess that there would be

 6   matching programs, if not more, in Hillsborough County,

 7   depending on where he'd like to stay upon his release.

 8          Because of what I know about his veteran status

 9   and his disability status and what type of benefits he gets

10   from those, I believe he will financially be able to sustain

11   himself when he gets out.  Because of how close he is to

12   earning his degree, I believe he will be able to do that, as

13   well as gain entrance into retraining programs that

14   specifically look for ex-cons.

15          I believe that -- I know that he is eligible for

16   V.A. benefits, both medical and mental health.  I can see

17   here today that he has a positive support network from all

18   the people that have shown up from him.  I am committing

19   myself to be a part of that positive support network in my

20   professional position upon his release, and I believe that

21   if he were to take the opportunities that he has and put all

22   of his effort towards them, I think there are very few

23   barriers to him leading a successful life.  I think that one

24   of the only barriers are his job fields of choice, of which

25   there are still plenty that will allow him with a convicted

1   status to enter the workforce.

2   Q    Is there anything else that you would like to tell

3   Judge Scriven?

4   A    Yes.  A couple things.  I pledge myself to help Allan

5   in making an ambitious plan for reintegration into society,

6   I pledge my professional help, and I pledge to always tell

7   you the truth.  You will need to hear the truth, and I will

8   give it to you, no matter how much it hurts.

9          As well, Allan has a couple tattoos that are going

10  to bar him getting into some good jobs, and I would like you

11  to know, Your Honor, that my family has offered to sponsor

12  the removal of these tattoos, if Allan so wishes to take us

13  up on that offer.

14         One thing that I haven't heard explained very well

15  is the nature of the combat in which Allan was involved.

16  Many people today seem to believe that the conflict our

17  United States is currently in is not a hand-to-hand combat

18  and that it is conducted mainly by drones and computers, and

19  while that is true on many fronts, there are many

20  noncombatants, Allan was not one of those.  Allan's service

21  harkened back much more to Vietnam War, where there was

22  actual hand-to-hand conflict.

23         As I said in my character witness, my personal

24  belief is that people are not meant to see things like that

25  and to participate in things like that, we are a soft nature

 1  and we can be broken, and on the other hand we can be

 2  rebuilt.

 3          THE COURT:  Thank you.  Any questions of this

 4  witness from the Government?

 5          MR. GAMMONS:  No, Your Honor.

 6          THE COURT:  Thank you.  You may step down.

 7          Call your next witness.

 8          MR. STECHSCHULTE:  Yes, Your Honor, I would call

 9  Ms. Andrea King.

10          THE COURT:  Please come forward to be sworn.

11          COURTROOM DEPUTY:  Please raise your right hand.

12          Do you solemnly swear or affirm under penalty of

13  perjury that the testimony you're about to give shall be the

14  truth, the whole truth and nothing but the truth, so help

15  you God?

16          THE WITNESS:  Yes, ma'am.

17          COURTROOM DEPUTY:  Please state your name for the

18  record and spell your last name.

19          THE WITNESS:  Andrea King, K-I-N-G.

20          COURTROOM DEPUTY:  Thank you, ma'am.  You may take

21  the witness stand.

22          THE COURT:  Ms. King, you're under oath.  You have

23  to give truthful answers.  If you give false answers, you

24  face penalties of perjury, false statement and obstruction.

25  Do you understand that?

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  How are you related to the defendant?

3          THE WITNESS:  I'm his fianceé.

4          THE COURT:  And how long have you all been in a

5     relationship?

6          THE WITNESS:  About three years now.  Two years.

7     Two years?  September 2017.

8          THE COURT:  Counsel?

9               **DIRECT EXAMINATION OF ANDREA KING**

10    **BY MR. STECHSCHULTE:**

11    Q    Ms. King, can you explain to the Court how you first

12    got to know Mr. Guinto.

13    A    Yeah.  I actually met him in a Snapchat group, a random

14    Snapchat group.  I'm a power lifter.

15    Q    Can you explain to the Court just what a Snapchat group

16    is.

17    A    Oh, sorry.

18         THE COURT:  Counsel, I know what a Snapchat group

19    is, and I read her letter, so you don't have to go back

20    through all of those details.

21         MR. STECHSCHULTE:  Okay.

22         THE COURT:  Would you like to ask questions about

23    which the Court doesn't have knowledge?

24         MR. STECHSCHULTE:  Yes, Your Honor.

25

1  BY MR. STECHSCHULTE:

2  Q    If you could go into -- why do you think, based upon

3  your experience -- and you've main -- have you maintained

4  contact with Mr. Guinto since he's been incarcerated?

5  A    Yeah, every day.

6  Q    Okay.  Obviously you've written a letter and described

7  his character.  Can you explain to the Court why he can be

8  rehabilitated.

9  A    I mean, now that I know when I met him he's

10  intelligent, he's caring, he's sweet.  He was literally in

11  school working when I met him, so as far as I know, the only

12  person in that club that actually had a job and did

13  something good for the community.  He actually introduced me

14  to a group of people in the power lifting community who I

15  never had met before who were surprised and spoke very

16  highly of him, but he dedicated his time to that, so I know

17  that when he --

18            THE COURT:  In the what community?

19            THE WITNESS:  Power lifting.

20            THE COURT:  Okay.

21  A    You know, he dedicated a lot of time to that.  So

22  I know he's a good person and I know if he has the right

23  direction -- like I said, he's smart, he has like 95 percent

24  of his AA finished, he was literally about to go back to

25  school, he just needs to finish his degree, and I think

1    that -- like Allison had said, that with all of the

2    different venues in front of him and options as far as

3    getting a job in society, that he would thrive and do well.

4    Q    Now, Ms. King, is there anything beyond what you

5    obviously wrote to the Court, the letter, that you would

6    like to tell the Judge today about Mr. Guinto?

7    A    I mean, I was going to actually read you the letter,

8    but obviously that's not what everyone is doing here, so

9    I mean, I just --

10          THE COURT:  I've read your letter, and I've

11   actually read it about three times, so you don't have to

12   feel obligated to recite it, feeling that it wasn't read.

13   I did read it.

14   A    Yeah.  I mean, that was pretty much it.

15          I mean, I love him.  I'm a 33-year-old woman that

16   has two really great jobs, I went to college, I own my own

17   house, and I wouldn't put myself in a situation with a

18   person that I didn't think was actually a good person.  If I

19   thought he was what this trial and what this incident has

20   portrayed him to be, I wouldn't in my life, in my world,

21   give myself to someone or spend the last 21 months on the

22   phone with someone I can't have contact with if I didn't

23   truly believe and know that he isn't the person that this

24   whole thing has brought to light.

25          MR. STECHSCHULTE:  Your Honor, I'm going to pass

1    the witness.

2          THE COURT:  Did you know he was in this motorcycle

3    gang during your relationship with him?

4          THE WITNESS:  I knew he was in a motorcycle club.

5    I had actually met a couple of the guys a couple times.

6    I had watched Sons of Anarchy, but I always would joke, like

7    nothing is actually like this, this isn't -- you know, I met

8    them, I wasn't a huge fan of them, but I loved him, so we

9    went to their Christmas party and it was like, whatever, and

10   I didn't think that in the capacity -- that it was actually

11   something like this, that this would ever happen.

12   I literally thought that was on TV.

13         THE COURT:  Well, what did you think his tattoos

14   were about?

15         THE WITNESS:  Which ones?  I mean, he has -- he

16   has tattoos, like religious tattoos, family tattoos.  The

17   ones he has now I'm not -- it's hard for me since I've seen

18   him -- I don't know much of the new ones, I can't see them

19   very well, but I mean most of his tattoos when I first met

20   him were just more or less like the same tattoos I have,

21   expressions of himself.  Like I said, he has the praying

22   hands, he has a family tattoo.  I mean, his tattoos don't

23   really portray the person that you are, in my mind, I guess.

24         THE COURT:  Anything from the Government of this

25   witness?

1          MR. GAMMONS:  No, Your Honor.

2          THE COURT:  Thank you very much.

3          Any other witnesses?

4          MR. STECHSCHULTE:  No, Your Honor.  I just wanted

5    to relay to the Court that Mr. Alvin Guinto, his brother, is

6    in the Philippines and would have liked to have been here,

7    but he did provide a letter to the Court, which I'm sure

8    Your Honor has read, along with Chris Fontanez, which was a

9    neighbor of Mr. Guinto, and expressed -- you know, explained

10   his character.

11         Your Honor, I think Mr. Guinto now would probably

12   like to give his allocution, Your Honor.

13         THE COURT:  Do his parents wish to speak?

14         MR. STECHSCHULTE:  I had spoken with them.

15   I don't know if they --

16         THE COURT:  Do they speak English?

17         MR. STECHSCHULTE:  Oh, yes, Your Honor.  Oh, we

18   spoke with them.  Yes.

19         Do you want to speak?

20         THE COURT:  Please come forward to be sworn.

21         COURTROOM DEPUTY:  Please raise your right hand.

22         Do you solemnly swear or affirm under penalty of

23   perjury that the testimony you're about to give shall be the

24   truth, the whole truth and nothing but the truth, so help

25   you God?

```
 1              THE WITNESS:  Yes.

 2              COURTROOM DEPUTY:  Please state your name for the

 3    record and spell your last name.

 4              THE WITNESS:  Grace Guinto, G-U-I-N-T-O.

 5              COURTROOM DEPUTY:  Thank you, ma'am.  You may take

 6    the witness stand.

 7              THE COURT:  Ms. Guinto, you're under oath.  You

 8    have to give truthful answers.  If you give false answers,

 9    you face penalties of perjury, false statement and

10    obstruction.  Do you understand that?

11              THE WITNESS:  Yes, Your Honor.

12              THE COURT:  How are you related to the defendant?

13              THE WITNESS:  He is my youngest son.

14              THE COURT:  And how often did you see him before

15    the incident that gives rise to this case?

16              THE WITNESS:  Before this happened, I haven't seen

17    him for a while because we moved to Seattle for a job.

18              THE COURT:  How often -- when did you move?

19              THE WITNESS:  I move about August before that

20    happened.  It happened I think in December.

21              THE COURT:  Before you moved, how often did you

22    see him?

23              THE WITNESS:  I can see him all the time, almost

24    probably about -- at least three times a week.

25              THE COURT:  He would come by your house?
```

1          THE WITNESS:  Actually he is really living in my
2    house and he goes back and forth.
3          THE COURT:  All right.  And can you characterize
4    his behavior before he went to the military and his behavior
5    after he returned from the military.
6          THE WITNESS:  He's a very good son.  He's a very
7    good kid, and as a mother we always make sure that we all
8    eat dinner at night at the same time, and he always called
9    me, wherever he is.  He is very caring.
10         THE COURT:  And how, if any way, did the military
11   experience he had change his personality, from your
12   perspective?
13         THE WITNESS:  I am -- my family is not really very
14   well-exposed to military, they are the very first one that
15   I have -- I encountered the military life, that's why I had
16   a very hard time adjusting.  He changed drastically,
17   you know, and I had a hard time understanding, but I tried
18   my best.  My husband is the one that's very, very loyal in
19   helping them, but he always -- he always very loving.
20   Whatever he had, he always have time with me, he always call
21   me and say "I love you mom," or even goodnight.
22         THE COURT:  How did his personality change
23   drastically?
24         THE WITNESS:  He -- he gets angry very easily.
25   Every time I say something or every time I called him if he

1   is not home at eight o'clock at night, he always said, mom,

2   I'm a grown man, what's going on.  Before he doesn't even

3   care, I'll be there soon, I'm going to be in bed this time

4   of the night, you know, I'll do my homework, but after the

5   military he -- he gets upset easily and --

6            THE COURT:  Did he ever do anything physical?

7            THE WITNESS:  No.

8            THE COURT:  And do you know if he was taking

9   medication or seeing a counselor for his emotional state?

10           THE WITNESS:  Yes.  I know he is taking some

11  medications, he is complaining to me about cannot sleep at

12  night and stay up at the middle of the night.

13           THE COURT:  All right.  Counsel, any questions?

14           MR. STECHSCHULTE:  No, Your Honor.

15           THE COURT:  Is there anything else you would like

16  to tell the Court beyond what you've already said?

17           THE WITNESS:  No, Your Honor.  I just waiting that

18  I can have my son back.

19           THE COURT:  All right.  Any questions of this

20  witness from the Government?

21           MR. GAMMONS:  No, Your Honor.

22           THE COURT:  Thank you.  You may step down.

23           Does the defendant wish to allocute?

24           MR. STECHSCHULTE:  Yes, Your Honor.

25           THE COURT:  Yes, sir.

1          THE DEFENDANT:  Your Honor, I want to apologize to

2     the friends and family of James Costa and Paul Anderson.

3     I hope my cooperation has been able to give some kind of

4     closure.  I give my deepest condolences.  I'd also like to

5     apologize to Cody Wesling's family.  I never should have

6     allowed him to get involved with the motorcycle club.

7     I never thought we'd find ourselves in a situation like

8     this.  I'm sorry, mom.  I'm sorry to my family and friends

9     for putting us through this.  I appreciate the unconditional

10    love and support that you guys have shown me.

11          Your Honor, I want to let you know that these

12    incidents I'm involved in is not in any way a reflection of

13    my character traits, values or upbringing.  I got involved

14    with the motorcycle club at a time when I was having

15    difficulties adjusting to normal civilian life after the

16    Army.  Sean and other prior military service members in the

17    motorcycle club showed me love and a sense of brotherhood

18    and camaraderie I was accustomed to having with my soldiers

19    in Afghanistan.  They gave me hope and a place to belong

20    when I couldn't find it anywhere else.  I was misled to

21    believe the 69'ers motorcycle club could provide me with

22    that same kind of brotherhood.  Unfortunately, they did not

23    share the same core values that were instilled in me by my

24    parents and by the United States Army.

25          I did what I did after the shootings because of a

1  false sense of loyalty I felt for the guys in my motorcycle

2  club and for fear that if I didn't help, they would also see

3  me as an enemy.  I've done everything I was asked to do to

4  try and right my wrongdoings in the form of grand jury

5  testimony and trial testimony.  I received threats from both

6  organizations for cooperating and have put my loved ones in

7  danger in order to bring justice and closure to everyone

8  involved.

9          Aside from these mistakes I made, I believe my

10 track record shows that given the opportunity, I can be a

11 productive member of society.  Your Honor, I'm asking for a

12 chance to show these poor decisions I made does not define

13 who I am.  At my core I'm a man of honor and integrity.

14 I know I can't undo what is done, but I truly am sorry for

15 everything that has happened.  I don't know what else I can

16 do to make things right, but I'll spend the rest of my life

17 making sure I do the right thing in any given situation.

18          THE COURT:  Thank you.

19          Mr. Gammons, there was a jailhouse call with one

20 of the co-defendants that I recall the defense presenting

21 bragging about his involvement in the shooting of

22 Mr. Anderson.  Was that Mr. Guinto?

23          MR. GAMMONS:  Yes, Your Honor.

24          THE COURT:  Do you have that by recollection or at

25 your fingertips?

```
 1          MR. GAMMONS:  I don't have the actual recording,
 2   Your Honor.
 3          THE COURT:  And was the conversation with
 4   Ms. King?
 5          MR. GAMMONS:  No, Your Honor, the conversation was
 6   between Mr. Leonard and Mr. Guinto.
 7          THE COURT:  What was the conversation in general?
 8          MR. GAMMONS:  It was the night of Mr. Anderson's
 9   shooting, when Mr. Guinto was giving Mr. Leonard the firearm
10   used in the shooting, and Mr. Guinto was discussing the
11   events that happened earlier that day.
12          THE COURT:  What do you recall him saying?  This
13   was a cursing conversation?
14          MR. GAMMONS:  Yes, Your Honor.
15          THE COURT:  Where he was bragging about having
16   done some gangster stuff?
17          MR. GAMMONS:  Yeah.  Words to that effect,
18   Your Honor.  He said the murder of Paul Anderson reminded
19   him of being back in Afghanistan, and I believe he said
20   something to the effect of it -- the shooting got him
21   sexually aroused when it occurred.
22          THE COURT:  Do you recall that, Mr. Guinto?
23          THE DEFENDANT:  Yes, Your Honor.
24          THE COURT:  How do you explain that conversation?
25          THE DEFENDANT:  Sean Leonard and I have a similar
```

1  history when it comes to being in the military, so the

2  choice of verbiage was -- sounds horrible, but it just -- as

3  grunts, as infantrymen, the way we talk and the things we

4  say to each other kind of sound a little outlandish, but --

5  I said those things, but I said those things to try to

6  impress him.  He was -- he was a fellow infantryman and also

7  supposed to be my big brother, so I said those things to try

8  to impress him.

9          THE COURT:  That's not how you really felt when

10  you all shot Mr. Anderson?

11          THE DEFENDANT:  No, Your Honor.

12          THE COURT:  And what was your nickname, as

13  I recall?

14          THE DEFENDANT:  There was a couple of them.  They

15  called me Big Beefy or Milk Carton.

16          THE COURT:  And what was the reason for those

17  nicknames?

18          THE DEFENDANT:  They called me Big Beefy just

19  because I was a big guy, I liked to compete in power

20  lifting.  I was kind of -- it just started as a joke, they

21  called me Milk Carton as a joke because when I was a

22  prospect for the motorcycle club I got lost on a ride and

23  they couldn't find me, I had to call and ping my location,

24  so they were joking about putting my face on a Milk Carton

25  because I was lost.

```
1                THE COURT:  And what's the significance of the
2      Psalms 141:1 tattoo?
3                THE DEFENDANT:  I got that before I went to
4      Afghanistan.  I just -- it was a strong bible verse that
5      stuck out to me.
6                THE COURT:  For your military service?
7                THE DEFENDANT:  Yes, Your Honor.
8                THE COURT:  Do you have the 1 percent tattoo
9      somewhere on your body?
10               THE DEFENDANT:  Yes, Your Honor.
11               THE COURT:  Where is it?
12               THE DEFENDANT:  On my sternum.
13               THE COURT:  And has Ms. King seen that?
14               THE DEFENDANT:  Yes, Your Honor.
15               THE COURT:  And did she know what it was?
16               THE DEFENDANT:  I believe so, Your Honor.
17               THE COURT:  Why wasn't your relationship with your
18     actual brother a sufficient brotherhood for you?
19               THE DEFENDANT:  I -- we weren't -- we weren't that
20     close growing up.  We became closer when we both joined the
21     military.
22               THE COURT:  How many years separate you?
23               THE DEFENDANT:  One and a half, Your Honor.
24               THE COURT:  All right.  Why weren't you close
25     growing up?
```

```
 1              THE DEFENDANT:  Um --

 2              THE COURT:  Just different personalities, or

 3    something happened?

 4              THE DEFENDANT:  We were just different

 5    personalities.

 6              THE COURT:  You lived in the same house?

 7              THE DEFENDANT:  Yes, Your Honor.

 8              THE COURT:  Thank you.

 9              Anything further from the Government?

10              MR. GAMMONS:  Yes, Your Honor.

11              Your Honor, one of the reasons we called

12    Mr. Guinto as the Government's first witness is because

13    Mr. Guinto knew a lot about this enterprise.  As far as time

14    involved with the 69'ers, he was involved longer than

15    Cody Wesling, he was involved longer than Michael Mencher.

16              As far as enterprise conduct, Mr. Guinto was

17    involved in drugs, he was involved in the Costa shooting

18    and, as you know, he was involved in the Anderson murder.

19    It appears from the accounts and what I know about

20    Mr. Guinto that he was a productive and law-abiding citizen

21    until linking up with the 69'ers.  It appears from what I've

22    heard today that he may be successful when he's released

23    from prison, but one of the things is that -- that I don't

24    want to forget is that in this case Paul Anderson lost his

25    life, and that is a very serious crime.  This is a crime --
```

1   an escalating feud between the Outlaws and the 69'ers that

2   could have been diffused by Mr. Guinto.  On December 21st,

3   when Mr. Anderson was murdered, just reaching out to

4   law enforcement could have stopped this, but Mr. Guinto did

5   it.  So despite Mr. Guinto's background, we think that the

6   serious crime should be appreciated in this case.

7              If the Court is to accept the Government's six

8   levels, I believe Mr. Guinto would be at a 36-I, which is

9   188 to 235 years.  If that were the case --

10             THE COURT:  Months.

11             MR. GAMMONS:  Sorry.  Months, Your Honor.

12             If that were the case, the Government would

13  request a low end guideline sentence.  We believe a sentence

14  in the range of 15 years is appropriate in this case.

15             Mr. Guinto's background is very, very different

16  from a lot of defendants that we see in Federal Court;

17  however, the crimes that we see in Federal Court are very

18  rarely as serious as the crimes alleged in this case, so we

19  believe that based on the background of the defendant and

20  the offense conduct, that a low end guideline sentence in

21  the neighborhood of 15 years is appropriate in this case.

22             THE COURT:  Thank you.

23             Anything else from the defense in response to the

24  Government's statements?

25             MR. STECHSCHULTE:  No, Your Honor.

1           THE COURT:  Sir, would you please stand.

2           The Court has considered the arguments of the

3    parties, the background and history of this defendant, the

4    circumstances surrounding this offense and the facts set

5    forth in the presentence report as well as the Government's

6    motion based upon the defendant's effort, which was

7    substantial in his efforts to cooperate with the Government.

8           Well, have a seat one more time, Mr. Guinto.

9           What of this Sean Leonard deal in New York?  How

10   did that come about and how do I square that with the facts

11   of this case?  Wasn't he basically unindicted and then

12   pursued on an Information that carried only a maximum period

13   of incarceration of five years?

14          MR. GAMMONS:  Correct, Your Honor.  Mr. Leonard

15   was arrested in New York.  He began cooperating immediately

16   on matters in New York State in addition to the matters in

17   Florida, and he was -- ultimately pled guilty to an

18   Information and plea agreement in New York with a five year

19   max.

20          THE COURT:  What of the charges of his cooperation

21   and the benefits he received had to do with this case versus

22   some other cooperation?

23          MR. GAMMONS:  Mr. Leonard has yet to be sentenced;

24   however, he is the -- his Information led to the arrest of

25   Arthur Siurano, who testified in this trial.  I expect that

1  at the time of sentencing they will present mitigation

2  evidence in relation to this case in the State of New York

3  in the Eastern District.

4          THE COURT:  But he went from, I believe, some

5  fairly substantial mandatory minimum sentences to a maximum

6  sentence of life and witness protection, so he's not going

7  to go to jail more than five years, if he serves any time at

8  all, as I understand it; is that right?

9          MR. GAMMONS:  Your Honor, Mr. Leonard wasn't a

10  felon and it was a firearm charge.  I don't -- there was

11  no -- a co-defendant was involved in selling narcotics, so I

12  don't believe there would have been a mandatory minimum

13  based on drugs or a 924(c) charge.  Certainly depending on

14  the charge he could have had a higher maximum, depending on

15  what Eastern District of New York charged him with.

16          THE COURT:  Even with all those firearms he was

17  dealing?  It was like multiple firearms.  It wasn't like a

18  felon in possession of one weapon.  He was an arms dealer.

19          MR. GAMMONS:  Yes, Your Honor.

20          THE COURT:  What was his original charge, do you

21  remember?

22          MR. GAMMONS:  He didn't have an original charge.

23  He was arrested when he was brokering a transaction between

24  a undercover ATF agent and his --

25          THE COURT:  So he was never charged with those

1  firearms and he was allowed to keep the money and then he

2  was charged with a fairly nominal offense, by Federal

3  standards?

4            MR. GAMMONS:  He was never charged.

5            THE COURT:  How does he compare in culpability, in

6  your mind, to Mr. Guinto?  He was the head of the New York

7  Chapter, or Mr. Siurano was?

8            MR. GAMMONS:  Mr. Leonard was a Regional

9  Vice President -- was a Vice President of the Killsborough

10 chapter and he was a Regional Sergeant-at-Arms.  As far as

11 culpability, Mr. Leonard was involved in trafficking drugs

12 on some occasions and involved in firearms trafficking;

13 however, he was a cooperating defendant before the Costa

14 shooting or the Paul Anderson murder, so as far as

15 culpability, I think he's substantially lesser than

16 Mr. Guinto.

17           THE COURT:  Because he was cooperating before the

18 shootings happened?

19           MR. GAMMONS:  Yes, ma'am.

20           THE COURT:  All right.  Sir, would you please

21 stand.

22           Based upon the background and history of this case

23 and the 3553 factors, it is the judgment of this Court that

24 this defendant, Allan Burt Guinto, is hereby committed to

25 the custody of the Bureau of Prisons to be incarcerated for

1   a term of 144 months.  This term consists of 144 months as

2   to Counts One and Eight and a one hundred -- I'm sorry.

3   A ten year term of incarceration on Counts One and Eight and

4   a 144 month term of incarceration as to Count 2, such terms

5   to run concurrently.

6          You may be seated.

7          Upon release from prison you will serve a five

8   year term of supervised release.  This consists of three

9   years as to Counts One and Eight and five years as to

10  Count Two, to run concurrently.  While on supervision you

11  will comply with the mandatory and standard conditions

12  adopted by this Court.  In addition, you will comply with

13  special conditions.

14         You must participate in mental health treatment,

15  outpatient or inpatient, as directed.  You will pay the

16  costs necessary to cover that to the extent of your ability

17  to pay, as deemed reasonable by the Office of Probation.

18         You will be prohibited from having contact with

19  members of motorcycle gangs or street gangs.

20         You are a convicted felon, so you must cooperate

21  in the collection of DNA as directed.

22         You must refrain from any use of a controlled

23  substance or possession of same.

24         You will submit to random drug testing within

25  15 days of your supervision and two periodic drug tests

1    thereafter as directed and thereafter up to 104 tests

2    per year at the discretion of Probation.

3                The Court waives the imposition of a fine.

4                Has the Government sought forfeiture in this case

5    against this defendant?

6                MR. GAMMONS:  No, Your Honor.

7                THE COURT:  It is ordered that you will pay the

8    special assessment of $300, which is due immediately.

9                Having considered the advisory sentencing

10   guidelines and all of the factors identified therein, the

11   Court departed downward based upon the Government's motion

12   under 5K1.1 for a total of six levels that it requested and

13   additionally for the defendant's background and personal

14   history, his level of remorse, the support of his family and

15   his prior military service for an additional approximate

16   three levels, with a sentence in the middle range of that

17   reduction.

18               The Court has accepted the plea agreement because

19   I am satisfied that it adequately reflects the seriousness

20   of the actual offense behavior and accepting it will not

21   undermine the statutory purposes of sentencing.

22               The defendant has pled guilty to Counts One, Two

23   and Eight in return for dismissal of Counts Three and Five

24   on motion of the Government.  Is there such a motion?

25               MR. GAMMONS:  Yes, Your Honor, and for the record

1  counts Three and Four the Government would move to dismiss

2  at this time.

3            THE COURT:  Three and Four or Three and Five?

4            MR. GAMMONS:  I believe it's counts Three and

5  Four, Your Honor.

6            THE COURT:  So he pled to Counts One, Two and

7  Eight, he was not charged in Five, and he is being dismissed

8  as to Three and Four; is that right?

9            MR. GAMMONS:  Yes, Your Honor.

10           THE COURT:  In accordance with the Government's

11 motion, Counts Three and Four are dismissed of the second

12 superseding indictment.  The underlying indictments are also

13 dismissed as to this defendant.

14           Is the defendant requesting special placement?

15           MR. STECHSCHULTE:  Yes, Your Honor.  We have --

16 I discussed it with Mr. Guinto, his placement within the

17 Bureau of Prisons.  His first recommendation or request

18 would be Coleman.  If that's not available -- Your Honor,

19 strike my original request.

20           I've spoken with Mr. Guinto and he would like to

21 go somewhere out west, in either Washington, where his

22 family resides or his parents reside, or also Nevada, where

23 I believe his sister resides -- or his aunt resides as well,

24 Your Honor.

25           THE COURT:  All right.  The Court would recommend

1   to the BOP that the defendant be placed in close proximity

2   to his family in Washington or in Nevada as is practicable.

3        Mr. Guinto, the Court cannot direct the BOP about

4   where to place you, I can only make a recommendation so that

5   you can be successful in your matriculation through this

6   prison sentence, and I'll make that recommendation.

7        Any other recommendation?

8        MR. STECHSCHULTE:  Your Honor, obviously regarding

9   vocational training, Mr. Guinto is interested in barber --

10  in hair cutting.  He had mentioned that -- it was referenced

11  as cosmetology in the probation report, but specifically,

12  you know, cutting hair, that would be something that he's

13  interested in as a trade, Your Honor.

14       THE COURT:  The Court would recommend that the

15  defendant be given any access to any vocational or

16  educational training as is available in the BOP facility to

17  which he is committed, including barbering if that is an

18  available option.  The Court would also recommend the

19  defendant to the RDAP program if he is eligible.

20       MR. STECHSCHULTE:  And that was our next request,

21  Your Honor, assuming he was eligible.

22       We don't have any other -- any further requests,

23  Your Honor.

24       THE COURT:  The Court having pronounced sentence,

25  does counsel for the defense object to the sentence or the

1   manner in which it was pronounced?

2          MR. STECHSCHULTE:  No, Your Honor.

3          THE COURT:  Any objection from the Government?

4          MR. GAMMONS:  No, Your Honor.

5          THE COURT:  You are hereby remanded to the custody

6   of the United States Marshal to await designation by the

7   Bureau of Prisons.

8          You gave up most of your rights to challenge this

9   sentence when you signed your plea agreement.  If any

10   remaining right of appeal exists that's implicated by this

11   sentence, you must exercise it within 14 days of the entry

12   of judgment, which will likely be today or tomorrow.  If you

13   fail to appeal, any remaining right of appeal will be

14   eliminated.  Do you understand that?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  Counsel, if your client chooses not to

17   appeal, get that decision in writing so that it cannot later

18   be argued that he asked you to take an appeal that you

19   failed to take, and if he chooses to take an appeal, please

20   file the notice of appeal timely.

21          Do you intend to stay on to prosecute an appeal if

22   he chooses to file one?

23          MR. STECHSCHULTE:  No, Your Honor.

24          THE COURT:  All right.  File the notice of appeal

25   and then the Court would appoint substitute counsel, if

```
1    appropriate, if he does not sign a waiver.
2              MR. STECHSCHULTE:  Yes, Your Honor.
3              THE COURT:  If you cannot pay the filing fee, the
4    Clerk of Court will be directed to accept the notice of
5    appeal without a fee, and if you cannot pay for a lawyer to
6    represent you in the prosecution or defense of an appeal,
7    the Court will appoint one for you.
8              Mr. Guinto, this is, because of your cooperation,
9    a chance at having a life past the period of your
10   incarceration.  But for the Government's grace in this case
11   you would be facing a mandatory life sentence, so the Court
12   hopes that you will take this opportunity to address your
13   mental conditions, to address your willingness to move back
14   into society successfully, and all the family members and
15   friends who are here, this is the time where he's going to
16   need you to get through this successfully because this will
17   be a difficult period of time for Mr. Guinto, but you can
18   move past this.
19             The Court would also direct the BOP to give the
20   defendant credit for all time he has served since the time
21   of his original arrest in this case.
22             Ms. Black, if you'll give this to counsel for the
23   defendant, I don't know if he wants to see this letter, and
24   then make a copy for the Court's file.
25             Is there anything further from the Government?
```

1          MR. GAMMONS:  No, Your Honor.

2          THE COURT:  From the defense?

3          MR. STECHSCHULTE:  No, Your Honor.

4          THE COURT:  Thank you.  We're dismissed.

5                        - - - - -

6            (Proceedings concluded at 12:01 p.m.)

7                        - - - - -

1                    C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript

4    of proceedings taken in a sentencing hearing in the United

5    States District Court is a true and accurate transcript of

6    the proceedings taken by me in machine shorthand and

7    transcribed by computer under my supervision, this the 26th

8    day of September, 2019.

9

10

11                              /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25