```
 1                IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3

 4   UNITED STATES OF AMERICA,      )
                                    )
 5                Plaintiff,        )
                                    )
 6                                  ) Case No.
             vs.                    ) 8:18-CR-00234-MSS-SPF
 7                                  )
                                    )
 8   CHRISTOPHER BRIAN COSIMANO and )
     MICHAEL DOMINICK MENCHER,      )
 9                                  )
                  Defendants.       )
10

11
     _____
12
             JURY TRIAL EXCERPT – TESTIMONY OF ALLAN GUINTO
13              BEFORE THE HONORABLE MARY S. SCRIVEN
                   UNITED STATES DISTRICT JUDGE
14
                 JULY 30, 2019 AND JULY 31, 2019
15            COMMENCING AT 1:44 P.M. on JULY 30, 2019
                        TAMPA, FLORIDA
16   _____

17

18

19

20        Proceedings recorded by mechanical stenography,
     transcript produced using computer-aided transcription.
21   _____

22            DAVID J. COLLIER, RMR, CRR
               FEDERAL OFFICIAL COURT REPORTER
23            801 NORTH FLORIDA AVENUE, 7TH FLOOR
                  TAMPA, FLORIDA  33602
24

25
```

1    **APPEARANCES:**

2    **FOR THE GOVERNMENT:**

3            *Carlton Gammons*
             *Natalie Hirt Adams*
4            United States Attorney's Office
             400 N. Tampa Street, Suite 3200
5            Tampa, Florida  33602
             (813) 274-6000

6

7    **FOR THE DEFENDANT CHRISTOPHER BRIAN COSIMANO:**

8            *J. Jervis Wise*
             Bjorn E. Brunvand, P.A.
9            615 Turner Street
             Clearwater, Florida  33756
10           (727) 446-7505

11

12   **FOR THE DEFENDANT MICHAEL DOMINICK MENCHER:**

13
             *Anne F. Borghetti*
14           Anne F. Borghetti, P.A.
             12211 49th Street North, Suite 1
15           Clearwater, Florida  33762-4300
             (727) 502-0300

16

17

18

19

20

21

22

23

24

25

1                       I N D E X

2

3    GOVERNMENT'S WITNESS:

4

5    **ALLAN GUINTO**                                        **PAGE**

6    Direct examination by Mr. Gammons                         5

7    Cross-examination by Mr. Wise                           106

8    Cross-examination by Ms. Borghetti                      152

9    Redirect examination by Mr. Gammons                     172

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                    - - - o0o - - -

 3        (Excerpt commences at 1:44 p.m. on July 30, 2019)

 4                    - - - o0o - - -

 5        THE COURT:  Ladies and gentlemen, that concludes

 6   the opening statements, and at this time we are going to

 7   hear evidence.  The Government is going to call its first

 8   witness.

 9        Counsel.

10        MR. GAMMONS:  The United States will call

11   Allan Guinto.  He's an in-custody witness.

12        THE COURT:  All right.

13             (Witness enters proceedings.)

14        THE COURT:  Sir, please raise your right hand to

15   be sworn.

16        COURTROOM DEPUTY:  Do you solemnly swear or affirm

17   under penalty of perjury that the testimony you're about to

18   give shall be the truth, the whole truth and nothing but the

19   truth, so help you God?

20        THE WITNESS:  Yes, ma'am.

21        COURTROOM DEPUTY:  Please state your name for the

22   record.

23        THE WITNESS:  Allan Guinto.

24        THE CLERK:  You may have a seat.

25        THE COURT:  Mr. Guinto, you're under oath, sir.
```

ALLAN GUINTO – JULY 30, 2019                    5
Direct Examination by MR. GAMMONS

1    You have to give truthful answers.  If you give false

2    answers, you face penalty of perjury, false statement and

3    obstruction.  Do you understand that?

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  Also wait until the question is asked

6    completely, and if you see opposing counsel stand to object,

7    wait until I rule on the objection before you begin your

8    answer.  Do you understand that?

9              THE WITNESS:  Yes, Your Honor.

10             THE COURT:  Have you spoken to anyone about

11   anything that has happened in this courtroom since yesterday

12   morning?

13             THE WITNESS:  No, Your Honor.

14             THE COURT:  Counsel, you may proceed.

15             MR. GAMMONS:  Thank you, Your Honor.

16                 **DIRECT EXAMINATION OF ALLAN GUINTO**

17   **BY MR. GAMMONS:**

18   Q    Good afternoon, Mr. Guinto.

19             Good afternoon.

20   A    Good afternoon.

21   Q    How old are you?

22   A    28.

23   Q    Can you tell me about your education background.

24   A    I completed high school, I joined the military, and

25   been to a little bit of college.

1    Q    And what did you study in college?

2    A    I originally went for computer programming.  I got

3    bored with computers, I tried paralegal studies, I hated

4    that, so I -- before I got locked up I was in the bio -- I

5    was taking the bio-med tech program.

6    Q    And you mentioned that you were in the Army.  How long

7    were you in the Army for?

8    A    Four years.

9    Q    And were you ever stationed anywhere abroad?

10   A    Yes, sir.  In Afghanistan.

11   Q    For how long?

12   A    12 months.

13   Q    When you returned from Afghanistan did you serve as a

14   reserve officer?

15   A    I served -- I finished my active duty contract in 2013

16   and I served in the Reserves until early 2014.

17   Q    And can you tell me what you've done in the past for

18   employment.

19   A    I worked in the Veteran's Service Office at St. Pete

20   College and I bounced at a few different nightclubs after

21   I got out the Army, but before the military I worked at

22   Steak 'n Shake.

23   Q    Sitting here today, you are a convicted felon?

24   A    Correct.

25   Q    Prior to this Federal case and the State case that was

ALLAN GUINTO — JULY 30, 2019                7
Direct Examination by MR. GAMMONS

1   adopted, had you ever been convicted of a felony before?

2   A    No, sir.

3   Q    And have you pled guilty in this case?

4   A    Yes, sir.

5   Q    To what?

6   A    Conspiracy to commit murder, murder in the aid of

7   racketeering and accessory after the fact.

8   Q    Those murder charges relate to the murder of whom?

9   A    Paul Anderson.

10  Q    And what about the accessory after the fact charges,

11  who does that relate to?

12  A    James Costa.

13  Q    Do you have a plea agreement with the United States?

14  A    Yes, sir.

15       MR. GAMMONS:  May I approach the witness,

16  Your Honor?

17       THE COURT:  Yes, sir.

18  BY MR. GAMMONS:

19  Q    I've handed you what has been pre-marked for

20  identification as Government's Exhibit 601.  Can you take a

21  look at that document.

22  A    Yes.

23  Q    Do you recognize it?

24  A    Yes.

25  Q    What is it?

1   A     My plea agreement.

2   Q     It's whose plea agreement?

3   A     Mine.  Allan Guinto.

4   Q     And can you tell me what that agreement means to you.

5   A     That I'm not going to trial.

6   Q     Are there any agreements that are made between you and

7   the United States that aren't in that document?

8   A     No.

9   Q     And the charges that you just mentioned, the

10  conspiracy, the murder charge and the accessory after the

11  fact, are they all in that document?

12  A     Yes, sir.

13  Q     Sitting here today, how much time could you face in

14  prison once you're sentenced?

15  A     Possibly life.

16  Q     Can you tell me why you're cooperating in this case.

17  A     The right thing to do.  I had no other choice.

18  Q     When you say "I had no other choice," what do you mean

19  by that?

20  A     They -- they got us dead to rights, there's no choice

21  but to cooperate.

22  Q     Have you continuously been in custody since December of

23  2017?

24  A     Yes, sir.

25  Q     Before you were in custody were you interviewed by

1   law enforcement?

2   A    Excuse me?

3   Q    Before you were arrested in this case were you

4   interviewed by law enforcement?

5   A    Yes.

6   Q    Were you truthful?

7   A    No.

8   Q    Why not?

9   A    I was scared.  I didn't know what to do.  I -- as a

10  1 percenter, I took an oath not to be a snitch and I didn't

11  know what the right thing to do was, so I lied.

12  Q    Let's take a step back.  You mentioned that -- "as a

13  1 percenter."  What is a 1 percenter?

14  A    Member of a 1 percent motorcycle club.

15  Q    And what does it mean to be a 1 percenter to you?

16  A    To me it's about loyalty to brothers in your club,

17  camaraderie and -- and just helping them and being there for

18  them, right or wrong.

19  Q    And going back to -- you were initially interviewed,

20  you weren't truthful, you were arrested.  Did you -- after

21  you were arrested did you sit down with State prosecutors

22  and participate in a statement?

23  A    Yes, I did a proffer in February.

24  Q    Were you sworn to tell the truth before that statement

25  was taken?

ALLAN GUINTO - JULY 30, 2019                    10
Direct Examination by MR. GAMMONS

```
 1   A     Yes.
 2   Q     And in relation to this Federal case, did you appear
 3   and testify in a Federal grand jury?
 4   A     Yes.
 5   Q     Prior to providing that statement were you sworn to
 6   tell the truth?
 7   A     Yes.
 8   Q     And you understand that today you've been sworn to tell
 9   the truth?
10   A     Yes.
11   Q     I want to talk about your background with motorcycle
12   clubs generally.  When did you first begin associating with
13   motorcycle clubs?
14   A     When I got out of the military, I met some guys in
15   Iron Order and they invited us to -- they invited me to hang
16   out and participate in club activities, which ultimately led
17   me to joining.
18   Q     And Iron Order is a motorcycle club?
19   A     Yes.
20   Q     How long were you associated with Iron Order?
21   A     A little over a year.
22   Q     Why did you decide to leave Iron Order?
23   A     One of my brothers -- one of my brothers passed away
24   and I didn't feel like they gave him the proper respect.
25   Q     When you say "brothers," do you mean blood brother or
```

ALLAN GUINTO - JULY 30, 2019                    11
Direct Examination by MR. GAMMONS

1   motorcycle club member?

2   A    Motorcycle club member.

3   Q    And when you say "proper," explain that to me a little

4   bit more.

5   A    Well, when he passed away we had a pretty big funeral

6   for him, his one year ride arrived, we planned it months

7   ahead of time, and no one showed up.  Six people showed up.

8   There was 120 brothers in the State of Florida, only six

9   people showed up to the ride, but everybody showed up to the

10  party, and that kind of rubbed me the wrong way, so that's

11  when I decided to leave.

12  Q    And we talked about earlier a 1 percent motorcycle

13  club.  Was Iron Order a 1 percent motorcycle club?

14  A    No.

15  Q    What differentiates a 1 percent motorcycle club from a

16  non-1 percent motorcycle club?

17  A    1 percent motorcycle club, they are considered a

18  1 percent society that doesn't conform to the rest of

19  society, they live by their own rules.

20  Q    And are you familiar with 1 percent motorcycle clubs in

21  the State of Florida?

22  A    Yes.

23  Q    What about in the country?

24  A    Yes.

25  Q    What are the most dominant motorcycle -- 1 percent

ALLAN GUINTO - JULY 30, 2019          12
Direct Examination by MR. GAMMONS

1    motorcycle clubs in the country, to your knowledge?

2    A    Hells Angels, the Bandidos, the Mongols, the Outlaws.

3    Q    And in the State of Florida, what are the most dominant

4    motorcycle clubs, 1 percent motorcycle clubs, in the State

5    of Florida?

6    A    The Outlaws, the Pagans.

7    Q    And tell me what are the Outlaws -- to your knowledge,

8    what is the Outlaws' reputation in the State of Florida?

9    A    They run the State of Florida.

10   Q    When you say "run the State of Florida," what does that

11   mean?

12   A    As far as motorcycle clubs go, it's supposedly their

13   territory.  They dictate who can -- who can run as an

14   organized club in the State of Florida.

15   Q    To your knowledge, if you want to open a clubhouse, do

16   you need Outlaw permission?

17   A    Yes.

18   Q    If you want to wear your cut with your chapter name on

19   it, do you need Outlaw permission?

20   A    Yes.

21   Q    I want to talk about the process of joining a 1 percent

22   motorcycle club.  Are you familiar with that?

23   A    Yes.

24   Q    Do you need a sponsor to join the club?

25   A    Correct.

ALLAN GUINTO - JULY 30, 2019                    13
Direct Examination by MR. GAMMONS

1  Q    What does that mean?

2  A    It means somebody that's willing to vouch for you as a

3  person that they trust.

4  Q    So it's invite only, you can't just ask to be one?

5  A    Yes.

6  Q    Are you familiar with the term "hang-around"?

7  A    Yes.

8  Q    What is that?

9  A    You're allowed to hang out at club functions, parties,

10  ride with them if invited.

11  Q    And is that part of the process of becoming a member of

12  a 1 percent motorcycle club?

13  A    Yes.

14  Q    Is there a set length of time that one must be a

15  hang-around before they move to the next level?

16  A    It -- it also depends on the motorcycle club.

17  Q    Once you are elevated to the next level, what is that

18  called?

19  A    A prospective member.

20  Q    Is that also referred to as a prospect or a probate?

21  A    Yes.

22  Q    Tell me, what's different from being a hang-around to a

23  prospect?

24  A    When you become a prospect you have responsibilities

25  and duties to your chapter.

ALLAN GUINTO - JULY 30, 2019          14
Direct Examination by MR. GAMMONS

1   Q     And is there a set time that you have to remain a

2   prospect?

3   A     Yes.

4   Q     How long is that?

5   A     Depending on -- in our motorcycle club it's 12 months,

6   minimum.

7   Q     And you mentioned your motorcycle club.  What

8   motorcycle club are you referring to?

9   A     The 69'ers.

10  Q     Do they sometimes go by "The Niners"?

11  A     Yes.

12  Q     So after your hang-around then you become a prospect

13  and you serve your 12 months.  What's the next step?

14  A     The chapter will vote on if you're -- if they believe

15  that you're ready to be a brother.

16  Q     And what do you mean by "a brother"?

17  A     A full patch member.

18  Q     So the next step is called a full patch member?

19  A     Correct.

20  Q     And what's different between being a prospect and a

21  full patch member?

22  A     You're equal to everybody else.

23  Q     And you mentioned there was a vote.  Who all gets to

24  vote?

25  A     The members of your chapter.

ALLAN GUINTO — JULY 30, 2019                    15
Direct Examination by MR. GAMMONS

1    Q     And is it a majority rules, a unanimous vote?  How does

2    it work to be voted in as a full patch member?

3    A     For us it was a unanimous vote.

4    Q     So if one person disagrees, you can't get into the

5    club?

6    A     Correct.

7    Q     So we just discussed being a full patch member.  What

8    is a patch?

9    A     The center patch on the back of your vest.

10   Q     And the 69'ers center patch is what?

11   A     A wolf.

12   Q     And you also just mentioned vests.  Are vests also

13   referred to as cuts?

14   A     Yes.

15   Q     In the world of 1 percent motorcycle clubs, are cuts

16   important?

17   A     Yes.

18   Q     Are there rules relating to what you can and can't do

19   with a cut?

20   A     Yes.

21   Q     What rules do you know about that?

22   A     Don't ever let it drop to the floor.  You always stand

23   up for yourself.  You're representing the whole organization

24   when you wear it, so just got to mind your P's and Q's.

25   Q     Have you ever seen the 69'ers Motorcycle Club

1  Constitution?

2  A    Yes.

3          MR. GAMMONS:  May I approach the witness,

4  Your Honor?

5          THE COURT:  Yes.  You have general leave to

6  approach as necessary.  You don't have to ask.

7          MR. GAMMONS:  Thank you, Your Honor.

8          THE WITNESS:  Can I drink water?

9          THE COURT:  Yes.

10  BY MR. GAMMONS:

11  Q    Mr. Guinto, I've handed you what's been pre-marked for

12  identification as Government's Exhibit 404.  Can you take a

13  look at that document and let me know when you're ready to

14  answer some questions about it.

15  A    I'm ready.

16  Q    Have you seen that document before?

17  A    Yes.

18  Q    Where have you seen that document?

19  A    In -- in our old clubhouse.

20  Q    When you say "our," who are you referring to?

21  A    Hillsborough Chapter 69'ers.

22  Q    And have you read that document before?

23  A    Briefly.

24  Q    Are you familiar with it?

25  A    Yes.

ALLAN GUINTO - JULY 30, 2019                    17
Direct Examination by MR. GAMMONS

1              MR. GAMMONS:  Your Honor, at this time the

2    Government seeks to introduce Government's Exhibit 40.

3              MR. WISE:  No objection, Your Honor.

4              MS. BORGHETTI:  No objection, Your Honor.

5              THE COURT:  It will be received.

6              MR. GAMMONS:  Permission to publish, Your Honor?

7              THE COURT:  Yes, sir.

8              MR. GAMMONS:  Madam deputy, can I use the

9    overhead?

10   BY MR. GAMMONS:

11   Q    I've shown you page 1 of Government Exhibit 404.  The

12   top reads "69'ers Motorcycle Club Constitution."  You're

13   familiar with that document, Mr. Guinto?

14   A    Yes.

15   Q    Approximately what time was it first introduced to you?

16   A    I didn't see it until around December 2017.

17   Q    And I'm going to read a few portions of this.

18             The top reads --

19             THE COURT:  So who first showed it to you?

20             THE WITNESS:  Sean Leonard, the old Vice President

21   of the chapter.

22             THE COURT:  So what day in December was it, do you

23   remember?

24             THE WITNESS:  I don't remember the exact date,

25   Your Honor.

1          THE COURT:  Was it before or after Paul Anderson

2    was shot?

3          THE WITNESS:  It was before.

4          THE COURT:  All right.  Counsel, continue.

5    BY MR. GAMMONS:

6    Q    The top reads:  The 69'ers Motorcycle Club is run by

7    the chapter officers, collectively known as the council.

8    The council has final say on all matters.  The council shall

9    deal with all changes and/or violations of this

10   Constitution.  The council will meet twice a year.  This

11   document and all contents herein are to be referred to and

12   followed by all chapters for the purpose of creating and

13   maintaining standards and uniform codes by principal by

14   which all members shall abide.

15          Individual charters will form a separate document

16   called bylaws which shall state the individual regulations

17   for the purpose of adhering to specific rules relevant to

18   their domain.  Charter bylaws shall be reviewed and approved

19   by a council vote at the end of the first biannual meeting.

20          Was that your understanding of the 69'ers Club

21   Constitution?

22   A    Yes.

23   Q    Did you ever attend a biannual meeting for the 69'ers?

24   A    Yes.

25   Q    Where was that?

ALLAN GUINTO - JULY 30, 2019                    19
Direct Examination by MR. GAMMONS

1    A     In Orlando.  At the clubhouse in Orlando.

2    Q     Was it the 69'ers clubhouse?

3    A     Yes.

4    Q     I'm showing you page 2 of Government's Exhibit 404

5    under Section 2, which reads:  Officers Structure.

6    President - primary officer and representative responsible

7    for the direction, promotion and preservation of the

8    chapter.  He is required to attend all council and high

9    level meetings.

10         Vice President - assumes Presidential duties when

11   the President is unavailable.  He is required to attend all

12   council and high level meetings.

13         Sergeant-at-Arms - responsible for enforcing club

14   policy at the discretion of the primary officer.

15         And Treasurer - responsible for all chapter

16   financial matters, such as collecting dues, paying bills and

17   keeping records of donations and contributions.

18         Was that your understanding of the Constitution of

19   the 69'ers?

20   A     Yes.

21   Q     I want to talk about the Killsborough chapter

22   specifically.  Were you a member of that group?

23   A     Yes.

24   Q     Who was your President?

25   A     Christopher Cosimano.

ALLAN GUINTO - JULY 30, 2019                    20
Direct Examination by MR. GAMMONS

1    Q    Do you see your President, Christopher Cosimano, in
2    court today?
3    A    Yes.
4    Q    Can you identify him by where he's sitting and identify
5    an article of clothing.
6    A    He's at that table, with the blue shirt on.
7         MR. GAMMONS:  Your Honor, may the record reflect
8    he's identified Mr. Cosimano?
9         THE COURT:  So noted.  Well, there's two people
10   with blue shirts on, so he might want to be more specific
11   for the record.
12        THE WITNESS:  Second to the right.
13        THE COURT:  Thank you.  So noted.
14        THE WITNESS:  To the left.
15   BY MR. GAMMONS:
16   Q    Vice President.  Who was the Vice President of the
17   Killsborough chapter of the 69'ers?
18   A    Sean Leonard.
19   Q    Sergeant-at-Arms.  Who was the Sergeant-of-Arms at the
20   Killsborough chapter of the 69'ers?
21   A    Erick Robinson.
22   Q    And the Treasurer.  Who was the Treasurer of the
23   Killsborough chapter of the 69'ers?
24   A    I was.
25   Q    I want to move to page 3 of Government's Exhibit 404

1  and read the first bullet point under Requirements:

2  To become a member you must be 18 years old, own an

3  American-made motorcycle, valid license and have

4  accomplished at least one year as a satisfactory prospect

5  and met the approval of all chapter members.

6          Was it your understanding that's a requirement of

7  the 69'ers Constitution?

8  A    Yes.

9  Q    We'll talk about this later, but other than yourself,

10  do you know of any 69'ers that rose from a prospect to a

11  full chapter member in less than a year?

12  A    Yes.

13  Q    Who was that?

14  A    Members who patched over.

15  Q    Explain that to me.

16  A    Belonged to another motorcycle club and then they

17  change over to the 69'ers.

18  Q    Moving to the bottom of page 3 of Government's Exhibit

19  404, under Conduct it reads:  There is no fighting among

20  members.  The Sergeant-at-Arms handles discipline, and

21  disputes are resolved within the chain of command.  Anyone

22  caught stealing from the club or banging another member's

23  old lady will be ejected from the club.  Old ladies are off

24  limits.

25          And the very bottom under Growth it says:  It is

 1  very important -- sorry.  It is every member's

 2  responsibility to help grow and maintain the integrity of

 3  the club.  If a member sponsors a prospect, it is his

 4  responsibility to school him on all matters.

 5          Was that your understanding of the Constitution of

 6  the 69'ers Motorcycle Club?

 7  A    Yes.

 8  Q    Tell me what would happen, based on your experience

 9  with the club, if a prospect embarrasses a sponsor in some

10  way.

11  A    They would -- they would deal with the sponsor behind

12  closed doors.  I don't necessarily know.  We've never really

13  had that issue in our chapter, so I couldn't answer that.

14  Q    I'm going to move to page 4 of Government's Exhibit

15  404.  Towards the top of the page it says:  Members are

16  required to do mandatory runs per year.

17          What is a run?

18  A    A ride.

19  Q    And did you participate in any runs while you were

20  associated with the 69'ers Motorcycle Club?

21  A    Yes.

22  Q    Tell me about those.

23  A    I -- they're just -- we rode to different bike events

24  in the state.  May have wanted to do a show of force to show

25  that the 69'ers were in Florida.

ALLAN GUINTO - JULY 30, 2019                    23
Direct Examination by MR. GAMMONS

1    Q    And you mentioned show of force.  What is that?

2    A    Just to show people that we're in Florida and we're not

3    going anywhere.

4    Q    And towards the bottom of page 4 of Government's

5    Exhibit 404, under Vests it reads:  All members are required

6    to affix patches on black leather or black denim vests only.

7    No colors are worn in a cage except during funerals.

8    Nothing will be worn on the back of your vest except your

9    colors.  Shirts with colors can be worn in summertime in

10   place of your vest if you wish.  Wearing support shirts of

11   any other club while wearing your colors is forbidden.

12   Memory patches may be affixed on either lower left or right

13   front of your colors.  All patches will be affixed on your

14   vest at all times of rank -- regardless of rank.

15            Was it your understanding that was a requirement

16   under the Constitution of the 69'ers Motorcycle Club?

17   A    Yes.

18   Q    You mentioned that you had to go on mandatory runs.

19   When you went on mandatory runs, was there any requirement

20   on who would ride where at certain times?

21   A    Yes.

22   Q    Tell me about that.

23   A    Depending on -- depending on the ride, depending on the

24   situation, if -- usually if -- if the President knew where

25   he was going, the President would be up front, to the front

ALLAN GUINTO - JULY 30, 2019                    24
Direct Examination by MR. GAMMONS

1    left, and then it would -- it would be in rank, President,

2    Vice President to his right, and then behind him would be

3    the other officers, then other chapter members.  Usually

4    Sergeant-at-Arms got to decide whether he took the rear or

5    rode in the back.

6    Q    So, generally speaking, the person with the most

7    authority is at the front of the pack?

8    A    Correct.

9    Q    I'm going to move to page 5 of Government's Exhibit

10   404.  I want to read the bottom under section 6, Prospects,

11   Eligibility.  It says:  Prospects must be at least 18 years

12   old.  Prospects can never have been a member of

13   law enforcement.  A member who wishes to sponsor must know a

14   candidate prospect for at least one year.  A sponsor is

15   responsible for the prospect.  A prospect must own a

16   motorcycle and have a valid license.

17          Was that your understanding of the 69'ers

18   Motorcycle Club Constitution?

19   A    Yes.

20   Q    Continuing over to the top page of Government's

21   Exhibits 404, the top of page 6, it reads:  Prospects must

22   attend all meetings and club functions.  Prospects must not

23   do anything a member tells him to do.

24          THE COURT:  You need to read that again.

25   Q    Sorry.  Prospects must do anything a member tells him

1    to do, that a member has done or is willing to do himself.

2    All members of the chapter must vote prospects on to full

3    membership.  The three strike rule applies to any prospect

4    for that -- that for whatever reason may need to leave --

5    may need a leave of absence as long as he is in good

6    standing with the chapter.

7            Was that your understanding of the 69'ers

8    Motorcycle Club Constitution?

9    A    Yes.

10   Q    And last I want to read Section 7 under Attendance.  It

11   says:  All members and prospects must attend one weekly

12   meeting.  A member must attend one meeting a week.  Miss two

13   meetings in a row and a fine equivalent of two weeks

14   additional dues are levied.  Miss three meetings in a row

15   and you loose your colors.  If a member misses a meeting

16   where a vote is taken, your vote is void.  The chapter

17   Treasurer takes dues at the beginning of every meeting.  Any

18   member who falls behind on his dues for more than two weeks

19   will be fined an additional -- an additional week's dues

20   until his obligations are met, and fines are payable within

21   one week of their notice.

22           Was that your understanding of the 69'ers

23   Motorcycle Club Constitution?

24   A    Yes.

25   Q    Mr. Guinto, we didn't read all the rules or regulations

ALLAN GUINTO - JULY 30, 2019                              26
Direct Examination by MR. GAMMONS

 1  in the 69'ers Motorcycle Club Constitution, but were there

 2  times that the Killsborough chapter did not follow these

 3  regulations to a T?

 4  A    Yes.

 5          MS. BORGHETTI:  I'm going to object to the leading

 6  questions.

 7          THE COURT:  Overruled.

 8  BY MR. GAMMONS:

 9  Q    Mr. Guinto, I've handed you what's been pre-marked for

10  identification as Government's Exhibit 1, 2, 3, 4, 5, 6, 7,

11  8, 9, 10, 12, 13 and 15.  Can you take a look at those and

12  let me know when you're ready to answer some questions about

13  them.

14  A    Yeah.  Yes.  Yes, sir.

15          MR. GAMMONS:  May I approach the Clerk's table,

16  Your Honor?

17          THE COURT:  Yes.

18  BY MR. GAMMONS:

19  Q    Do you recognize those photographs?

20  A    Yes.

21  Q    Who are the individuals in those photographs?

22          Well, do you know the people in those photographs?

23  A    Yes.

24  Q    Have you met with those people in those photographs on

25  more than one occasion?

ALLAN GUINTO - JULY 30, 2019                27
Direct Examination by MR. GAMMONS

1    A    Yes.

2    Q    Do the photos fairly and accurately depict the

3    individuals as you -- as you remember them?

4    A    Yes.

5              MR. GAMMONS:  Your Honor, at this time the

6    Government requests to move into evidence Government's

7    Exhibits 1 through 10, 12, 13 and 15.

8              THE COURT:  Any objection?

9              MR. WISE:  No, Your Honor.

10             MS. BORGHETTI:  No objection.

11             THE COURT:  They'll be received.

12             MR. GAMMONS:  May I have the computer, Madam

13   Courtroom Deputy?

14   BY MR. GAMMONS:

15   Q    Did there come a time when you began to associate with

16   members of the Outlaws Motorcycle Club?

17   A    Yes.

18   Q    Approximately what year was that?

19   A    Around the middle of 2016.

20   Q    And at that time were you associated with any

21   motorcycle clubs?

22   A    No.

23   Q    So you weren't in Iron Order, you weren't a 69'er?

24   A    No.

25   Q    And who did you know that was an Outlaw at that time?

1    A     Clint Walker.

2    Q     And what was Clint Walker's status with the Outlaw

3    Motorcycle Club at that time?

4    A     He was a member of the St. Pete chapter, Outlaws.

5    Q     Was he a full patch member?

6    A     Yes.

7    Q     I'm showing you Government's Exhibits 2.  Do you

8    recognize that individual?

9    A     Yes.

10   Q     Who is that?

11   A     Sean Leonard.

12   Q     Did he have a nickname?

13   A     Phelps.

14   Q     And at the time Mr. Leonard had -- what status did he

15   have with any motorcycle club?

16   A     He was a probationary Outlaw.

17   Q     So he was sort of -- he was a prospect for the Outlaws

18   at the time?

19   A     Yes.

20   Q     Did he later hold any position with the 69'ers?

21   A     Yes.

22   Q     And what was that?

23   A     He was the Hillsborough Chapter Vice President and the

24   Regional Sergeant-at-Arms.

25   Q     You mentioned that the 69'ers center patch is a wolf.

ALLAN GUINTO - JULY 30, 2019                29
Direct Examination by MR. GAMMONS

1   What is the Outlaw Motorcycle Club center patch?

2   A    A skull and crossed pistons.

3   Q    And is there a nickname for that center patch?

4   A    Charlie.

5   Q    Were you ever a hang-around, prospect, probate for the

6   Outlaws?

7   A    No.

8   Q    What was your -- what was your relationship with

9   Clint Walker and Sean Leonard at the time?

10  A    I was -- I was friends with Clint.  I had grown up --

11  well, when I was in high school I knew Clint.  When he was

12  coming back from Iraq, the Marine Corps, we worked out at

13  the same gym.  I talked to him a lot.  I looked up to him.

14  I didn't -- I didn't see him again until a few years later,

15  after I got out of the military, and he found me on

16  Instagram and asked if I wanted to come hang out.

17  Q    And to take a step back to the 69'ers Motorcycle Club,

18  what do you know about the history of the 69'ers?

19  A    They started in Brooklyn, New York, 1967.

20  Q    And they are in fact a 1 percent motorcycle club?

21  A    Yes.

22  Q    You mentioned patching over from one club to another.

23  Did the 69'ers, to your knowledge, break off of any other

24  motorcycle club?

25  A    Hells Angels.

ALLAN GUINTO - JULY 30, 2019                    30
Direct Examination by MR. GAMMONS

1   Q    That's a yes, the Hells Angels?

2   A    Yes.

3   Q    You mentioned that they were founded in Brooklyn, there

4   was at least chapters in Florida.  To your knowledge, what

5   other states were the 69'ers active in?

6   A    New York, New Jersey, Pennsylvania, Connecticut,

7   Puerto Rico.

8   Q    And that first chapter in Brooklyn, did that have a

9   nickname within members of the 69'ers?

10  A    It was called Mom's, Mom's House, Mother Chapter.

11  Q    Had you ever -- had you ever traveled up to the

12  Mother Chapter?

13  A    No.

14  Q    Was there plans for you ever to travel up to the

15  Mother Chapter?

16  A    Yes.

17  Q    Tell me about that.

18  A    I guess there was -- there was some brothers from up

19  north that haven't got a chance to meet me and they said

20  they were proud of me and they were waiting for me to come

21  up there.

22  Q    And when you say proud of you, what were they proud of

23  you about?

24  A    What happened at LBC, the Local Brewing Company.

25  Q    And we'll talk about that in a moment.

ALLAN GUINTO - JULY 30, 2019                      31
Direct Examination by MR. GAMMONS

1           Are you familiar with how the 69'ers Motorcycle

2   Club came to be established in the State of Florida?

3   A    A little bit.

4   Q    Tell me what you know about it.

5   A    Phelps -- Phelps used to get into a lot of fights, in

6   a lot of trouble.  He got into a fight with the -- with the

7   Iron Order and there was -- there was a big brawl with them,

8   and from my understanding, what he told me was that the

9   Outlaws weren't happy with what they did to the members of

10  the Iron Order, and some of the guys -- some of the younger

11  guys from like Orlando like weren't happy with the Outlaws

12  and they decided that they wanted to patch over to 69'ers.

13  Q    So let me try to unpack that.

14          At the time -- at the time you're referring to,

15  Phelps held what status with the Outlaws?

16  A    He was a probationary Outlaw.

17  Q    And he got in a fight with members of the Iron Order?

18  A    Yes.

19  Q    And to your understanding, some members of the Outlaws

20  were unhappy with that?

21  A    Yes.

22  Q    Okay.  And did Phelps attempt to leave the Outlaw

23  Motorcycle Club?

24  A    Yes.

25  Q    Did any other Outlaws move with him?

ALLAN GUINTO – JULY 30, 2019                    32
Direct Examination by MR. GAMMONS

1   A    Yes.

2   Q    I'm showing you what's come into evidence as

3   Government's Exhibit 9.  Do you know that individual?

4   A    Yes.

5   Q    Who is that?

6   A    Isaac.

7   Q    What was Isaac's original affiliation with the Outlaws?

8   A    I don't -- I know he was a full patch member of the

9   Outlaws.  I don't know what -- what status or rank he held

10  with them.

11  Q    And did he ultimately become a 69'er?

12  A    Yes.

13  Q    What position did he end up holding with the 69'ers?

14  A    He was the Orlando Chapter President and the Florida

15  State Boss.

16  Q    Showing you Government's Exhibit 10, which has been

17  admitted into evidence, do you recognize that individual?

18  A    Yes.

19  Q    Did he have any background with the Outlaws?

20  A    No.

21  Q    What do you know him as?

22  A    I know him as Dakota.  I don't know his legal name.

23  Q    Did Dakota ever hold any status with the 69'ers?

24  A    Yes.

25  Q    And what was that?

ALLAN GUINTO - JULY 30, 2019                    33
Direct Examination by MR. GAMMONS

1    A    He was a full patch member in the Orlando chapter.

2    Q    Isaac and Dakota were part of the same Orlando chapter?

3    A    Yes.

4    Q    Showing you Government's Exhibit 12, do you recognize

5    that individual?

6    A    Yes.

7    Q    Who is that?

8    A    They call him Big Joe.

9    Q    Repeat that for me.

10   A    Big Joe.

11   Q    Did Big Joe have any prior affiliation with the

12   Outlaws?

13   A    Yes.

14   Q    Tell me about that.

15   A    He was a member of the Outlaws.

16   Q    And did he ultimately patch over to the 69'ers?

17   A    Yes.

18   Q    What chapter?

19   A    Orlando.

20   Q    I'm showing you Government's Exhibit 13.  Do you

21   recognize that individual?

22   A    Yes.

23   Q    Who is that?

24   A    Thorne.  I know him as Thorne.

25   Q    Did Thorne have any prior affiliation with the Outlaws?

1    A    Yes.

2    Q    And did he have any subsequent affiliation with the

3    69'ers Motorcycle Club?

4    A    Yes.

5    Q    Tell me about that.

6    A    He was one of the guys that patched over.

7    Q    So those four individuals that I just showed you,

8    Isaac, Big Joe, Thorne and Dakota, they all were originally

9    Outlaws and they became 69'ers; is that right?

10        THE COURT:  Asked and answered, Counsel.

11   A    No.  Dakota was a Warlock.

12   Q    What was the first 69'ers chapter to open in the State

13   of Florida?

14   A    Orlando.

15   Q    Were there other chapters that opened up after that?

16   A    Yes.

17   Q    Tell me about that.

18   A    Daytona, Osceola, Hillsborough and a nomad chapter.

19   Q    And tell me, what's a nomad chapter?

20   A    They don't have a -- they don't necessarily have a

21   clubhouse or stay in one place.

22   Q    When you joined the Killsborough chapter, who was your

23   sponsor?

24   A    Sean Leonard.

25   Q    I want to talk about the other members of the

ALLAN GUINTO - JULY 30, 2019                    35
Direct Examination by MR. GAMMONS

1   Killsborough chapter.  Who was that?

2   A    Christopher Cosimano.

3   Q    And he was the President of the Killsborough chapter?

4   A    Yes.

5           THE COURT:  What's that exhibit number?

6           MR. GAMMONS:  Sorry.  That's Government's Exhibit

7   Number 1.

8   BY MR. GAMMONS:

9   Q    I'm now showing you Government's Exhibit Number 3.  Do

10  you recognize that individual?

11  A    Yes.

12  Q    Who is that?

13  A    Erick Robinson.

14  Q    Did he have a nickname?

15  A    Big E.

16  Q    Was he a member of the Killsborough chapter?

17  A    Yes.

18  Q    And what was his position within the Killsborough

19  chapter?

20  A    He was Sergeant-at-Arms.

21  Q    Did he have any biological relationship to

22  Mr. Cosimano?

23  A    Yes.

24  Q    What was that?

25  A    As a brother.

ALLAN GUINTO - JULY 30, 2019                36
Direct Examination by MR. GAMMONS

1    Q    As a blood brother?

2    A    Yes.  That's what they told all of us.

3    Q    Showing you Government Exhibit 4, do you know who that

4    is?

5    A    That's me.

6    Q    Government's Exhibit 5, do you know who that is?

7    A    Michael Mencher.

8    Q    Do you see Mr. Mencher in the courtroom today?

9    A    Yes.

10   Q    Can you identify him by pointing him out and

11   identifying an article of clothing.

12   A    He's at the table at the very right, wearing a suit

13   jacket and tie.

14        MR. GAMMONS:  Your Honor, may the record reflect

15   that he's identified Michael Mencher?

16        THE COURT:  So noted.

17   BY MR. GAMMONS:

18   Q    What was Mr. Mencher's status within the motorcycle

19   club?

20   A    He was a pros -- he was a prospect.

21   Q    And did -- when is the first time that you met

22   Mr. Mencher?

23   A    The 2016/2017 New Year's party.

24   Q    Did Mr. Mencher tell you anything about his background

25   with motorcycle clubs?

ALLAN GUINTO - JULY 30, 2019                    37
Direct Examination by MR. GAMMONS

```
 1   A    He didn't necessarily.  Other brothers did.
 2   Q    Don't mention that, please.
 3             How did you first meet Mr. Cosimano?
 4   A    I knew Christopher Cosimano back when I was Iron Order.
 5   I met him when he was a member of the Clique Motorcycle
 6   Club.
 7   Q    And that motorcycle club is C-L-I-Q-U-E?
 8   A    I believe so.
 9   Q    What's your relationship with Mr. Cosimano at that
10   point, when you were in Iron Order and he was in the Clique?
11   A    We were cordial.
12   Q    When did you guys become closer friends?
13   A    When Clint Walker asked me to meet up with him to hang
14   out, that same night Chris showed up to hang out with him
15   too.
16   Q    What same night are you referring to?
17   A    The night we met up at Quaker Steak.  That's when Clint
18   was asking me to hang out.
19   Q    I want to show you a few more photographs.
20             Government's Exhibit 6, do you recognize that
21   individual?
22   A    Yes.
23   Q    Who is that?
24   A    Cody Wesling.
25   Q    Was he a member of the Killsborough chapter?
```

ALLAN GUINTO - JULY 30, 2019                    38
Direct Examination by MR. GAMMONS

1    A    He was a prospective member, yes.

2    Q    And how do you know Mr. Wesling?

3    A    We were friends before.

4    Q    Before what?

5    A    Before the motorcycle club.

6    Q    How did you meet Mr. Wesling?

7    A    I don't even remember.  I just -- I think when I got

8    out of the Army -- my friend Allen, we were mutual friends,

9    and he rode motorcycles and we became friends.

10   Q    Showing you Government's Exhibit Number 7, do you

11   recognize that individual?

12   A    Yes.

13   Q    Was he also a member of the Hillsborough chapter?

14   A    Yes.

15   Q    What was his name?

16   A    They call him Little Ricky.

17   Q    His name was Little Ricky?

18   A    That's what they call him.  I don't know his Government

19   name.

20        THE COURT:  What's that exhibit number again?

21        MR. GAMMONS:  Number 7, Your Honor.

22   Q    And what was his status within the Killsborough

23   chapter?

24   A    He was a road captain.

25   Q    And I'm showing you Government's Exhibit 8.  Do you

ALLAN GUINTO - JULY 30, 2019                    39
Direct Examination by MR. GAMMONS

```
 1   know who that is?

 2   A     Kenneth DiFranco.

 3   Q     And what status did -- was he a member of the

 4   Killsborough chapter?

 5   A     Yes.

 6   Q     What status did Mr. DiFranco hold within the 69'ers?

 7   A     He was a full patch member.

 8   Q     And Mr. DiFranco is -- what's his nickname?

 9   A     Animal.

10   Q     Is Mr. DiFranco now deceased?

11   A     Yes.

12   Q     Did you have a nickname that you were known as within

13   the 69'ers Motorcycle Club?

14   A     Yes.

15   Q     What was that?

16   A     They called me either Big Beefy or Milk Carton.

17   Q     Big Beefy or Milk Carton; is that right?

18   A     Yes.

19   Q     Did the 69'ers, the Killsborough chapter, did they ever

20   have a clubhouse of sorts?

21   A     Yes.

22   Q     Where was that located?

23   A     On Riverview Drive in Riverview, Florida.

24   Q     And tell me about that structure.

25   A     It was actually where Eric and Chris and Mike lived,
```

ALLAN GUINTO - JULY 30, 2019          40
Direct Examination by MR. GAMMONS

```
 1  and we just made a bar in the shed in the back and called it
 2  a clubhouse.
 3  Q    When you say Erick, Chris and Mike, you're referring to
 4  Christopher Cosimano, Erick Robinson and Michael Mencher?
 5  A    Yes.
 6  Q    It was -- it was their home?
 7  A    Yes.
 8  Q    And tell me about the shed in the back that was a
 9  converted clubhouse.
10  A    It was like a little garage and we just built a bar,
11  put a TV back there, some couches.  It was a place to hang
12  out.
13  Q    Once you became a full patch member of the 69'ers
14  Motorcycle Club did you have to pay dues?
15  A    Yes.
16  Q    How much were dues for the Killsborough chapter?
17  A    Fifty dollars a month.
18  Q    And what was your understanding of where those dues
19  were sent?
20  A    To the Nation.
21  Q    When you say "to the Nation," what do you mean by that?
22  A    To the Mother Chapter.
23  Q    Your understanding was that your dues were sent to
24  Brooklyn?
25  A    Yes.
```

ALLAN GUINTO - JULY 30, 2019                     41
Direct Examination by MR. GAMMONS

1   Q    And the Killsborough chapter, did you have chapter
2   meetings?
3   A    Yes.
4   Q    What were those referred to as?
5   A    Church.
6   Q    How --
7         THE COURT:  Mr. Gammons, can you take that
8   photograph down.
9   BY MR. GAMMONS:
10  Q    How often did you have church?
11  A    We started once a week and we decided it was too much,
12  so we were only doing it every other week, the first and
13  third Thursday of every month.
14  Q    And typically where would church occur?
15  A    At the clubhouse.
16  Q    Within the 69'ers Motorcycle Club was there a National
17  Boss?
18  A    Yes.
19  Q    What was the name of that person?
20  A    Pipo.
21  Q    And do you know Pipo's real name?
22  A    No.
23  Q    Where did Pipo live?
24  A    New Jersey.
25  Q    In addition to a National Boss, were there also

ALLAN GUINTO – JULY 30, 2019          42
Direct Examination by MR. GAMMONS

1  regional bosses in the 69'ers Motorcycle Club?

2  A    Yes.

3  Q    Florida fell under what region?

4  A    I don't -- Art's region.

5  Q    When you say Art's region, who is Art?

6  A    The Regional Boss.

7  Q    Showing you Government's Exhibit 15, do you recognize

8  that individual?

9  A    Yes.

10  Q    Who is that?

11  A    They call him Art, or the Peacock.

12  Q    Art or Peacock?

13  A    Yeah.  Yes.

14  Q    And what was his -- you mentioned that he was the

15  Regional Boss?

16  A    Yes.

17  Q    Structurally, would he have less authority than Pipo?

18  A    Yes.

19  Q    To your knowledge, where did Art reside?

20  A    In Pennsylvania.

21  Q    And other than Florida, what other states or areas were

22  under Art's authority?

23  A    Florida, Pennsylvania, Puerto Rico.

24  Q    In your experience, was drug use common amongst

25  individuals in the 69'ers Motorcycle Club?

ALLAN GUINTO - JULY 30, 2019                43
Direct Examination by MR. GAMMONS

1    A    Yes.

2    Q    During the time you were associating with the 69'ers

3    Motorcycle Club, were you using any controlled substances?

4    A    Yes.

5    Q    What were those?

6    A    Marijuana and cocaine.

7    Q    Did you ever use testosterone?

8    A    Yes.  That was a personal thing though, it had nothing

9    to do with the club.

10   Q    Were you aware of any other individuals involved with

11   the 69'ers who were involved in drug trafficking as well?

12   A    Yes.

13   Q    I want to talk specifically about Art, the person you

14   identified as Art in Government's Exhibit 15.  Did you have

15   personal knowledge of him being involved in any drug

16   trafficking?

17   A    I heard talk.

18   Q    Do you have any personal knowledge of him being

19   involved in drug trafficking or ever seen him involved in a

20   drug deal?

21   A    Not in drug deals, but with drugs, yes.

22   Q    Tell me about that.

23   A    He just --

24        THE COURT:  Can you clarify that this is his

25   personal knowledge.

ALLAN GUINTO - JULY 30, 2019                44
Direct Examination by MR. GAMMONS

1   Q     Yes.  Do you -- your personal knowledge, have you ever
2   seen him with drugs?
3   A     Yes.
4   Q     Can you tell me about that.
5   A     A lot of cocaine at parties.
6   Q     Tell me about that circumstance.
7   A     He just -- we did a lot of cocaine at parties.  Art had
8   a lot of cocaine every time he came down.
9   Q     On about how many occasions did you see Art with
10  cocaine?
11  A     A handful.  I -- there was a lot of parties.
12  Q     Handful.  More than five, less than five?
13  A     More than five.
14  Q     More than ten?
15  A     I didn't see him that often, so I would say less than
16  ten.
17  Q     Where did Art live?
18           THE COURT:  I'm sorry.  When you say "a lot of
19  cocaine," how much do you mean?
20           THE WITNESS:  I don't --
21           THE COURT:  Kilo quantities, use quantities?
22           THE WITNESS:  I'm not privy to quantities.
23  I just -- like visually, it was -- I mean, we used to just
24  have a plate and pass it around.  I don't know how to
25  measure -- I don't know the measurements of --

ALLAN GUINTO - JULY 30, 2019                45
Direct Examination by MR. GAMMONS

```
 1              THE COURT:  You've seen flour.

 2              THE WITNESS:  Yes, ma'am.

 3              THE COURT:  You've seen flour, so about how many

 4    cups?  Half a cup, a whole cup, ten cups?

 5              THE WITNESS:  About a whole cup at one time.

 6              THE COURT:  And how many times did you say?

 7              THE WITNESS:  More than once.  A few parties,

 8    three or four parties at the mansion in Orlando.

 9              THE COURT:  Counsel, continue.

10    BY MR. GAMMONS:

11    Q    You mentioned the mansion in Orlando.  What is that?

12    A    That's the Orlando clubhouse.

13    Q    The Orlando 69'ers clubhouse?

14    A    Yes.

15    Q    It's referred to as the mansion?

16    A    Yes.

17    Q    Do you know where Art obtained cocaine from?

18    A    No.

19    Q    Did Art distribute cocaine to anybody that you knew in

20    the 69'ers?

21    A    Yes.

22    Q    Showing you Government's Exhibit 9, the person you

23    identified as Isaac, did Art distribute any narcotics to

24    Isaac, to your personal knowledge?

25    A    Yes.
```

ALLAN GUINTO - JULY 30, 2019                46
Direct Examination by MR. GAMMONS

1   Q    Tell me about that.

2   A    Isaac and Phelps would talk about it openly to me, in

3   front of me.

4   Q    I want to talk about just what Isaac told you.  What

5   did Isaac tell you about his drug distribution?

6   A    He just -- he just bragged about how much money he had

7   and how much he owed Art.

8   Q    And how much did he owe Art, to your knowledge?

9   A    Over 100,000.

10  Q    And based on what Isaac told you, what type of

11  controlled substances was he receiving from Art?

12  A    Marijuana and cocaine.

13  Q    Did you know who Isaac distributed the cocaine and

14  marijuana to?

15  A    No.

16  Q    Showing you Government's Exhibit 3, Erick Robinson, to

17  your personal knowledge, did you know of Erick Robinson

18  being involved with drug trafficking?

19  A    Yes.

20  Q    Did he ever mention to you who he received drugs from?

21  A    No.

22  Q    Did you ever see Mr. Robinson with drugs?

23  A    Yes.

24  Q    Can you tell me about that.

25  A    I bought cocaine and marijuana from him on several

ALLAN GUINTO – JULY 30, 2019                    47
Direct Examination by MR. GAMMONS

1  occasions.

2  Q    What amounts?

3  A    Grams at a time.

4  Q    Did you ever see Mr. Robinson provide any controlled

5  substances to any other members of the 69'ers?

6  A    Yes.

7  Q    Who is that?

8  A    Mike Mencher, Sean Leonard.

9  Q    Anybody else?

10  A    Not that I can recall at the moment.

11  Q    And can you tell me the circumstances of those drug

12  transactions, where you were, what you observed.

13  A    Well, I got -- I got it from Erick, and when you --

14  when you get -- when you buy drugs from a brother, they're

15  not allowed to make money off of you, so they have to --

16  he's supposed to sell it to me at the price he got it for.

17  That was one of the rules of our -- of our chapter.  We're

18  not allowed to make money off of each other.

19  Q    And did you have any knowledge of Mr. Mencher selling

20  drugs?

21  A    Yes.

22  Q    What from your personal knowledge do you know about

23  Mr. Mencher's drug sales?

24  A    Heroin and cocaine.

25  Q    And how did you know that?

ALLAN GUINTO - JULY 30, 2019                    48
Direct Examination by MR. GAMMONS

1  A    He talked about it openly, and I was with him when he

2  did, hanging out, partying, drinking at the bars, and he

3  supposedly sold some to some people at the bar we were

4  hanging out at.

5  Q    Do you recall what bar that was?

6  A    Showtown or Showtime in Gibsonton.

7  Q    And what is the most recent time you can recall

8  Mr. Mencher discussing drug sales?

9  A    Right after the Paul Anderson shooting, he said he had

10 to -- he said that he had to go to Tampa and meet up with

11 somebody to drop some off.

12 Q    When you say "drop some off," what was he referring to?

13 A    Heroin.

14 Q    And what did he refer to?  Did he say, I'm going to go

15 drop off some heroin, or did he use another term?

16 A    Boy.

17 Q    Boi, B-O-I?

18 A    Yes.  I don't know how they spell boy, but that's what

19 they called heroin.  That's what he told me and Erick before

20 he left the clubhouse.

21 Q    So the day of Paul Anderson's murder, Mr. Mencher said

22 he had to go conduct a drug deal?

23 A    Yes.

24 Q    Mr. Guinto, I've handed you what's been pre-marked for

25 identification as Government's Exhibit 310-1 to 310-9.  Can

ALLAN GUINTO – JULY 30, 2019                49
Direct Examination by MR. GAMMONS

1   you take a look at those.

2   A    Yes.

3   Q    Do you recognize those?

4   A    Yes.

5   Q    What are those photos?

6   A    Pictures of members.

7   Q    When you were arrested, did law enforcement seize your

8   phone?

9   A    Yes.

10  Q    Were those photos on your camera role at the time

11  law enforcement seized your phone?

12  A    Yes.

13  Q    Do those photos fairly and accurately depict the photos

14  that were on your phone when law enforcement seized it?

15  A    Yes.

16          MR. GAMMONS:  Your Honor, at this time the

17  Government requests to move into evidence Government's

18  Exhibits 310-1 to 310-9.

19          THE COURT:  Any objection?

20          MR. WISE:  No, Your Honor.

21          MS. BORGHETTI:  No, Your Honor.

22          THE COURT:  They'll be received.

23          MR. GAMMONS:  Permission to publish, Your Honor?

24          THE COURT:  Yes, sir.

25

ALLAN GUINTO - JULY 30, 2019                    50
Direct Examination by MR. GAMMONS

1    BY MR. GAMMONS:

2    Q    I'm showing you 310-1.  What does that photo depict?

3    A    This is pictures of members of the Orlando chapter and

4    Tampa -- and the Hillsborough chapter in Ybor.

5    Q    The date on the bottom says Tampa Grand Opening,

6    1-6-16.  Was that in fact when the grand opening was?

7    A    No, that's a typo.  It was supposed to be '17.

8    Q    1-6-17 was supposed to be the grand opening?

9    A    Yes.

10   Q    Showing you Government's Exhibit 310-2, what does that

11   photo depict?

12   A    It's a picture of a 69'ers vest.

13   Q    And is this a typical cut for a 1 percent motorcycle

14   club?

15   A    Yes.

16   Q    I'm going to zoom in on some of the patches.  Have you

17   seen this patch?

18   A    Yes.

19   Q    Can you tell me about that patch.

20   A    It just shows the member is or was a part of the

21   Brooklyn chapter.

22   Q    And that would be the wolf that you referred to?

23   A    Mom.  Mom's.  Mother Chapter.

24   Q    This patch on the bottom left, what would that be

25   referred to as?

ALLAN GUINTO - JULY 30, 2019                51
Direct Examination by MR. GAMMONS

1   A    A side rocker.

2   Q    A side rocker.

3        Are you familiar with this patch?

4   A    Yes.

5   Q    The 1 percenter patch, how do you -- how do you earn

6   that?

7   A    You earn it whenever you get voted in as a full patch

8   member.

9   Q    I'm going to go to Government's Exhibit 310-3.  What's

10  depicted in that photograph?

11  A    The members of the Florida 69'ers and other members

12  from other states.

13  Q    And I'm hovering the cursor over an individual on the

14  far right.  Do you recognize that individual?

15  A    Yes.

16  Q    Who is that?

17  A    Mike Mencher.

18  Q    And I'm hovering over an individual in the center of

19  the photograph.  Who is that?

20  A    Isaac.

21  Q    The individual to the left of the 69'ers emblem, who is

22  that?

23  A    Sean Leonard.

24  Q    In the back, do you know who that individual is?

25  A    Art.

1  Q    And right behind Art, do you know who that is?

2  A    Erick Robinson.

3  Q    Were you at this event?

4  A    Yes.

5  Q    Are you in this photograph?

6  A    No.

7  Q    Tell me what this event pertained to.

8  A    That was the New Year's party.

9  Q    That was the New Year's party where you met

10 Mr. Mencher?

11 A    Yes.

12 Q    Showing you 310-4, do you -- what's depicted in that

13 photograph?

14 A    That's members of the Florida and Pennsylvania

15 chapters.

16 Q    And in -- I'm hovering over an individual wearing a

17 black beanie.  Do you know who that is?

18 A    Christopher Cosimano.

19 Q    And to the right, do you know who that is?

20 A    Art.

21 Q    And to his right, do you know who that is?

22 A    Erick Robinson.

23 Q    At the bottom, on his knee, do you know who that is?

24 A    Little Ricky.

25 Q    Were you on this trip?

1    A    No.

2    Q    So someone must have sent you this photo and you saved

3    it on your phone?

4    A    Yes.

5    Q    Did anyone ever tell you what the purpose of that trip

6    was?

7    A    No.

8    Q    Showing you Government's Exhibit 310-5, what's depicted

9    in that photograph?

10   A    It's Hillsborough chapter members.

11   Q    Can you identify the individuals that you recognize in

12   that photograph.

13   A    Mike Mencher, Christopher Cosimano, Little Ricky,

14   Cody Wesling.

15   Q    In that photograph is Mr. Mencher wearing his cut?

16   A    Yes.

17   Q    Are you familiar with the term "soft colors"?

18   A    Yes.

19   Q    What is that?

20   A    It's a T-shirt with their patches printed on them.

21   Q    So the shirt that Mr. Cosimano is wearing in this

22   photograph, would that be referred to as a soft color?

23   A    Yes.

24   Q    Showing you Government's Exhibit 310-6, do you

25   recognize that?

1   A    Yes.

2   Q    Who is depicted in that photograph?

3   A    Christopher Cosimano, some brothers from Daytona,

4   prospect Adam and myself.

5   Q    And that's you on the far right?

6   A    Yes.

7   Q    Showing you 310-7, do you recognize that photo?

8   A    Yes.

9   Q    Who do you recognize in that photograph?

10  A    Erick Robinson, Christopher Cosimano, Little Ricky and

11  Kenneth DiFranco.

12  Q    That's Kenneth DiFranco on the bottom left?

13  A    Yes.

14  Q    And Little Ricky to his right?

15  A    Yes.

16  Q    Showing you Government's Exhibit 310-8, do you

17  recognize that photograph?

18  A    Yes.

19  Q    Where is that photograph taken?

20  A    At the Hillsborough clubhouse.

21  Q    Is that the home of Mr. Cosimano, Mr. Mencher and

22  Mr. Robinson?

23  A    Yes.

24  Q    Who is depicted in that photograph?

25  A    On the very left they call him Hulk, then it's myself

ALLAN GUINTO - JULY 30, 2019                    55
Direct Examination by MR. GAMMONS

```
 1   and then another member in the Orlando area, I forgot his
 2   name, and then there's Little Ricky and then Klutz.
 3   Q    And going to 310-9, do you recognize that photograph?
 4   A    Yes.
 5   Q    And where is this photograph taken?
 6   A    In front of the Hillsborough County clubhouse.
 7   Q    Who do you recognize in that photograph?
 8   A    Christopher Cosimano, Art, Mike Mencher, Erick
 9   Robinson, Pipo, myself, Hulk, Little Ricky and Klutz.
10   Q    So in this photograph the regional -- sorry, the
11   National Boss Pipo has come down to Riverview, Florida as
12   well as the Regional Boss Art has come down from
13   Pennsylvania?
14   A    Yes.
15   Q    What was the -- do you recall the purpose of this
16   meeting?
17   A    We were just having a party.
18   Q    Okay.  It's been mentioned a few times, so let's talk
19   about it.
20        Do you remember April 18th, 2017?
21   A    Yes.
22   Q    Where did you go to have dinner that evening?
23        THE COURT:  Mr. Gammons, we're going to take the
24   afternoon break until 3:15.
25        The jury is to be reminded that you're not allowed
```

ALLAN GUINTO - JULY 30, 2019                    56
Direct Examination by MR. GAMMONS

1    to discuss the case as it's coming in with each other or
2    anyone else.  Just go ahead and take your break and we'll
3    come back and sit back on the stand at three o'clock.
4            I'm sorry.  3:00, not 3:15.  Three o'clock.
5                    *(Jury exits proceedings.)*
6            THE COURT:  Court stands in recess until
7    three o'clock.
8            It's as if you were still sitting on the stand
9    during this break.  Do you understand that?
10           THE WITNESS:  Yes, Your Honor.
11           THE COURT:  All right.
12                       - - - - -
13              (Recess at 2:43 p.m. until 3:02 p.m.)
14                       - - - - -
15           THE COURT:  Are there any issues before we re-call
16   the jury?
17           MR. GAMMONS:  Not from the United States.
18           MS. BORGHETTI:  No, Your Honor.
19           MR. WISE:  No, Your Honor.
20           THE COURT:  Please recall the jury.
21                  *(Jury re-enters proceedings.)*
22           THE COURT:  The Court reminds you, sir, that
23   you're under oath.  Do you understand that?
24           THE WITNESS:  Yes, Your Honor.
25           THE COURT:  Counsel, you may proceed.

1   BY MR. GAMMONS:

2   Q    Mr. Guinto, Government's Exhibit 601 is in front of you

3   right now.  You testified that that's your plea agreement

4   and you're familiar with it?

5   A    Yes.

6   Q    On the last page of it, have you and your lawyers both

7   signed that document?

8   A    Yes.

9         MR. GAMMONS:  Your Honor, at this time the

10  Government seeks to move into evidence Government's Exhibit

11  601.

12        MR. WISE:  No objection.

13        MS. BORGHETTI:  No objection, Your Honor.

14        THE COURT:  It will be received.

15  BY MR. GAMMONS:

16  Q    Mr. Guinto, while we're going through individuals'

17  nicknames, did Mr. Michael Mencher have a nickname that you

18  knew him as?

19  A    Punken.

20  Q    He went by Pumpkin?

21  A    Punken.

22  Q    All right.  I'm going to talk about April 18th, 2017.

23  Do you remember that night?

24  A    Yes.

25  Q    At that time what status did you hold within the

ALLAN GUINTO - JULY 30, 2019                    58
Direct Examination by MR. GAMMONS

1    69'ers?

2    A    I was a prospect.

3    Q    And do you recall how long you had been prospecting

4    approximately at that point?

5    A    About seven months.

6    Q    And at that time what status did Sean Leonard, also

7    known as Phelps, hold with the 69'ers?

8    A    He was my sponsor.  He was the Chapter Vice President

9    and Regional Sergeant-at-Arms.

10   Q    And what was the relationship between the 69'ers and

11   the Outlaws in the State of Florida in April of 2017?

12   A    Supposedly we were supposed to be cordial.  There was

13   supposed to be a hands-off order.

14   Q    What's a hands-off order?

15   A    We don't touch each other.  No fighting.

16   Q    You mentioned that you had to have permission from the

17   Outlaws to wear your cuts, to have a clubhouse.  To your

18   understanding, had the Outlaws provided that permission in

19   April of 2017?

20   A    No.

21   Q    But it was still your impression that there was a

22   hands-off order?

23   A    That's what we were told.

24   Q    So where did you go on April 18th, 2017?

25   A    The Local Brewing Company.

ALLAN GUINTO - JULY 30, 2019                    59
Direct Examination by MR. GAMMONS

1    Q    Where is that located?

2    A    Tarpon or -- Tarpon Springs or Palm Harbor.

3    Q    And who did you go to Local Brewing Company with?

4    A    With Sean Leonard and --

5    Q    Anybody else?

6    A    And three other individuals.

7    Q    Were any of those other individuals either patch

8    members or hangouts with the 69'ers Motorcycle Club?

9    A    They hung out.  One was a patch member of a club called

10   the Originals, he wanted to hang around the 69'ers.

11   Q    So one individual was a hang-around?

12   A    Yes.

13   Q    When you went to Local Brewing Company were you wearing

14   your cuts?

15   A    Yes.

16   Q    And you knew that you didn't have Outlaw permission to

17   wear your cuts at that point?

18   A    Yes.

19   Q    What occasion brought you, Sean Leonard and the other

20   individuals to Local Brewing Company on April 18th, 2017?

21   A    It was a bike night and two dollar tacos.

22   Q    Let's talk about that bike night.  Who was that bike

23   night hosted by?

24   A    The Cobras Motorcycle Club.

25   Q    Is the Cobras Motorcycle Club a 1 percent motorcycle

1    club?

2    A    No.

3    Q    To your knowledge, do they have any affiliation with

4    the Outlaws?

5    A    Yes.

6    Q    What?

7    A    They're like a support club for them.

8    Q    What's a support club of another motorcycle club?

9    A    They wear support patches and they go to their

10   functions and events and support any events they have going

11   on.

12   Q    Would a support club be subordinate to the main club?

13   A    Yes.

14   Q    What was your first impression or inkling that night

15   that something was about to go wrong?

16   A    When a lot of them pulled into the parking lot.

17   Q    Where were you sitting at Local?

18           MS. BORGHETTI:  Objection.  A lot of who?

19           THE WITNESS:  A lot of members of the Out --

20           MR. GAMMONS:  Hold on.  Hold on.

21           THE WITNESS:  Sorry.

22           THE COURT:  The objection is sustained.

23   BY MR. GAMMONS:

24   Q    Where were you sitting at Local Brewing Company?

25   A    In the front patio area.

ALLAN GUINTO – JULY 30, 2019          61
Direct Examination by MR. GAMMONS

1    Q      And were you eating at that point?

2    A      Yes.

3    Q      And you mentioned that a lot of them arrived.  Who

4    arrived?

5    A      Members of the Outlaws, Cobras and Black Pistons

6    motorcycle clubs.

7    Q      The Black Pistons, tell me about that motorcycle club.

8    A      They're a support club to the Outlaws.

9    Q      And are they a 1 percent motorcycle club?

10   A      No.

11   Q      How could you identify that these individuals were

12   Outlaws, Black Pistons and Cobras?

13   A      By the patches on their vests.

14   Q      Did they arrive in vehicles, motorcycles?

15   A      They arrived on motorcycles.

16   Q      And approximately how many individuals were there?

17   A      More than 20.

18   Q      Were you inside or outside at the Local Brewing

19   Company?

20   A      Outside.

21   Q      And you see 20 guys arrive on motorcycles wearing

22   either patches or support patches of the Outlaws.  What do

23   they do then?

24   A      They surrounded us.

25   Q      And said what or did what?

1  A    They surrounded us.  They were directing traffic, kind

2  of creating like a perimeter around us so no one could get

3  in or out of the patio area.

4  Q    Did you recognize any of the 20 or so individuals that

5  approached you?

6  A    A few of them.

7  Q    Who did you recognize?

8  A    Boston Mike, the -- he went by Boston Mike, a guy that

9  went by Slider and Paul Anderson.

10  Q    Boston Mike, Slider and Paul Anderson?

11  A    Yes.

12  Q    Did anybody in that group of 20 individuals sit at the

13  table with you, Sean Leonard and the three others?

14  A    Yes.

15  Q    Who sat at the table?

16  A    Paul Anderson.

17  Q    Anybody else?

18  A    No, they all stood around us.

19  Q    What was said to you?

20  A    Was --

21       THE COURT:  Let's establish who was speaking

22  first.

23  Q    Who was the first person to speak to you?

24  A    Paul Anderson.

25  Q    What did Mr. Anderson say to you?

ALLAN GUINTO - JULY 30, 2019                    63
Direct Examination by MR. GAMMONS

1   A     He -- he spoke to Phelps first.  He asked Phelps if he

2   was still a cop, and Phelps said no, and he said --

3   Q     Please stop right there.

4         Do you know why he asked Mr. Phelps if he was a

5   cop?

6   A     No.

7   Q     Do you ever know of Mr. Phelps ever being a cop?

8   A     I knew he worked as a security officer for a private

9   company, but I had never knew him to be a part of

10  law enforcement.

11  Q     So after Mr. Phelps said that he wasn't a cop, what did

12  Paul Anderson say?

13  A     He -- he then asked me -- he asked me -- he like

14  grabbed -- he had his arm around me and he asked -- he was

15  like, you got this pretty fast.

16  Q     When you say "this," what are you referring to?

17  A     My vest.

18  Q     Okay.

19  A     And -- because at that point I had my top and bottom

20  rockers, and --

21  Q     Let me ask about the 20 people that were -- the other

22  people that weren't Paul Anderson that were surrounding you.

23  What were they doing as Mr. Anderson spoke to you?

24  A     I got nervous and I put my hand on my -- on my

25  waistband.

ALLAN GUINTO - JULY 30, 2019                    64
Direct Examination by MR. GAMMONS

1    Q    Let me ask you, the people that weren't sitting at the

2    table, standing around the table, what were they doing?

3    A    The people standing around the table?

4    Q    Yes, sir.

5    A    They were just talking down to us and making snide

6    comments.

7    Q    So after you were told that you got your vest pretty

8    fast, what happened next?

9    A    I put my hand on my waistband, I was feeling a little

10   nervous, there was a lot of them around us, and Slider

11   pulled out a pistol and put it to my head.

12   Q    Was Slider standing or sitting at that time?

13   A    He was standing in front of me to the left.

14   Q    Let me ask you, the other three individuals that were

15   sitting at the table with you, were they still there?

16   A    No, they -- they had gotten up and left.

17   Q    Were they given permission to leave?

18   A    Yes.

19   Q    Tell me about that.

20   A    One of the Outlaws said -- told us that anyone who

21   doesn't want to have anything to do with this is more than

22   welcome to get up and leave.  Slider also told me, he said,

23   if I wanted to, I could drop my vest right there and there

24   would be no harm done to me.  He gave me the option to

25   leave.

ALLAN GUINTO - JULY 30, 2019                    65
Direct Examination by MR. GAMMONS

1   Q    Did any of those three people that you were with take

2   the option to leave?

3   A    Yes.

4   Q    Did you take the option to leave?

5   A    No.

6   Q    Why not?

7   A    Because Phelps was my brother and I wasn't going to

8   leave him by himself.

9   Q    So there's only just you and Phelps sitting at the

10  table and approximately 20 individuals surrounding you?

11  A    Yes.

12  Q    After Slider -- the person you identified as Slider

13  puts a gun to your head, what does he say to you?

14  A    He -- he told me -- he gave me -- he said -- he said,

15  we don't want you, we just want Phelps.  If you get up and

16  leave right now and drop your cut, there won't be any harm

17  done to you, you can go.

18  Q    So there were two preconditions, you had to leave your

19  jacket and then you could leave?

20  A    Yes.

21  Q    After you decided not to leave, is there any further

22  conversation between you, Paul Anderson, Phelps, Slider,

23  Boston Mike, any of those individuals?

24  A    Phelps was speaking to them.  I -- I don't recall what

25  they were saying.  I was pretty scared.  I was just trying

1    to see what move Phelps was going to make.

2    Q    Were you armed at the time?

3    A    Yes.

4    Q    Did you have a concealed carry permit at the time?

5    A    Yes.

6    Q    Was Mr. Phelps armed at the time?

7    A    Yes.

8    Q    Did he also have a concealed carry permit?

9    A    To my knowledge.

10   Q    What happened next?

11   A    I -- I looked over at Phelps and he was zipping up his

12   vest.  I went to do the same thing, and I guess someone

13   thought I was grabbing my gun because I heard someone scream

14   "gun, gun, gun" and Slider pistol whipped me in the head.

15   At that point we began to fight back and I lost

16   consciousness and woke up a couple times.  I woke up --

17   I woke up on the floor to I believe it was Paul Anderson

18   telling me to stay on the ground.  His exact words were, "If

19   you don't get up, I won't fucking kill you."

20   Q    And do you remember, were they beating you with hands

21   and feet or anything else?

22   A    I got hit in the back of the head with -- I don't know

23   what I got hit with, but I know there was beer bottles and

24   tables and things like that.

25   Q    When you finally came to, what were the individuals you

ALLAN GUINTO - JULY 30, 2019                    67
Direct Examination by MR. GAMMONS

1    were fighting doing?

2    A    They were -- I came to when he told me not to get up,

3    and they were getting on their bikes and leaving.

4    Q    And did you know where Mr. Leonard was at the time?

5    A    No, I didn't.  He -- he found me and helped me up.

6    Q    And tell me about the injuries that you sustained

7    during that fight.

8    A    I got a concussion and a cut in the back of my head,

9    had to get stitches.

10   Q    And tell me, did you still have your jacket when you

11   came to?

12   A    No.

13   Q    Did Mr. Leonard still have his jacket when you came to?

14   A    No.

15   Q    In the one percent motorcycle world, would getting beat

16   up and having your jacket stolen be humiliating for you?

17   A    Yes.

18   Q    Were you worried what it was going to do to your

19   reputation within the club?

20   A    Yes.

21   Q    Mr. Guinto, I've handed you what's been pre-marked for

22   identification as Government's Exhibit 402.  Can you take a

23   look at those items and let me know when you're ready to

24   answer some questions about them.

25   A    Yes.

1  Q     Do you recognize them?

2  A     Yes.

3  Q     How do you recognize them?

4  A     They are pictures taken off my camera -- my phone.

5  Q     Do you remember approximately when those photos were

6  taken?

7  A     About -- after the fight happened at LBC.

8  Q     Was it the same night of the fight?

9  A     Yes.

10  Q     Do they fairly and accurately depict how you appeared

11  on April 18th, 2017?

12  A     Yes.

13            MR. GAMMONS:  Your Honor, at this time the

14  Government seeks to admit Government's Exhibits 402-1 and

15  402-2.

16            MR. WISE:  No objection, Your Honor.

17            MS. BORGHETTI:  No objection.

18            THE COURT:  They'll be received.

19            MR. GAMMONS:  Permission to publish, Your Honor?

20            THE COURT:  Yes, sir.

21  BY MR. GAMMONS:

22  Q     I've showed you Government's Exhibit 402-1.  What does

23  that depict?

24  A     It's a picture of me after the incident.

25  Q     And showing you Government's 402-2, what does that

1    depict?

2    A    A picture of me after the fight.

3    Q    Did you go to the hospital for the injuries that you

4    received?

5    A    Yes.

6    Q    In addition to your personal reputation in the

7    Killsborough chapter, would having your cut taken cause

8    disgrace to the 69'ers nation?

9    A    Yes.

10   Q    Why?

11   A    Because that's the most important thing to us, is our

12   patch.

13   Q    Did Mr. Cosimano ever learn about what happened at

14   Local Brewing Company?

15   A    That same night.

16   Q    And did you have conversations in the following days or

17   months with Mr. Cosimano about that incident?

18   A    Yes, I overheard conversations between him and other

19   leadership of --

20             MR. WISE:  Objection.  Hearsay, Your Honor.

21             THE COURT:  Establish a foundation.

22   BY MR. GAMMONS:

23   Q    Mr. Guinto, I only want to discuss what you heard

24   Mr. Cosimano say.  With regard to the Local Brewing Company,

25   was Mr. Cosimano upset about the incident?

ALLAN GUINTO - JULY 30, 2019                    70
Direct Examination by MR. GAMMONS

1    A    Yes.

2    Q    Was there any plan of action that he wanted to take,

3    based on the conversations that you had with him or you

4    heard him having?

5    A    Yes.

6    Q    What did he say?

7    A    He said he was going to get two of them back.

8    Q    When he said "two of them," how did you understand that

9    to mean?

10   A    I understood that to mean he was going to get two of

11   their vests.

12   Q    Did there come a point in time when you realized that

13   he just wasn't referring to vests?

14   A    Yes.

15   Q    When was that?

16   A    When he shot James Costa.

17   Q    And at that point what did you take his "I'm going to

18   get two" to mean?

19   A    He would -- either lives or vests.

20   Q    I've handed you what's been pre-marked for

21   identification as Government's Exhibit 409.  Can you take a

22   look at that photograph.

23   A    Yes.

24   Q    Do you recognize that photograph?

25   A    Yes.

ALLAN GUINTO - JULY 30, 2019                71
Direct Examination by MR. GAMMONS

```
 1   Q     How do you recognize it?
 2   A     That's a picture of Chris Cosimano, Erick Robinson and
 3   myself.
 4   Q     Approximately when was that photograph taken?
 5   A     About a -- about a month after the LBC incident.
 6   Q     So if Local Brewing Company was in April 2017, would it
 7   have been in March of 2017?
 8   A     After.  It was in May or June.
 9   Q     Does that photo fairly and accurately depict the scene
10   as you remember it at that time?
11   A     Yes.
12           MR. GAMMONS:  Your Honor, at this time the
13   Government seeks to admit Government's Exhibit 409.
14           THE COURT:  Any objection?
15           MR. WISE:  May we have just a moment, Your Honor?
16           THE COURT:  Yes, sir.
17           MR. WISE:  No objection, Your Honor.
18           MS. BORGHETTI:  No objection, Judge.
19           THE COURT:  It will be received.
20           MR. GAMMONS:  Permission to publish, Your Honor?
21           THE COURT:  Yes, sir.
22   BY MR. GAMMONS:
23   Q     Showing you Government's Exhibit 409, on the far
24   right-hand side of this photograph, who is that depicted?
25   A     That's me.
```

ALLAN GUINTO - JULY 30, 2019                72
Direct Examination by MR. GAMMONS

1    Q    And what is that on the back of your motorcycle helmet?

2    A    It's a sticker that says "Afghanistan, I served."

3    Q    And in the center of the photo, who is that individual?

4    A    Erick Robinson.

5    Q    How do you know that is Mr. Robinson in that

6    photograph?

7    A    That's his motorcycle and that's him.  We were riding

8    together that day.

9    Q    Have you seen that helmet before?

10   A    Yes.

11   Q    Under what circumstances?

12   A    In the clubhouse.

13   Q    And on the far left, do you recognize who that is?

14   A    That's Christopher Cosimano.

15   Q    And how do you know that?

16   A    By him -- by himself and the motorcycle.

17   Q    You recognize that motorcycle, you've seen it before?

18   A    Yes.

19   Q    Do you remember where you, Mr. Cosimano and

20   Mr. Robinson were going or coming from on that date?

21   A    We were -- we went to a funeral for a member of the

22   Kingsmen Motorcycle Club.

23   Q    Is the Kingsmen Motorcycle Club a 1 percent motorcycle

24   club?

25   A    No.

ALLAN GUINTO - JULY 30, 2019                    73
Direct Examination by MR. GAMMONS

1    Q    And where was this funeral located?

2    A    It was up north, close to Leesburg.

3    Q    Do you know what state it was in?

4    A    In Florida.

5    Q    How long after the Local Brewing Company fight did you

6    become a full patch member?

7    A    Less than a month.

8    Q    So you had been a prospect or a probate for about

9    eight months at that point?

10   A    For about seven months, yes.

11   Q    How did it go -- you mentioned earlier that you had to

12   be a prospect for at least 12 months.  How did you become a

13   full patch member in only seven?

14   A    The incident at Local Brewing Company, some of the

15   brothers said that they were proud of me for not leaving

16   Phelps and standing my ground and fighting.

17   Q    So instead of losing respect within the organization,

18   you gained respect?

19   A    Yes.

20   Q    And you mentioned earlier in your testimony that folks

21   from out-of-state involved in the 69'ers Motorcycle Club

22   wanted to meet you.  Was it in reference to this event where

23   you refused to give up your jacket and stayed with your

24   brother?

25   A    Yes.

ALLAN GUINTO - JULY 30, 2019          74
Direct Examination by MR. GAMMONS

1    Q    I want to go back to the person who you said was a

2    hang-around or a hangout who was given the opportunity and

3    walked out.  Did that person ever become a full patch member

4    of the 69'ers?

5    A    No.

6    Q    Did that person -- was that person ever allowed to hang

7    out with the club again?

8    A    Yes.

9    Q    So I want to talk about -- you mentioned a term called

10   shows of force.  What is a show of force?

11   A    We just -- we get everybody together, we call a

12   mandatory ride, so -- to show that we have a lot of members

13   in the state, and we go to wherever the event is.

14   Q    What type of events would you do shows of force at?

15   A    Bike nights, Biketoberfest, Bike Week.

16   Q    And before the fight at Local Brewing Company, who

17   was -- was there anybody in the 69'ers Motorcycle Club who

18   was more vocal about shows of force than another?

19   A    Sean Leonard.

20   Q    What would Sean Leonard say?

21   A    He just wanted -- he just wanted to be out there all

22   the time, show the Outlaws that we were here.

23   Q    And after the Local Brewing Company was Mr. Leonard

24   still the most vocal proponent of shows of force?

25   A    No.

1    Q    Who was?

2    A    Christopher Cosimano.

3    Q    What types of shows of force would Mr. Cosimano talk to

4    you about?

5    A    He just wanted to go to all the bike nights and all the

6    local events.

7    Q    And when you went there, would you wear your cut?

8    A    Yes.

9    Q    Would you ride your bike?

10   A    Yes.

11   Q    Did it matter if it was an Outlaw event or not?

12   A    No.

13   Q    Was this done to just show that the 69'ers were in the

14   State of Florida, or to antagonize the Outlaws, or for some

15   other reason?

16   A    To antagonize them.

17   Q    "Them" being who?

18   A    The Outlaws.

19   Q    Did they ever react?

20   A    There was a threat that they were going to take our

21   vests whenever they saw us at Quaker Steak & Lube.

22   Q    So after the Local Brewing Company you learned that

23   there was a threat that your vests would be taken?

24   A    Yes.  On sight.

25   Q    And did you attend that event that night?

ALLAN GUINTO - JULY 30, 2019                76
Direct Examination by MR. GAMMONS

1    A    Yes.

2    Q    Tell me what happened.

3    A    They said that members of the Outlaws that they called

4    the One Ton Crew were going to show up to take our vests,

5    and Chris really wanted to go, go over there.  Phelps --

6    Phelps and I talked on the side and Phelps voiced his

7    concern.

8    Q    What was Mr. Leonard's concern?

9    A    For safety of the brothers.

10   Q    And did the Killsborough chapter ultimately end up

11   going and attending that event?

12   A    Yes.

13   Q    Tell me about that.

14   A    When we showed up there was a lot of -- there was a lot

15   of law enforcement there and no members of the Outlaws were

16   present.

17   Q    So there wasn't a fight that night?

18   A    No.

19   Q    At some point did Mr. Leonard make you aware that he

20   had been arrested in the northern United States?

21   A    Yes.

22   Q    What information did he tell you about that?

23   A    He told us that he got picked up by the ATF on gun

24   charges and they didn't have enough on him to indict him so

25   they released him back down here.

ALLAN GUINTO – JULY 30, 2019                77
Direct Examination by MR. GAMMONS

1   Q    Was that after the Local Brewing Company fight?

2   A    Yes.

3   Q    But it was before the James Costa shooting?

4   A    Yes.

5   Q    Were you worried that Mr. Leonard was cooperating with

6   law enforcement?

7   A    No.

8   Q    Were there members of the Killsborough chapter that

9   were worried that Mr. Leonard was cooperating with

10  law enforcement?

11  A    Yes.

12  Q    Who was that?

13  A    Erick Robinson, Christopher Cosimano and members from

14  the Orlando chapter.

15  Q    As you sit here today, you know that Mr. Leonard

16  in fact was cooperating with law enforcement?

17  A    Yes.

18  Q    I want to fast forward to July 25, 2017.  Do you

19  remember that day?

20  A    Yes.

21  Q    Did you have any correspondence with Mr. Cosimano about

22  this ongoing feud with the Outlaws earlier in the day?

23  A    Yes.

24  Q    How did you communicate with Mr. Costa?

25  A    He FaceTimed me.

ALLAN GUINTO - JULY 30, 2019                    78
Direct Examination by MR. GAMMONS

```
 1   Q    Was it common for and you Mr. Cosimano to FaceTime with
 2   one another?
 3   A    Yes.
 4   Q    Were you ever instructed specifically to FaceTime as
 5   opposed to text message or make a phone call?
 6   A    Yes.
 7   Q    Why?
 8   A    Because it was supposedly encrypted.
 9   Q    So Mr. Cosimano FaceTimed you, and what does he say?
10   A    He FaceTimed me and he was in his work van hanging out
11   in front of Red Tiki.
12   Q    Where is Red Tiki?
13   A    It's a bar in St. Pete.
14   Q    Do you know anything about Red Tiki?
15   A    It's an Outlaw hangout.
16   Q    So he's in his work van, he's in front of an Outlaw
17   hangout in St. Petersburg.  What does he tell you?
18   A    He told me that he had a feeling that he was going to
19   catch one slipping today and he was going to get one.
20   Q    When he said "get one," what did you take that to mean?
21   A    A vest.
22   Q    What purpose did he call you for?  Just to let you
23   know?
24   A    To let me know and tell me to be ready on standby.
25   Q    Do you know why he called you particularly?
```

ALLAN GUINTO - JULY 30, 2019                    79
Direct Examination by MR. GAMMONS

1   A    He told me to let the other brothers know.

2   Q    So did you make yourself available later that day for

3   him to call you?

4   A    No.

5   Q    How did you make yourself unavailable?

6   A    I -- I told him that -- I said, don't -- don't do

7   anything stupid, you're over an hour away from everyone and

8   you're going to be by yourself.

9   Q    Was it common for Mr. Cosimano to spend time over in

10  the Pinellas County area?

11  A    Yes.

12  Q    Did you ever correspond with Mr. Cosimano later that

13  day on July 25th, 2017?

14  A    Yes.

15  Q    Tell me about that.

16  A    Later that night he -- he called me or FaceTimed me,

17  asked me to meet him off of Valroy and 41 and that he needed

18  an escort back home.

19  Q    At that point when he called you, did you know why he

20  needed an escort?

21  A    He told me that he -- he got one of them.

22  Q    And at that point did you know exactly what he meant by

23  "I got one of them"?

24  A    Not yet.

25  Q    Did you go meet him in the area of U.S. 41 and Valroy

1   Road?

2   A    Yes.

3   Q    Why?

4   A    Because he told me to meet up with him.

5   Q    Were you allowed to defy Mr. Cosimano?

6   A    I mean, if I really -- if I had anything else going on

7   more important, yes.

8   Q    But on that occasion you decided to go meet with him?

9   A    Yeah, I didn't have anything going on.

10  Q    Where exactly did you meet up with Mr. Cosimano?

11  A    Off of Valroy.  I just turned onto Valroy off of 301

12  and I was heading towards 41 when I saw his work van, the

13  headlights of the work van and the car behind it being

14  driven by Little Ricky, and I followed them to the -- to the

15  Wawa on 301 and Sun City Boulevard.

16  Q    And what car were you driving?

17  A    My Dodge Charger.

18  Q    Dodge Charger.  What color is that vehicle?

19  A    Black.

20  Q    And you recognized the car that the person you

21  identified as Little Ricky drove as well?

22  A    Yes.

23  Q    Was it common for Mr. Cosimano or any members of the

24  Killsborough chapter to ask you to escort them places?

25  A    No.

1   Q    After you arrived at the Wawa with you, Mr. Cosimano

2   and Little Ricky, did you speak to Mr. Cosimano?

3   A    Yes.

4   Q    What did he tell you?

5   A    He told me that he got one of the Outlaws.  I asked him

6   who.  He said he shot Jimbo.

7   Q    Do you know who Jimbo is?

8   A    James Costa.

9   Q    What do you know about James Costa?

10  A    I know that he's -- at the time was the St. Pete

11  Chapter President of the Outlaws.

12  Q    So he tells you that he shot James Costa.  Did you

13  believe that Mr. Costa was alive or dead?

14  A    From what he told me, we believed that he was dead.

15  Q    And what else did Mr. Cosimano tell you?

16  A    He told me to get rid of the clothes and the firearm.

17  Q    What clothes are you referring to?

18  A    The clothes he was wearing.  He changed out of it and

19  gave it to me in a -- in a bag and he gave me the gun with

20  it.

21  Q    And did he give you any specific instructions about

22  what to do with that change of clothes and that firearm?

23  A    He told me that he wanted me to -- there was a laser on

24  the gun, he told me that he wanted me to take the laser off

25  because he wanted to keep it, but he told me to make sure

ALLAN GUINTO - JULY 30, 2019          82
Direct Examination by MR. GAMMONS

1    that I got rid of the gun and to get rid of the clothes and

2    to keep my mouth shut because Phelps was next.

3    Q    Did he elaborate at all on saying Phelps was next?

4    A    Yeah, he said -- I kind of -- when he told me Phelps

5    was next, I kind of asked him what are you talking about,

6    and he said, "You know Phelps is a cop, right?"  That's when

7    I -- I said no, I don't -- I don't think so.  I don't think

8    he is.  You have to show me -- I said, you have to show me

9    proof.  And that's why I -- I kept the firearm.

10   Q    So he gave you the guns -- sorry.  He gave you the gun,

11   he gave you the change of clothing and he told you that

12   Phelps was next?

13   A    Yes.

14   Q    Did Mr. Cosimano believe that Phelps was a cop?

15   A    Yes.

16          THE COURT:  Counsel, it's not necessary for you to

17   repeat the witness' answers.

18   BY MR. GAMMONS:

19   Q    The gun that you were given -- well, let me ask you

20   this.

21          The clothes you were given, where did you take it?

22   A    Back to my house.

23   Q    Where did you store it?

24   A    Yes.

25   Q    Sorry.  Where did you store it?

1   A    In my closet.

2   Q    What about the gun you were given, where did you take

3   it?

4   A    I kept it for a couple days.  I just kept it in my car,

5   I didn't know what to do with it, and when -- I talked to

6   Cody and we decided to bury it.

7   Q    Who is Cody?

8   A    He was a prospective member of the 69'ers.

9   Q    Is that Cody Wesling?

10  A    Yes.

11  Q    Where did you and Mr. Wesling bury that firearm?

12  A    In his back yard.

13  Q    How long did that -- do you remember what type of

14  firearm it was, what color it was, what make and model and

15  everything?

16  A    It was a .45 caliber pistol.  It was like peyote brown,

17  like a military brown color.

18  Q    And how long did that firearm remain buried in

19  Mr. Wesling's back yard?

20  A    A couple weeks.

21  Q    At some point was that firearm removed?

22  A    Yes.

23  Q    Tell me about that.

24  A    I -- I went and saw Phelps the next -- the day after

25  the shooting.  Phelps called me to meet up with him and he

ALLAN GUINTO - JULY 30, 2019                    84
Direct Examination by MR. GAMMONS

 1   asked me about the shooting, if I knew anything --

 2            MR. WISE:  Objection.  Hearsay as to what Phelps

 3   said.

 4            THE COURT:  Counsel?

 5            MR. GAMMONS:  Let me ask the question a different

 6   way, Your Honor.

 7            THE COURT:  Sustained.

 8   BY MR. GAMMONS:

 9   Q    Mr. Guinto, what is the reason you removed that firearm

10   from Mr. Wesling's property?

11   A    To give it to Phelps.  I didn't believe Phelps to be a

12   cop, so I told Phelps what Durty told me -- Chris told me he

13   was going to do, and I gave him the firearm.

14   Q    So you gave the firearm that Mr. Cosimano gave you to

15   Mr. Leonard?

16   A    Yes.

17   Q    After you, as everyone else believed, disposed of the

18   firearm and the clothing used by Mr. Cosimano, do you think

19   that your stature within the Killsborough chapter was

20   raised?

21   A    Yes.

22   Q    Do you think that Mr. Cosimano trusted you more?

23   A    Yes.

24   Q    Knowing that there is a disagreement between the

25   Outlaws and the 69'ers in the State of Florida, do you

1   believe that this raised the profile of the 69'ers nation,

2   shooting the President of a rival chapter in the State of

3   Florida?

4   A    Yes.

5   Q    You mentioned that you gave the gun to Sean Leonard.

6   Do you remember where that occurred?

7   A    At Jimmy's Sports Bar in Largo, Florida.

8   Q    And was it inside the establishment, outside the

9   establishment?

10  A    It was outside the establishment.

11  Q    Where?

12  A    In the parking lot, by his truck.

13  Q    I want to move to August 25th, 2017.  Do you remember

14  that date?

15  A    Yes.

16  Q    On that date did you get a call from -- or any

17  correspondence from Mr. Cosimano involving the Outlaws

18  Motorcycle Club?

19  A    Yes.

20  Q    Approximately what time of day was it?

21  A    It was later on in the evening.

22  Q    And how did he communicate with you?

23  A    FaceTimed me.

24  Q    When Mr. Cosimano FaceTimed you, what did he say?

25  A    He said he wanted to go on a little ride and go take

1  pictures in front of the Outlaw clubhouse with our colors on

2  to piss them off, and post them online.

3  Q    The Outlaws clubhouse located where?

4  A    South St. Pete.

5  Q    And is that the clubhouse that Mr. Costa would have

6  been the President of?

7  A    Yes.

8  Q    Did you agree to go with him?

9  A    Yes.

10  Q    Approximately what time did you depart to go to meet

11  with Mr. Cosimano?

12  A    I don't recall what time.

13  Q    Was it in the evening?

14  A    Yes.

15  Q    And did you go directly to meet with him or where did

16  you guys meet up?

17  A    We met up at a gas station off of Causeway and 41.

18  Q    Was there anybody else present besides you and

19  Mr. Cosimano?

20  A    Little Ricky.

21  Q    So what do you, Little Ricky and Mr. Cosimano do at

22  that gas station?

23            THE COURT:  One second.

24            MR. WISE:  Your Honor, can we have a sidebar?

25            THE COURT:  Yes.

 1   *(End of bench conference; proceedings resume in open court.)*

 2          MR. WISE:  Your Honor, I believe this line of

 3   questioning is going into an allegation that Mr. Cosimano,

 4   Mr. Guinto and this Little Ricky committed an arson of the

 5   Outlaws' clubhouse.  That is not something I believe that is

 6   charged in the indictment.  I think it would be something

 7   that would have been a 404 act.  It was not noticed.  I'm

 8   aware of it from the discovery.  I was not expecting that to

 9   come in based on the exhibit list that had been provided, so

10   I would object to -- if that is where we're going, with this

11   arson, I would object to that coming in as being irrelevant,

12   being unduly prejudicial under 403 and being in violation of

13   the 404(b) notice requirements.

14          THE COURT:  Counsel?

15          MR. GAMMONS:  Your Honor, I'm happy to skip that

16   line of questioning.  In speaking with Ms. Borghetti, it's

17   my understanding that she will cross-examine Mr. Guinto on

18   that issue.  I'll leave it alone and I'll bring it up on

19   redirect if she chooses to.

20          THE COURT:  All right.

21   *(End of bench conference; proceedings resume in open court.)*

22   BY MR. GAMMONS:

23   Q    Mr. Guinto I want to talk about December 21st, 2017.

24   Do you remember that date?

25   A    Yes.  Yes.

1  Q    That afternoon of December 21st, 2017, did you meet
2  with any members of the Killsborough chapter of the 69'ers?
3  A    Yes.
4  Q    Who?
5  A    I met with Erick Robinson and Cody Wesling for lunch.
6  Q    Where did you meet for lunch?
7  A    At the Rivers Edge in Gibsonton.
8  Q    And approximately what time of day was that?
9  A    It was around -- around one o'clock in the afternoon.
10 Q    Did you ever receive any communication or
11 correspondence from Mr. Cosimano as you, Mr. Wesling and
12 Mr. Robinson ate at the Rivers Edge?
13 A    Yes.
14 Q    Tell me about that.
15 A    He -- he was -- he was -- he was FaceTiming Erick, he
16 was trying to get a hold of Erick, and we ignored him a
17 couple times because we were eating lunch, and finally Erick
18 decided to pick up and he talked to Chris for a little bit
19 and he handed the phone to me.
20 Q    So because you were on FaceTime, could you hear the
21 conversation that he was having with Mr. Robinson?
22 A    Yes.
23 Q    And obviously you heard the conversation you had with
24 him.
25 A    Yes.

ALLAN GUINTO - JULY 30, 2019                    89
Direct Examination by MR. GAMMONS

1   Q     Did he make any requests of you?

2   A     He wanted us to go back to the clubhouse.

3   Q     And do you know why he wanted you to go to the

4   clubhouse?

5   A     He said he knew where an Outlaw was and he wanted to

6   follow him.

7   Q     Did you go to the clubhouse?

8   A     We eventually did, because we didn't want to at first,

9   we just wanted to finish eating lunch, and Erick said we'll

10  go whenever we finish.

11        MS. BORGHETTI:  Objection, Judge.  Personal

12  knowledge.  He keeps saying "we."

13        THE COURT:  Overruled.

14  BY MR. GAMMONS:

15  Q     Mr. Guinto, if you can just talk about what you did

16  personally.

17  A     Yes, sir.

18  Q     Did you go directly from Rivers Edge to the clubhouse?

19  A     Yes.

20  Q     And where is that located?

21  A     In Riverview, Florida.

22  Q     And I keep referring to the clubhouse.  This is where

23  Mr. Mencher, Robinson and Cosimano lived?

24  A     Yes.

25  Q     Once you -- what vehicle were you driving?

ALLAN GUINTO - JULY 30, 2019          90
Direct Examination by MR. GAMMONS

1   A    My Dodge Charger.

2   Q    Did you drive by yourself or was anybody in the car

3   with you as you drove to the clubhouse?

4   A    I drove by myself.

5   Q    Mr. Robinson or Mr. Wesling, did they also go to the

6   clubhouse?

7   A    Yes.

8   Q    Do you remember what vehicles they were in?

9   A    No.

10  Q    When you arrived at the clubhouse did you see any other

11  members of the Killsborough chapter?

12  A    Yes.

13  Q    Who?

14  A    Mike Mencher and Christopher Cosimano.

15  Q    When you saw them, what were they doing?

16  A    They were getting their bikes ready and they were

17  gearing up for a ride, to get on their motorcycles.

18  Q    When you say "getting their bikes ready," what do you

19  mean by that?

20  A    He pulled them out of the garage, because they have

21  a lot of cars in the driveway, so it always took a minute to

22  pull the bikes out.

23  Q    And can you tell me, how were -- how was Mr. Cosimano

24  dressed?

25  A    He was -- he had on -- he had on like a black hoody and

ALLAN GUINTO - JULY 30, 2019                91
Direct Examination by MR. GAMMONS

1   like a riding mask.

2   Q    Was he wearing a helmet?

3   A    Yes.

4   Q    And how was Mr. Mencher dressed?

5   A    Same way.  He normally doesn't wear like a mask or a

6   bandanna on his face, but that day he was wearing one.

7   Q    And tell me about --

8   A    And they weren't wearing their -- they weren't wearing

9   their vests.

10  Q    Generally if you're going on a ride as a Killsborough

11  chapter member, would you wear your vest?

12  A    Yes.

13  Q    Tell me about the bikes.  Was there anything out of the

14  ordinary with Mr. Mencher or Mr. Cosimano's motorcycles?

15  A    They -- they flipped their license plates so you

16  couldn't see them.

17  Q    So you could not see them?

18  A    Yep.  And all the -- Chris took off his 69'ers

19  stickers.

20  Q    Do you know how recently he had taken off the 69'ers

21  stickers?

22  A    He did it before that day.

23  Q    And where were those 69'ers stickers located?

24  A    On the saddle bags.

25            MR. GAMMONS:  Madam courtroom deputy, may I use

ALLAN GUINTO - JULY 30, 2019          92
Direct Examination by MR. GAMMONS

1   the overhead.

2   BY MR. GAMMONS:

3   Q    I'm showing you Government's Exhibit 409.  The stickers

4   that say 1 percenter, are those the stickers that you're

5   referring to?

6   A    Yes.

7   Q    So at that time did you still have a concealed carry

8   permit?

9   A    Yes.

10  Q    Were you carrying a gun?

11  A    Yes.

12  Q    At that time did Mr. Wesling have a concealed carry

13  permit?

14  A    Yes.

15  Q    When you hung out with him, generally did Mr. Wesling

16  have his gun on him?

17  A    Yes.

18  Q    At that time did you hang out with Mr. Mencher often?

19  A    As often as I hung out with the club.

20  Q    And did you know Mr. Mencher to carry a firearm?

21  A    Yes.

22  Q    So Mr. Mencher and Mr. Cosimano on are on their bikes.

23  Are you getting on a bike or are you getting in a car?

24  A    I'm getting in my car.

25  Q    And what does Mr. Wesling do?

1   A    He was going to go home, but when I started my car my

2   check engine light came on, so I asked -- I asked Cody,

3   I said, hey, do you care if you drive because my check

4   engine light is on, and if my car dies out, like they're

5   probably going to need you, and he said he didn't mind.

6   Q    And what does Mr. Robinson do?

7   A    I asked -- I asked Erick if he wanted to ride with me

8   or Cody, and he said he'd come ride with me.

9   Q    And at that point did you know where you were going?

10  A    I knew we were supposed to follow them to --

11  Q    "Them" being who?

12  A    Christopher Cosimano and Mike Mencher.

13  Q    Okay.

14  A    We were supposed to follow them to Canterbury Park,

15  around that area of Tampa.

16  Q    Did you know why you were going to that area of Tampa?

17  A    Because they wanted to follow an Outlaw.

18  Q    And at that point did you know who the Outlaw was?

19  A    Not until we saw him.

20  Q    When did you realize who the person was you were

21  following?

22  A    When -- when Erick told me that -- who the truck

23  belonged to.

24  Q    Tell me about this truck.  When did you first see the

25  truck?

ALLAN GUINTO - JULY 30, 2019          94
Direct Examination by MR. GAMMONS

1  A    I first saw the truck when we pulled up to the powder

2  coating facility in Canterbury Park.

3  Q    Can you describe the truck for me?

4  A    It was an older model Ford Ranger.

5  Q    And whose truck was that?

6  A    Paul Anderson's.

7  Q    That's the same Paul Anderson who beat you up at Local

8  Brewing Company eight months earlier?

9  A    Yes.

10  Q    Once you know it's Paul Anderson, do you know at that

11  point as you're watching his truck where Mr. Wesling,

12  Mr. Mencher and Mr. Cosimano are located?

13  A    Mr. Wesling was parked right beside us.  We were parked

14  about a half a block down from where the truck was, but

15  they -- I don't know where they went, but they went and hid

16  off in the bikes.  The plan was for us to follow the truck

17  and we would call them and tell them which direction the

18  truck was going, then they'd follow us.

19  Q    And did you ever see the truck depart?

20  A    Yes.

21  Q    How long did you wait before the truck departed?

22  A    Not long.  Almost immediately we started following it.

23  Q    And at that point did the plan go into motion?  Did you

24  begin following Mr. Anderson's truck?

25  A    Yes.

ALLAN GUINTO – JULY 30, 2019                95
Direct Examination by MR. GAMMONS

1  Q    Were you ever -- were you ever able to visually see

2  Mr. Anderson and identify that was the person who was

3  driving the truck?

4  A    Yes.

5  Q    Did you -- from when you started following him in the

6  area of Canterbury Park to where the vehicle stopped moving,

7  did you ever lose sight of Mr. Anderson?

8  A    No.

9  Q    Were you in contact with Mr. Mencher or Mr. Cosimano

10 while you were following Mr. Anderson?

11 A    Erick Robinson was.

12 Q    And he was in the vehicle with you?

13 A    Yes.

14 Q    Approximately how long between when Mr. Anderson left

15 that location, how long did you follow him for?

16 A    For about half an hour, give or take.

17 Q    And generally what highways or roads did you take, if

18 you recall?

19 A    We left the area, Canterbury Park, and got on

20 Hillsborough, and from Hillsborough we got onto Suncoast

21 Parkway.

22 Q    Did you ever see -- you can see Mr. Anderson, but could

23 you see Mr. Cosimano or Mr. Mencher's bikes?

24 A    Yes.

25 Q    Were they still -- were their faces still covered?

ALLAN GUINTO - JULY 30, 2019                96
Direct Examination by MR. GAMMONS

1   A    Yes.

2   Q    Were their license plates still obscured?

3   A    Yes.

4   Q    At some point did you reach the plaza at State Road 54?

5   A    Yes.

6   Q    Did you stop to pay the toll at that plaza?

7   A    Yes.

8   Q    Let me take a step back.  You mentioned that you and

9   Mr. Wesling were following Mr. Anderson's truck --

10  A    Yes.

11  Q    -- and the two motorcycles were following yours.  Where

12  in the lineup were you after Mr. Anderson's truck?

13  A    I was -- I was about an eighth of a mile behind

14  Paul Anderson's truck, just keeping an eye on it, following

15  him.  Cody Wesling's vehicle was behind mine, and the two

16  bikes were following Cody's vehicle.

17  Q    At some point did Mr. Wesling's vehicle pass yours?

18  A    Yes.

19  Q    When did that happen?

20  A    I stopped at the toll booth because I didn't realize

21  that we had to pay and I didn't want to get billed for the

22  SunPass, so we stopped to pay the toll, and then Cody's

23  vehicle passed my vehicle on the right and went through the

24  SunPass lane, and after his vehicle the two bikes came

25  afterwards and passed us.

ALLAN GUINTO - JULY 30, 2019                    97
Direct Examination by MR. GAMMONS

1   Q    So at that point the two bikes and Mr. Wesling's

2   vehicle had passed you?

3   A    Yes.

4   Q    And what happened next?

5   A    I was -- I asked Erick to -- if he had any change, and

6   we were digging around my car to find 75 cents, and when I

7   rolled the window down to throw the change in we heard -- we

8   heard gunshots.

9   Q    And at that point could you still see either

10  Mr. Wesling or the motorcycles or Paul Anderson's truck?

11  A    I could not.

12  Q    What could you see?

13  A    I just -- I couldn't see anything.  I just saw the --

14  there was about -- there was a lot of cars in front of us,

15  between us and them, but what I -- what I did see, when I --

16  when I pulled off to the right to see what happened, I saw

17  Cody's vehicle behind Paul Anderson's and I saw Paul

18  Anderson deceased in the vehicle.

19  Q    And how do you know Paul Anderson was deceased?

20  A    I didn't know.  He just looked to be dead.

21  Q    And describe what you saw.

22  A    He was slumped over in his -- in his vehicle and there

23  was a hole in the window above the door handle.

24  Q    And did you see where either of the motorcycles went at

25  that point?

ALLAN GUINTO - JULY 30, 2019                98
Direct Examination by MR. GAMMONS

```
 1   A    They -- they went straight through the light and made a
 2   left on 54.
 3   Q    And Mr. Robinson is still in your passenger seat?
 4   A    Yes.
 5   Q    Where do you drive at that point?
 6   A    I -- he told me to -- he told me to make a U-turn,
 7   because he asked me -- he was like -- I told him, I said,
 8   man, they killed that guy, he's dead.  And he was like, how
 9   do you know?  I said, bro, I saw him, he's dead.  He's
10   like -- he told me to make a U-turn, go back, I want to see.
11   So I made a right on 54 from the toll, I made a U-turn, went
12   under the bridge, made another U-turn and drove by again,
13   and after we drove by and he was looking, there was already
14   a police officer there, so we just kept going.  Before we
15   reached 41, Chris and Mike pulled up in front of us on their
16   bikes and gave us a signal to follow them, or to follow
17   Chris.
18   Q    Did you follow Mr. Cosimano?
19   A    Yes.
20   Q    And when you saw Mr. Mencher and Mr. Cosimano again,
21   you saw both of them or one or the other?
22   A    I saw both of them.
23   Q    And were they wearing the same clothing?
24   A    No, they had already changed.
25   Q    And did they direct you to go somewhere or did they
```

1  direct you to follow them?  How did you know where to go?

2  A    They -- well, when they first passed us I saw Chris and

3  he told us to follow him, follow him, so we followed him to

4  a -- we turned on 41 and went south and then we turned on

5  like -- on another road, I don't remember what road it was,

6  but we ended up at a three-way stop in a pretty secluded

7  area.

8  Q    And what happened at that three-way stop?

9  A    He gave the gun --

10  Q    Who is "he"?

11  A    Christopher Cosimano gave the firearm to Erick Robinson

12  and told him to get rid of it, along with the helmets, the

13  helmet and the sweater.

14  Q    Once you -- did you speak --

15         THE COURT:  I'm sorry, did you say helmet or

16  helmets, with an S?

17         THE WITNESS:  Helmets.  Multiple.

18         THE COURT:  How many?

19         THE WITNESS:  There was already one in my -- there

20  was already one in my car and the one that he was wearing at

21  the time.

22         THE COURT:  So how many did he give you at the

23  time?

24         THE WITNESS:  He only gave me one.

25         THE COURT:  All right.  Counsel, continue.

ALLAN GUINTO – JULY 30, 2019                    100
Direct Examination by MR. GAMMONS

1   BY MR. GAMMONS:

2   Q    Was there any discussion between you and Mr. Cosimano

3   about what just happened?

4   A    No, not at that time.

5   Q    Was there any discussion between you and Mr. Mencher at

6   that time about what just happened?

7   A    Yes.

8   Q    What was that?

9   A    He asked if we would take his gun too, and I said no.

10  Q    After you took the helmet, the clothes and

11  Mr. Cosimano's gun, does Mr. Robinson stay with you?

12  A    Yes.

13  Q    And where do you go?

14  A    We were instructed to meet back at the clubhouse.

15  Q    Who instructed you to do that?

16  A    Chris and Erick.

17  Q    Is that directly where you drove?

18  A    Yes.

19  Q    And once you arrive at the clubhouse, who was there?

20  A    When we were pulling in, Chris was leaving in his

21  truck.  I don't know where he was going.  We assumed he was

22  going to his girl -- his girlfriend's house, but --

23  Q    Who else was there besides Mr. Cosimano when you

24  arrived?

25  A    Cody Wesling showed up a few minutes or a few moments

1   after us, and Mike Mencher.

2   Q     And did you keep possession of that clothing?

3   A     No.

4   Q     Who took the clothing?

5   A     Erick.

6   Q     Did you keep possession of the gun that Mr. Cosimano

7   gave you?

8   A     Yes.

9   Q     What did you do -- well, did Mr. Cosimano or anybody

10  else ask you to do anything with that gun?

11  A     No.  Erick -- Erick asked me, he said -- he was like,

12  can you get rid of the -- can you get rid of the gun.

13  I said yes.

14  Q     And what did you plan to do with the gun?

15  A     Give it to Phelps.

16  Q     Why would you give the gun used to kill Paul Anderson

17  to Sean Leonard?

18  A     Because he was known for disposing of firearms

19  previous.

20  Q     So you believed at that point -- you still believed

21  that the firearm you had given him related to the

22  Jimbo Costa shooting had been destroyed?

23  A     Yes.

24  Q     Did you ever see news coverage of the murder of

25  Paul Anderson?

1    A    Yes.

2    Q    I've handed you what's been pre-marked for

3    identification as Government's Exhibit 223-1 through 223-5.

4    Can you take a look at those photos.

5    A    Yes.

6    Q    Do you recognize those photos?

7    A    Yes.

8    Q    Did you see those photos on the news on or about

9    December 21st, 2017?

10   A    Yes.

11   Q    Do they fairly and accurately depict the photos that

12   you saw on that date?

13   A    Yes.

14          MR. GAMMONS:  At this time the Government requests

15   to move into evidence Government's Exhibit 223-1 to 223-5.

16          MR. WISE:  No objection, Your Honor.

17          MS. BORGHETTI:  No objection, Your Honor.

18          THE COURT:  They'll be received.

19          MR. GAMMONS:  Permission to publish, Your Honor?

20          THE COURT:  Yes, sir.

21   BY MR. GAMMONS:

22   Q    I'm showing you Government's Exhibit 223-1.  Is that

23   photo consistent with what Mr. Cosimano was wearing when you

24   left the house with him on December 21st, 2017?

25   A    Yes.

ALLAN GUINTO - JULY 30, 2019                    103
Direct Examination by MR. GAMMONS

1    Q    Is that motorcycle consistent with the motorcycle that
2    you knew him to ride?
3    A    Yes.
4    Q    I'm showing you Government's Exhibit 223-2.  Same
5    question.  Is that consistent with what Mr. Cosimano was
6    wearing when you left the house with him on December 21st,
7    2017?
8    A    Yes.
9    Q    I'm going to zoom in on his saddle bags.  Is this how
10   the patches appeared on his bike on that date?
11   A    Yes.
12   Q    And I'm going to move on to 223-3.  Again, is this how
13   Mr. Cosimano appeared to you on that date, December 21st,
14   2017?
15   A    Yes.
16   Q    Is this -- was he still dressed in this fashion when he
17   drove past you at the final toll plaza before Paul Anderson
18   was murdered?
19   A    Yes.
20   Q    Showing you Government's Exhibit 223-4, is this how
21   Michael Mencher was dressed when you left the clubhouse with
22   him on December 21st, 2017?
23   A    Yes.
24   Q    Is this motorcycle consistent with the motorcycle that
25   you saw Mr. Mencher ride commonly?

ALLAN GUINTO - JULY 30, 2019                   104
Direct Examination by MR. GAMMONS

1    A    Yes.

2    Q    Do you remember what Mr. Mencher's license plate read?

3    A    No.

4    Q    I'm showing you Government's Exhibit 223-5.  Is this --

5    the person depicted in this photograph, is this consistent

6    with how Mr. Mencher was dressed when you left the house,

7    the clubhouse, on December 21st, 2017?

8    A    Yes.

9    Q    Have you ever seen Mr. Mencher wear a hat with this

10   insignia on it, the two lightning bolts?

11   A    Yes.

12   Q    And had you ever seen Mr. Mencher's motorcycle with the

13   two lightning bolt insignia on the back fender before?

14   A    Yes.

15   Q    After you took possession of the firearm that

16   Mr. Cosimano gave you, where did you go?

17   A    I went back home and then to my girlfriend's house.

18   Q    Did there come a -- did you ever get -- follow up with

19   your plan to give the firearm to Mr. Phelps?

20   A    Yes.

21   Q    Or to Mr. Leonard, I should say.

22   A    Yes.

23   Q    When did that occur?

24   A    Around eleven o'clock that night, he came to the house

25   to pick it up.

 1   Q     Which house?

 2   A     To my girlfriend's house.

 3   Q     And did you speak with him on that occasion?

 4   A     Yes.

 5   Q     And what did you believe Mr. Phelps was going to do

 6   with that firearm?

 7   A     I believed he was going to get rid of it.

 8   Q     But not give it to law enforcement?

 9   A     Yes.

10   Q     Did you believe that if you would have refused to

11   participate in this ride out following Mr. Anderson, would

12   you have lost respect within the Killsborough chapter of the

13   69'ers?

14   A     I don't think so.  He was -- he didn't clearly state

15   what we were going to do that day, so to my knowledge

16   I could have gone or could have stayed back and it wouldn't

17   have made a difference.

18   Q     The individual that was killed that day, Paul Anderson,

19   he was the one who beat you up?

20   A     Yes.

21   Q     And the one who started the war between the 69'ers and

22   the Outlaws?

23   A     Yes.

24   Q     How long after giving the firearm to Sean Leonard were

25   you arrested?

1   A    About four hours later.

2   Q    And have you been continuously in custody since that

3   date?

4   A    Yes.

5          MR. GAMMONS:  I have no further questions,

6   Your Honor.

7          THE COURT:  Counsel.

8          MR. WISE:  Thank you, Your Honor.

9          THE COURT:  Take the lights up, please.

10          MR. WISE:  Good afternoon, Mr. Guinto.

11          THE WITNESS:  Good afternoon.

12          MR. WISE:  May I approach the table, Your Honor?

13          THE COURT:  Yes, sir.

14          MR. GAMMONS:  Your Honor, may I return exhibits

15   that have been admitted into evidence?

16          THE COURT:  Yes, sir.

17              **CROSS-EXAMINATION OF ALLAN GUINTO**

18   **BY MR. WISE:**

19   Q    All right, Mr. Guinto.  I'd like to talk to you a

20   little bit about the 69'ers.

21          You were the Treasurer?

22   A    Yes, sir.

23   Q    And let me show you what's in as exhibits --

24   Government's Exhibit 404, this Constitution.  You said you

25   first saw that in December of 2017?

1   A     Yes, sir.

2   Q     That's the same month that Paul Anderson was shot?

3   A     Yes.

4   Q     So this 69'ers club that you were a part of, that had

5   been in existence for quite some time before you ever saw

6   this, correct?

7   A     Yes.

8   Q     And isn't it true that you actually saw this in

9   Orlando, at the Orlando -- at some establishment associated

10  with the Orlando clubhouse, correct?

11  A     I didn't -- I didn't see that in Orlando.  There was --

12  we were supposed to have meetings, we had meetings over

13  there where we were supposed to discuss it, but I never

14  personally saw that in Orlando.

15  Q     Okay.  Did this come from Orlando?

16  A     Yes.

17  Q     Okay.  From Dakota Ellison?

18  A     Yes.

19  Q     And where did you see it?

20  A     I saw it with Phelps at the clubhouse.

21  Q     This clubhouse, you're talking about basically

22  Mr. Cosimano's garage?

23  A     Yes.

24  Q     And that wasn't even really a clubhouse until November

25  of 2017, right?

ALLAN GUINTO - JULY 30, 2019          108
Cross-Examination by Mr. Wise

1   A    Yes.

2   Q    And that was the point when it really -- there was a

3   bar built and that's where you guys would hang out; is that

4   right?

5   A    Yes, sir.

6   Q    I want to talk about some of the things that are in

7   this Constitution.  You see section 1, Charters.  Six

8   members are required to form a charter, of which four shall

9   be officers.  Do you see that at the top there?

10  A    Yes.

11  Q    Now, when the 69'ers started --

12          THE COURT:  Counsel, would you turn the microphone

13  towards you when you're at the screen.  Yes, sir.

14  BY MR. WISE:

15  Q    When your 69'ers group started, you started with --

16  there were three people, right?

17  A    Correct.

18  Q    So did you even ever have six members?

19  A    No.

20  Q    Okay.  The 69'ers Motorcycle Club is a not-for-profit

21  organization, and individual charters will form an LLC or

22  limited liability corporation.

23          Are you familiar with what an LLC is?

24  A    Yes.

25  Q    And you were the treasurer of the club?

```
 1    A      Yes.

 2    Q      But you never formed a limited liability corporation,

 3    correct?

 4    A      You're correct, I never formed one.

 5    Q      It goes on to say that the club accountant shall be

 6    responsible for filing a tax return at the end of each

 7    fiscal year.  You never filed a tax return though, right?

 8    A      No.

 9    Q      And before this clubhouse/garage was in existence in

10    November, meeting -- you would meet at like the Brick House

11    Bar and Restaurant here in Tampa, right, places like that?

12    A      Yes.

13    Q      Public places where you guys would just hang out,

14    essentially, right?

15    A      Yes.

16    Q      Early on you were really friends with Sean Leonard,

17    right?

18    A      Yes.

19    Q      And isn't it correct you didn't really become close

20    with Christopher Cosimano until July or August?

21    A      Yes.

22    Q      Art Siurano was mentioned some at the beginning of your

23    Direct.  This -- he wasn't part of your -- your local

24    organization, right, your local 69'ers club?

25    A      Correct.  Yes, sir.
```

1    Q    What, he was the Regional Boss?  He was part of the

2    Orlando club; is that right?

3    A    He was the Regional Boss and he belonged to a different

4    state.

5    Q    Okay.  When he would come hang out with y'all, he was

6    known to get pretty heavily intoxicated, right, when he

7    would hang out at the parties?

8    A    Yes.

9    Q    And he was the guy that would bring in the cocaine that

10   you mentioned a lot of other people used?

11   A    Yes.

12   Q    You mentioned several people that you would see him

13   hand drugs to.  Mr. Cosimano was not one of them, right?

14   A    Correct.

15   Q    Mr. Cosimano would maybe smoke some marijuana at

16   parties, but he wasn't using the hard drugs that others were

17   using, correct?

18   A    Correct.

19         THE COURT:  Counsel, you trail off at the end of

20   your sentences and so you're not going to be recorded

21   clearly.

22         MR. WISE:  I'm sorry, Your Honor.  I'll work on

23   that.

24   BY MR. WISE:

25   Q    All right.  Let's go to the LBC incident that you talk

1    about.

2              Isn't it correct that Sean Leonard essentially

3    wanted to push the boundaries with the Outlaws by going to

4    that LBC night?

5    A    Yes.  I -- yes.

6    Q    Christopher Cosimano had told you all not to do that,

7    right?  He advised against doing that?

8    A    I've never had that conversation with Christopher

9    Cosimano.

10   Q    Okay.  Well, in any event, Christopher Cosimano

11   certainly was not there with you all that night, right?

12   A    Correct.

13   Q    And afterwards Christopher Cosimano was upset at you

14   all for having started this issue with the Outlaws, correct?

15   A    Yes.

16   Q    And Sean was upset at the Outlaws, correct?

17   A    Yes.

18   Q    And you said that you were -- it was humiliating to you

19   to lose your vest, correct?

20   A    Yes.

21   Q    And you wanted -- and Leonard wanted some retaliation

22   against the Outlaws, correct?

23   A    Yes.

24   Q    And Chris did not, correct?

25   A    That's not true.

ALLAN GUINTO - JULY 30, 2019                112
Cross-Examination by Mr. Wise

1    Q    Okay.  You said earlier that Christopher was upset that

2    you guys had started this with the Outlaws, right?

3    A    Yes.

4    Q    So you're saying he changed his mind at some point and

5    decided that he did want to retaliate?

6    A    Yes.

7    Q    You said early on in your Direct that there came a

8    point when Chris said -- told you he wanted to get two

9    vests?

10   A    Yes.

11   Q    And you took -- you did not think that meant killing

12   anyone at that point, right?

13   A    Yes.

14   Q    You said that you did not think that that meant killing

15   anyone until that Costa incident?

16   A    He didn't say he was going to get two vests, he said he

17   wanted to get two of them.

18   Q    Okay.  You took that to mean two vests?

19   A    I assumed two vests, yes.

20   Q    Paul Anderson directly confronted you and Sean Leonard,

21   right?

22   A    Correct.

23   Q    And you've previously said that you didn't think Chris

24   hated Paul, right?

25   A    Yes.

1   Q    You thought he just wanted two Outlaws in general,

2   whoever they were, he wanted two Outlaw vests?

3   A    Yes.

4   Q    Let's talk about James Costa and that incident.

5              You testified on Direct that -- you went into a

6   whole explanation as to Chris calling you before this

7   shooting saying he saw -- he saw one of the Outlaws and

8   wanted you to go meet him and he was going to take one out,

9   and you went into a whole explanation of this beforehand,

10  right?

11  A    Okay.

12  Q    Am I fairly summing up what you testified to on Direct?

13  A    Yes.

14  Q    Okay.  You had spoken to authorities about this

15  incident several times prior to today, correct?

16  A    Yes.

17  Q    You spoke with law enforcement December 21st, 2017,

18  shortly after you were arrested, correct?

19  A    Yes.

20  Q    You gave a proffer, a sworn statement on February 8th

21  of 2018, correct?

22  A    Yes.

23  Q    And when you gave that, that sworn statement, I think

24  your attorney was there, there were attorneys from the State

25  Attorney's Office and maybe -- maybe an attorney from the

1    U.S. Attorney's Office there?

2    A    Yes.

3    Q    Okay.  And then you testified in front of a grand jury

4    sometime after that, correct?

5    A    Yes.

6    Q    And in all those statements you never said anything

7    about all these calls and this -- all this stuff that

8    happened before Costa was supposedly shot, correct?

9    A    I don't recall.

10   Q    Okay.  Would it help to refresh your recollection if

11   you looked at transcripts of, say, that sworn statement and

12   your grand jury testimony?

13   A    Yes.

14            MR. WISE:  Your Honor, may I approach the witness?

15            THE COURT:  Yes, sir.

16   BY MR. WISE:

17   Q    These are the transcripts.  Take a look at those, see

18   if it refreshes your recollection.  I can try to direct you

19   to some page numbers, if you need --

20   A    Okay.  What are you -- what are you referring to?  What

21   exactly do you want me to look at?

22   Q    Well, if you look at -- in the sworn statement,

23   I believe if --

24   A    In which --

25   Q    The February 8th statement.

1              MR. GAMMONS:  Your Honor, can we clarify the

2      question pending?

3              THE COURT:  Yes, sir.

4              MR. WISE:  The question pending was whether it

5      would refresh his recollection to review the transcript of

6      the February 6th statement and the grand jury testimony to

7      see if that refreshes his recollection as to whether or not

8      he ever said anything about all of this communication with

9      Mr. Cosimano prior to the Costa shooting.

10             THE COURT:  Is that sufficiently clarified?

11             MR. GAMMONS:  I would like further clarification

12     on all the communication between and what specifically he's

13     looking for.

14             THE COURT:  Well, the witness can look at the

15     record and see if it refreshes his recollection about

16     whether he told anybody about all of these communications

17     with Mr. Cosimano before the Costa shooting.  I don't know

18     how long that's going to take because I have no idea how

19     long these transcripts are.

20             MR. WISE:  And that is -- they're both just under

21     50 pages, Your Honor.

22             THE COURT:  Well, you need to be more precise then

23     rather than more clear.  Do you have a specific statement

24     that you think he said that's not in that transcript?

25             MR. WISE:  Your Honor, it is -- the issue is

```
 1    I don't believe it is contained in there, and it's all the
 2    statements of anything that -- any communication he had with
 3    Mr. Cosimano prior to the alleged Costa shooting.
 4            THE COURT:  All right.  Look in the transcript and
 5    see if you see anything about a conversation you had with
 6    Mr. Cosimano in advance of the Costa shooting.
 7            MR. GAMMONS:  Your Honor, may we approach?
 8            THE COURT:  No.
 9            What page are you on?
10            THE WITNESS:  Your Honor, I'm on page 41.
11            THE COURT:  Of how many?  Of how many total pages?
12            THE WITNESS:  Oh, I'm sorry.  48, Your Honor.
13            THE COURT:  All right.
14            THE WITNESS:  All right, Your Honor, I looked at
15    it.
16            THE COURT:  Does it refresh your recollection as
17    to whether you had all those calls with Mr. Cosimano or that
18    you told anyone about all those calls in those transcripts?
19            THE WITNESS:  Yes, Your Honor.
20            THE COURT:  And how is your recollection
21    refreshed?
22            THE WITNESS:  I seen the transcripts.
23            THE COURT:  Did you see yourself having said that
24    before?
25            THE WITNESS:  I just looked at the December 21st.
```

1              THE COURT:  Is there anything about the calls in

2    that transcript?

3              THE WITNESS:  No, Your Honor.  I'd have to look at

4    this one.  I just looked at one of them.

5              THE COURT:  All right.  How long is that one?

6              THE WITNESS:  47 pages.

7              THE COURT:  Counsel, do you have another question?

8    We'll come back to that.

9              MR. WISE:  Yes, Your Honor.  I can move on.

10   BY MR. WISE:

11   Q    Now, Mr. Guinto, you turn over this gun to Sean Leonard

12   sometime after the shooting of Mr. Costa, right?

13   A    Yes.

14   Q    And you claim you held onto that so you could have

15   leverage over Chris, right?

16   A    Yes, sir.

17   Q    And, of course, if you are in possession of a gun that

18   was used in a shooting, it could also make you look guilty

19   of the shooting, wouldn't you agree?

20   A    Yes, sir.

21   Q    And when you turned this gun over to Leonard, it's --

22   there's rust on it, right?  It's pretty rusty?

23   A    Yes, sir.

24   Q    And that's because you had buried it in Cody Wesling's

25   back yard?

ALLAN GUINTO - JULY 30, 2019          118
Cross-Examination by Mr. Wise

1    A    Yes.  The elements got to it.

2    Q    Now, you claim that Mr. Cosimano had told you he did

3    the shooting, and he told you details, right?

4    A    Yes.

5    Q    And one of the things he supposedly told you is that he

6    ran -- he ran his van into the back of Costa's bike?

7    A    Yes.

8    Q    And you're familiar with Mr. Cosimano's work van,

9    right?

10   A    Yes.

11   Q    Pretty big work van?

12   A    Yes.

13   Q    Do you know what kind it is, like an E something?

14   A    I'm not familiar with --

15   Q    But it's basically a full-sized van, right?

16   A    Yes.

17   Q    Sits up pretty high?

18   A    Yes.

19   Q    And have you seen James Costa's bike?

20   A    I've seen -- I've seen him riding before, but I'm not

21   familiar with what make or model.

22   Q    Okay.  It sits pretty low, right?

23   A    I'm not familiar with --

24   Q    Okay.

25   A    -- his motorcycle.

ALLAN GUINTO - JULY 30, 2019                    119
Cross-Examination by Mr. Wise

1    Q    Okay.  What kind of car were you driving at that time?

2    A Dodge Charger, I think you said?

3    A    Yes.

4    Q    And it sits pretty low to the ground, right?

5    A    Yes.

6    Q    Kind of like a sports car?

7    A    Yes.

8    Q    Your car had some -- had some problems, some mechanical

9    problems?

10   A    I know the check engine light came on.  I don't know

11   what mechanical problems.

12   Q    Okay.  Was it an old police car?

13   A    Yes.

14   Q    So it had a lot of miles on it?

15   A    Not really.

16   Q    Okay.  Did you buy it from the police department?

17   A    No, I bought it from Phelps.

18   Q    Okay.  And was it a car that had been used through

19   police service before Phelps bought it, as far as you know?

20   A    Yes.

21   Q    So you would assume -- well, how many miles did it have

22   on it, do you know?

23   A    When I bought it it only had 70,000 miles on it.

24   Q    Okay.  And there were some engine mount problems with

25   it, correct?

ALLAN GUINTO - JULY 30, 2019                    120
Cross-Examination by Mr. Wise

1    A    I have no idea what -- I don't know what the problems

2    were.  I just know that the check engine light was on.

3    Q    Okay.  It had fairly loud exhaust compared to like a

4    brand new car, right?

5    A    No.

6    Q    You're aware that Mr. Cosimano's van was taken into

7    custody, correct?

8    A    Yes.

9    Q    Your car was never taken into custody in connection

10   with the Costa shooting, right?

11   A    Correct.

12   Q    As far as you know, you were never investigated for the

13   Costa shooting, right?

14   A    Correct.

15   Q    Your phone was never seized at any time close in time

16   to the Costa shooting, right?

17   A    Correct.

18   Q    And you said Mr. Cosimano gave you some clothes from

19   that night too, right?

20   A    Correct.

21   Q    You didn't turn those over to Phelps when you gave him

22   the gun?

23   A    No.

24   Q    So you didn't think the clothes would be good leverage,

25   just the gun?

ALLAN GUINTO - JULY 30, 2019                    121
Cross-Examination by Mr. Wise

1    A     Yes.

2    Q     And going back to things you've said about this in the

3    past, you never previously said anything about Chris having

4    told you to keep your mouth shut because Phelps is next,

5    right?

6    A     Say again?

7    Q     In these prior statements you've made, these sworn

8    statements, you've never said that Chris told you to keep

9    your mouth shut because Phelps is next, right?

10   A     I've told the ATF that.

11   Q     You told the ATF that, but you didn't say that when you

12   gave your sworn statement or when you testified in front of

13   the grand jury, right?

14   A     Right.  Correct.

15   Q     Okay.  And you would agree that's pretty important, a

16   pretty important detail to keep out, wouldn't you?

17   A     I -- they never asked about it, but I told my lawyer

18   and then when we -- we talked about it.

19   Q     But never told the grand jury, never told all those

20   people that were there for your sworn statement?

21   A     Correct.

22   Q     All right.  Let's move ahead a little bit.

23         Sometime prior to the Paul Anderson shooting was

24   there not a time when Paul Anderson tried to run you off the

25   road when you were on your motorcycle?

ALLAN GUINTO - JULY 30, 2019                122
Cross-Examination by Mr. Wise

1   A    I don't know that it was Paul Anderson.

2   Q    Okay.  Well, is it -- maybe a month or so before the

3   shooting, maybe not even that long, a truck that looked very

4   similar to the one you saw Paul Anderson in tried to run you

5   off the road, right?

6   A    No, the truck that tried to run me off the road was a

7   Dodge Ram 1500.  Paul Anderson drove a little Ford Ranger.

8   Q    Okay.  It's your belief Paul Anderson was in a

9   Ford Ranger?

10  A    Yes.  It's the little small --

11  Q    Okay.  So if you're mistaken on the make of that, I'm

12  sure we'll see photographs that might explain that.

13  A    Yes.

14  Q    Okay.  But the one that tried to run you off the road

15  was a Dodge pickup truck?

16  A    Yeah, a fairly large pickup truck.

17  Q    About the same color as the one that Paul Anderson was

18  driving?

19  A    Yes.

20  Q    Had you not told people in the past that you thought it

21  was Paul Anderson that had tried to run you off the road?

22  A    No.  I said someone on their team tried to run me off

23  the road.

24  Q    Someone on their team.  On what team?

25  A    On the Outlaws' side.

1   Q    You testified that the shooting of Paul was a

2   surprise --

3   A    Yes.

4   Q    -- to you?

5         And as far as you know, it was a surprise to learn

6   who was there?

7   A    Yes.

8   Q    When you were at the house in Riverview before all this

9   happened, you were only there for about three to five

10  minutes from the time you go there after you eat your tacos

11  until you leave; is that right?

12  A    Give or take.

13  Q    Okay.

14  A    It was a while ago.  I don't remember.

15        THE COURT:  Counsel, how much longer with this

16  witness for you?

17        MR. WISE:  I'll probably go past 5:00, Your Honor.

18        THE COURT:  All right.  We're going to stop now

19  and pick up tomorrow morning at nine o'clock.

20        The Court reminds the jurors that you are still

21  under your obligation not to speak about this case.  Don't

22  start doing any research.  Don't go online.  Don't talk to

23  any family members about it or anyone else.

24        When you leave this area you can -- you should

25  remove your juror badges and then Mr. Anderson will give you

ALLAN GUINTO - JULY 30, 2019                    124
Cross-Examination by Mr. Wise

 1   further instructions about them.  Leave your notes, if

 2   you've taken any, on your chair face down.

 3          Anybody have any questions?  We will start sharply

 4   at nine o'clock tomorrow morning, so please be here in time

 5   to be on the stand at nine o'clock.  Thank you.

 6                    *(Jury exits proceedings.)*

 7          THE COURT:  The witness can be removed.

 8          Sir, it's as if you were still on the stand.  Do

 9   not discuss your testimony or your impending testimony with

10   anyone.  Do you understand that?

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  Thank you.  You may be excused.

13                  *(Witness exits proceedings.)*

14                     - - - o0o - - -

15          *(Excerpt ends at 4:35 p.m. on July 30, 2019)*

16                     - - - o0o - - -

17        *(Excerpt resumes at 9:19 a.m. on July 31, 2019)*

18                     - - - o0o - - -

19               *(Witness re-enters proceedings.)*

20          THE COURT:  Mr. Guinto, if you'll retake the

21   witness stand, sir.

22                 *(Jury re-enters proceedings.)*

23          THE COURT:  Good morning, ladies and gentlemen.

24   You will recall that we were in the examination by the

25   defense of the Government's witness, Mr. Guinto.  He has

1    retaken the stand.

2          Sir, has anyone discussed your testimony or your

3    impending testimony with you since trial completed

4    yesterday?

5          THE WITNESS:  No, Your Honor.

6          THE COURT:  You are reminded that you're still

7    under oath.  Do you understand that?

8          THE WITNESS:  Yes, Your Honor.

9          THE COURT:  Counsel, you may proceed.

10         MR. WISE:  Thank you, Your Honor.

11         Good morning, Mr. Guinto.

12         THE WITNESS:  Good morning, sir.

13         **CONTINUED CROSS-EXAMINATION OF ALLAN GUINTO**

14   **BY MR. WISE:**

15   Q    I think when we left off yesterday you were describing

16   how you all had been out to lunch, went back to the house in

17   Riverview and you were there for about three to five minutes

18   before leaving again; is that correct?

19   A    Correct.

20   Q    And at some point during this timeframe I believe you

21   had said that Chris had told you that he knows where an

22   Outlaw is and we're going to follow him; is that right?

23   A    Yes.

24   Q    And your response was "I don't have time for this"?

25   A    Yes.

1   Q    But you still ended up going out with everyone, right?

2   A    Yes.

3   Q    And you testified that, I think, both Mr. Cosimano and

4   Mr. Mencher were wearing masks and gloves?

5   A    Yes.

6   Q    But that wasn't unusual, at least for Chris, right?

7   A    No.

8   Q    He would typically wear something covering his face and

9   wear gloves when he would go out on his bike, correct?

10  A    Correct.

11  Q    And of course this is happening December 21st, when

12  it's a lot cooler outside than it is now, right?

13  A    Yes.

14  Q    And when you're on a motorcycle, when you're out in the

15  cool weather, especially on the Interstate, you have wind

16  coming at you, it gets cold, right?

17  A    Correct.

18  Q    You had also mentioned yesterday about license plates

19  being flipped on the bikes, correct?

20  A    Yes.

21  Q    And that was something that had -- Chris' bike

22  especially had the ability to flip the license plate for a

23  long time, right, as far as you know?

24  A    Yes.

25  Q    In fact, he would use that to avoid paying tolls,

1    correct?

2    A    Yes.

3    Q    So it was something where he could just reach back,

4    flip it up, so the toll camera wouldn't catch him going by,

5    right?

6    A    Yes.

7    Q    So that was something he did as a usual practice?

8    A    Yes.

9    Q    So the fact of the license plate and the flipping back

10   and the fact that he's wearing the gloves and wearing the

11   mask, that didn't seem out of the ordinary to you, right?

12   A    Yes.

13   Q    At that point I believe no one ever tells you who

14   you're supposedly following, correct?

15   A    Yes.

16   Q    Okay.

17   A    Correct.

18   Q    And for the court reporter's benefit, you have to

19   answer out loud.  I know nodding a head or shaking a head is

20   normal, but that doesn't show up on a transcript.

21        So you don't know who you're following, but you

22   told Cody to drive as well just in case your car breaks; is

23   that correct?

24   A    Yes.

25   Q    And you mentioned yesterday that there was a check

ALLAN GUINTO - JULY 31, 2019                    128
Cross-Examination by Mr. Wise

1    engine light on, but you had also said that there was --

2    your car was doing some weird things in the past, right?

3    A    Yes.

4    Q    What were those weird things your car was doing back

5    then?

6    A    When I would accelerate, it would hesitate.

7    Q    Okay.  And you were worried that it might just shut

8    down on you --

9    A    Yes.

10   Q    -- at some point?

11             So I assume you knew that you must have been going

12   some distance away, correct?

13   A    No.

14   Q    Okay.  Well, I mean, if you're just going to go to the

15   gas station down the street, would there be any need for

16   Cody to follow you in case your car breaks down?

17   A    I don't know.

18   Q    You end up going to a powder coating shop in Tampa,

19   right?

20   A    Correct.

21   Q    You don't stop at a gas station along the way, do you?

22   A    It's been a while.  I don't remember.

23   Q    Don't remember stopping at a gas station?

24   A    Might have.

25   Q    Okay.  Now, you testified yesterday, I believe early

1   on, that you didn't know that the person that you were

2   following was Paul Anderson until you saw him.

3   A    Correct.

4   Q    But then I think you said later in your Direct, if

5   I recall yesterday, that you didn't know that the person you

6   were following was Paul Anderson until Erick told you.  Do

7   you recall saying that as well?

8   A    Yes.

9   Q    So which one is it?

10  A    Erick --

11  Q    Did you find out it was Paul when you saw Paul or did

12  you find out it was Paul when Erick told you it was Paul?

13  A    Erick told me it was Paul and we saw him.

14  Q    So that's happening at the same time, you're saying?

15  A    Yes, sir.

16  Q    Now, you sometime there get word that Erick is supposed

17  to call Mike Mencher when Paul leaves the shop?

18  A    Correct.

19  Q    So by that point you at least knew that this was

20  Paul Anderson that was -- that you were supposed to be

21  following?

22  A    Yes.

23  Q    Okay.  So I guess we assume at that point that Paul is

24  at the powder coating shop?

25  A    Yes.

ALLAN GUINTO - JULY 31, 2019                    130
Cross-Examination by Mr. Wise

1    Q     So when did you see him?

2    A     When he was getting in his truck.

3    Q     Okay.  So he was -- so you saw him when he was leaving?

4    A     Yes.

5    Q     So you knew that Erick was supposed to call Mencher

6    when Paul was leaving, you knew that at some point ahead of

7    time, right?

8    A     Yes.

9    Q     And you don't see Paul until he's getting in his truck,

10   leaving?

11   A     Yes.

12   Q     So all this is happening at once that you're finding

13   out it's Paul, Erick is telling you it's Paul, and Erick is

14   telling you "I have to call Mencher when Paul leaves,"

15   that's all happening all at one time?

16   A     Yes.

17   Q     Okay.  And when Paul does leave, he calls Mencher, not

18   Chris, right?

19   A     Yes.  He tried -- he tried to call Chris first but

20   he -- he got upset, saying Chris put his phone either -- he

21   either turned it off or put it on airplane mode, and then he

22   started calling Mencher.

23   Q     Okay.  So we should have phone records then if Erick

24   was trying to call Chris?

25   A     Yes.

1    Q    And when you all pulled out onto the Parkway, you're

2    the car in the lead, right?

3    A    Correct.

4    Q    And Cody is behind you somewhere --

5    A    Yes.

6    Q    -- right?

7         And the bikes are somewhere behind you?

8    A    Yes.

9    Q    And the truck that's believed to belong to

10   Paul Anderson is somewhere ahead of you?

11   A    Yes.

12   Q    A fair distance away, right?

13   A    About an eighth of a mile.

14   Q    Okay.  And the bikes then, how far back are they from

15   your car?

16   A    They're behind Cody's car, so I couldn't tell you.

17   Q    Now, you all pull off at the 54 exit on the Parkway,

18   right?

19   A    Yes.

20   Q    You're the first one to pull off.

21   A    Yes.

22   Q    But you pull into the pay toll booth, correct?

23   A    Yes.

24   Q    And as you're paying the toll, that's when you hear

25   shots, right?

ALLAN GUINTO - JULY 31, 2019                    132
Cross-Examination by Mr. Wise

1    A    Yes.

2    Q    So you're some distance -- because at this point

3    Paul Anderson is essentially up right by the stoplight at

4    54, correct?

5    A    Correct.

6    Q    So you're a considerable distance behind if you're

7    still at the toll booth; would you agree?  Maybe 100 yards?

8    A    I couldn't tell you the distance between the toll booth

9    and the stoplight.

10   Q    Okay.  But you know for a fact you're paying the

11   toll booth when you hear the shots?

12   A    Yes.

13   Q    And you can't see the shooting --

14   A    No.

15   Q    -- correct?

16        Now, I think you've said before that you were

17   waiting on the bar to come up of the toll booth, right?

18   A    Yes.

19   Q    So that toll booth would have been one that has a stop

20   bar?

21   A    Yes.

22   Q    As far as you remember.

23        And when the bikes pulled away, I think you said

24   they went to the left?

25   A    Yes.

1    Q    So they would have gone west?

2    A    Yes.

3    Q    Like back towards New Port Richey and the coast

4    basically, right?

5    A    Yes.

6    Q    Not -- not right, to the east, back towards Riverview?

7    A    Yes.

8    Q    And then you drove back by -- well, you drive by Paul,

9    you go to the left as well --

10   A    No.

11   Q    You don't?

12   A    I -- I went east.

13   Q    Okay.

14   A    I went east originally and then I was told to make a

15   U-turn and drive back by.

16   Q    Okay.  So you go right and east?

17   A    And make a U-turn, I come back around under the bridge

18   and make another U-turn.

19   Q    Okay.  So where -- where do you cross the bridge?

20   A    There was a bridge that goes over 54.  I went under the

21   bridge.

22   Q    So you go -- you go east?

23   A    I go east, I make a U-turn, I'm heading west, and I

24   pass where the shooting happened, which is to my left,

25   I cross under the -- under the bridge and I make another

ALLAN GUINTO - JULY 31, 2019                  134
Cross-Examination by Mr. Wise

1    U-turn and drive back by where the shooting happened to my

2    right.

3    Q    Okay.  So you essentially passed Paul then three times,

4    right, when you go past him on the toll booth road, when you

5    go past him going west and then when you go past him going

6    east again; is that correct?

7    A    Right.

8    Q    Now, you testified, I believe, yesterday that when you

9    see Chris and Mike later on, Chris gives you the guns and

10   the clothes.

11   A    Yes.

12   Q    So it's your testimony that Chris hands them directly

13   to you?

14   A    No.  He -- he came to the passenger side and gave it to

15   Erick.

16   Q    Okay.  So when you said -- you weren't giving all the

17   details then yesterday when you said he gave them to you.

18   He really gave them to Erick and told Erick to burn the

19   stuff; is that what your testimony is?

20   A    He told us to get rid of it.

21   Q    Okay.  At some point then you call Cody and tell him to

22   go back home?

23   A    Yes.

24   Q    When you get back to Riverview, do you see Chris there

25   just for a short time?

ALLAN GUINTO - JULY 31, 2019                    135
Cross-Examination by Mr. Wise

1    A    Yes.

2    Q    And he leaves in his truck?

3    A    Yes.

4    Q    And you all never really have any discussion about what

5    happened; is that right?

6    A    Excuse me?

7    Q    You all never really have any discussion about what

8    happened during that time?

9    A    No.

10   Q    All right.  And then you leave at some point later with

11   the gun?

12   A    Yes.

13   Q    And then when you leave with the gun, at some point,

14   I think it's later that night or maybe by the next morning,

15   you take that gun to Sean Leonard, right?

16   A    The same night.

17   Q    It was the same night.  Okay.

18        And when you give him the gun, the clip is not in

19   the gun, is it?

20   A    No.

21   Q    In fact -- because the clip was in your trunk, right?

22   A    I don't know where the magazine was.

23   Q    Okay.  Well, if we assume the clip was in your trunk,

24   do you have any idea how the clip would have gotten into

25   your trunk?

ALLAN GUINTO - JULY 31, 2019                    136
Cross-Examination by Mr. Wise

 1  A    I don't know that the magazine was in the truck of my

 2  car.

 3  Q    You don't know where it was, you just know it wasn't in

 4  the gun when you gave it to Leonard?

 5  A    Yes.

 6  Q    Were you trying to hold the clip for leverage or

 7  something?

 8  A    No.  I don't remember what I did with the magazine.

 9  Q    Okay.  When you give the gun to Sean Leonard, you tell

10  him -- you make a lot of statements to him about what

11  happened, right?

12  A    Yes.

13  Q    You tell him that they done good, right?

14  A    Yes.

15  Q    You tell him that you're proud of what happened, right?

16  A    Correct.

17  Q    You told him that you had tailed Paul Anderson all day,

18  right?

19  A    Yes.  I don't know the exact words.  I don't remember

20  the exact words I said to Sean.  It was a long time ago.

21  Q    Okay.  But you told him something to the effect of

22  "I tailed Paul all day"?

23  A    Yes.

24  Q    And you told him that you asked to be the shooter,

25  right?

1    A    Yes.

2    Q    You told him you were the one that wanted to shoot

3    Paul Anderson, right?

4    A    I said that to him.

5    Q    And you told him that what went down was gangster as

6    fuck, right?

7    A    Yes.

8    Q    And you laughed about it?

9    A    Yes.

10    Q    You told him it gave you a hard-on, seeing

11    Paul Anderson dead, right?

12    A    Yes.

13    Q    And I assume by that you mean it gave you an erection?

14    A    Yes.

15    Q    And you end that conversation by saying, "I'm here to

16    do whatever you all need me to do," right?

17    A    Correct.

18    Q    Now, a couple months later when you give your sworn

19    statement at the State Attorney's Office, you told them that

20    after you saw Paul dead you felt like vomiting, right?

21    A    Yes.

22    Q    Because when you talked to them you didn't know that

23    they had a recording of you talking to Sean Leonard when you

24    said all these other things, right?

25    A    Correct.

ALLAN GUINTO - JULY 31, 2019                    138
Cross-Examination by Mr. Wise

1    Q    Now, at some point shortly after you were arrested --

2    I think this was discussed a little bit yesterday.

3    December 22nd, you talked to some detectives or at least

4    some law enforcement who were investigating the case, right?

5    Is that right?

6    A    I don't understand the question.

7    Q    December 22nd, I think it's the day after you're

8    arrested or -- well, December 22nd, under whatever

9    circumstances it is, you talked to law enforcement, correct?

10   A    Correct.

11   Q    And you didn't tell them a lot of the things that

12   you've told the jury today, right?

13   A    Correct.

14   Q    And you didn't tell them a lot of things that you ended

15   up telling law enforcement later on, right?

16   A    Correct.

17   Q    And they confront you at least a couple of times at

18   that point about you not telling the truth, right?

19   A    Yes.

20   Q    At that point you denied knowing who did the shooting?

21   A    Yes.

22   Q    Really anything about it, right?

23   A    Yes.

24   Q    And then you give the sworn statement at some -- some

25   point in February, correct, that we talked about a little

ALLAN GUINTO - JULY 31, 2019                   139
Cross-Examination by Mr. Wise

1   bit?

2   A    Yes.

3   Q    And then you testify in front of the grand jury at some

4   point later on, in April, I think, right?

5   A    Yes.

6   Q    And yesterday I had shown you some of the transcripts

7   of those various -- well, at least two of those

8   communications, two of those -- two of the sworn testimonies

9   that you gave, and one of them I showed you was the

10  grand jury statement.  I was asking you isn't it correct

11  that in all these statements you had not said anything about

12  Paul having called you -- or, I'm sorry, about Chris having

13  called you before he was allegedly following Jimbo Costa,

14  correct?

15  A    Say that again?

16  Q    Yeah, that was kind of a compound question.

17  I apologize.

18        Yesterday I had asked you wasn't it true that when

19  you gave all these previous statements you had never said

20  anything about Chris having called you to say he was

21  following Jimbo Costa and giving you all these details about

22  where he saw Jimbo in St. Pete and all that?

23  A    Correct.

24  Q    And you looked through I think one of those

25  transcripts, and I think you may have been starting to look

1    through the other one, and I have a page I can direct you to

2    now, so hopefully this will be a little -- a little quicker.

3              MR. WISE:  May I approach?

4              THE COURT:  Yes, please.

5    Q    I want to hand you one of those two transcripts and ask

6    you to look specifically at page 27.

7              THE COURT:  But only talk when you're at a

8    microphone.

9              Is there a question?  Is there a question pending?

10             MR. WISE:  There is.  I'm going to go back to the

11   question from before, and I can ask the question if -- if

12   reviewing that might refresh his recollection as to whether

13   he made -- he discussed in detail the call from Chris

14   Cosimano before the Jim Costa shooting.

15             THE COURT:  So the question is:  Does page 27

16   refresh your recollection about that?

17             MR. WISE:  Yes.

18             THE COURT:  He's only asking you about page 27.

19   Does it refresh your recollection?

20             THE WITNESS:  Yes, Your Honor.

21             MR. WISE:  May I approach?

22   BY MR. WISE:

23   Q    Are you done reviewing that?

24   A    Yes.

25   Q    There's just two pages.

ALLAN GUINTO - JULY 31, 2019                    141
Cross-Examination by Mr. Wise

1           THE COURT:  There's no other question pending.  If

2    he has another question, he can ask it.

3           You can get your document.

4    BY MR. WISE:

5    Q    So, Mr. Guinto, in reviewing that, it's true you did --

6    you did mention, in fairness, that Chris had called you at

7    some point prior to the shooting and said that he was

8    following Jimbo Costa?

9    A    He didn't say he was following Jimbo Costa.  He said he

10   was going to follow an Outlaw.

11   Q    Okay.  He didn't go into the detail about, you know,

12   having -- like you described yesterday, I saw him at

13   such-and-such bar and call all the others and tell them

14   what's happening?

15   A    He didn't go into specifics about who he was following.

16   Q    Okay.  And in all these other -- these prior

17   statements, as far as you recall, you had not said anything

18   about -- about this up until you test -- the time you

19   testified in front of the grand jury in April of 2018; is

20   that correct?

21   A    Yes.

22   Q    And while we're back on that topic too, by the way,

23   Riverview is the area where the clubhouse is or where

24   Mr. Cosimano's house is, right?

25   A    Correct.

ALLAN GUINTO - JULY 31, 2019                    142
Cross-Examination by Mr. Wise

1    Q    And just in case any of the jurors are not familiar

2    with that, that's essentially kind of in the eastern part of

3    Hillsborough County, right?

4    A    Yes.

5    Q    If you're in St. Petersburg and you're traveling to

6    Riverview, the most logical route to take would be going

7    over the Skyway, right?

8    A    Either the Skyway or the Gandy.

9    Q    Okay.  You could take either, and if you went to the

10   Gandy you would have to -- you would have to cut back

11   through Tampa, right?

12   A    I guess, yes.

13   Q    Well, two different ways you could go to Riverview from

14   St. Pete would be the Skyway or the Gandy, in your

15   testimony?

16   A    Yes.

17   Q    Now, when you were in the jail you had a lot of

18   conversations over the phone, right?

19   A    Correct.

20   Q    And you talked to Cody Wesling at times over the phone,

21   right?

22   A    Yes.

23   Q    And one time in particular, you talked to him on

24   February 28th, do you recall that, approximately?

25   A    I talked to Cody numerous times.

1    Q    Okay.  Well, on this one time he told you that the ATF

2    had come to see him.  Do you recall that conversation?

3    A    Yes.

4    Q    And do you recall him telling you that "they asked me

5    if there's something buried in my back yard" and he asked

6    you "does that sound familiar"; do you remember that?

7    A    Yes.

8    Q    And you answered yes, right?

9    A    Yes.

10   Q    And he said, "I'm pretty sure I know what that means.

11   Is that going to work itself out?"  And you answered, "yeah,

12   yeah," right?  Do you remember that?

13   A    Yes.

14   Q    And then you asked him:  "Do you have anything buried

15   in your back yard?"  Do you remember that?

16   A    No, I don't.

17   Q    Okay.

18   A    I don't remember the specifics of the conversation.

19   Q    Don't remember all the specifics.  You may have said

20   that, don't remember all the specifics?  Okay.

21        Do you remember him then telling you, "I told them

22   what I knew.  I didn't really know what happened"?

23   A    Yes.

24   Q    And then him saying "there was nothing in the back yard

25   that I was aware of," and then you telling him "they already

1    know about that"?

2    A    Yes.

3    Q    Okay.  And then you advised him "you might want to call

4    them back and say hey"?

5    A    I advised him that he might want to be honest.

6    Q    And then -- okay.  And then you said:  "Sorry if

7    I blindsided you with that.  I thought I was clear when I

8    told you you're going to have to do the right thing"?

9    A    Well, Cody and I had a conver -- when I first got

10   locked up, he came to visit me, and one of the things he

11   said to me was, "hey, don't worry, I know that I'm

12   eventually going to have to do the right thing," and I said

13   okay, and then later on when we had that conversation,

14   I thought he knew that he was going to have to be honest

15   about that.

16   Q    But then you go on to directly tell him:  "I did bury

17   that thing back there and I gave it to who it needed to go

18   to"?

19   A    Sorry?

20   Q    Didn't you go on to tell Cory:  "I did bury that thing

21   back there and I gave it to who it needed to go to"?

22            THE COURT:  The answer is yes or no.  Did you say

23   that, if you recall?

24            THE WITNESS:  Yes, Your Honor.

25

1   BY MR. WISE:

2   Q    And then you go on to tell him:  "I don't know if I we

3   can get in trouble for this conversation"?

4   A    Yes.

5   Q    Because you knew everything was being recorded?

6   A    Yes.

7   Q    And maybe Cody didn't know that?  Do you know if Cody

8   knew he was being recorded at that point?

9   A    I don't know if he knew that.

10  Q    And then towards the end of that conversation you tell

11  him that "me and you are going to have to stick together,"

12  right?

13  A    Correct.

14  Q    And then you go on to talk about how you're both going

15  to testify against Chris, right?

16  A    Yes.

17  Q    And as far as you know, you guys got your story

18  straight; is that correct?

19  A    Correct.

20           MR. WISE:  May I approach the well?

21           THE COURT:  Which exhibit are you looking for?

22           MR. WISE:  601, Your Honor.  I believe it's in

23  evidence.  May I confer with --

24           THE COURT:  You may.

25           Madam Clerk, was 601 moved in yesterday?

1              COURTROOM DEPUTY:  It was, Your Honor.

2              THE COURT:  Do you have it, Counsel?

3              MR. WISE:  Your Honor, I have my copy, but it's

4     marked up.  I don't necessarily need this one in evidence if

5     there's a clean copy.

6              THE COURT:  Mr. Guinto, are there any exhibits on

7     your table?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  Pass it to counsel.

10             MR. WISE:  Thank you.

11    BY MR. WISE:

12    Q    All right.  Mr. Guinto, I want to discuss the document

13    you just handed me, which is in evidence as Government's

14    601.  That is your plea agreement that we saw yesterday,

15    right?

16    A    Correct.

17    Q    And you -- as you discussed yesterday -- had entered a

18    guilty plea to Counts One, Two and Eight of the same

19    indictment that these two defendants have been charged in,

20    correct?

21    A    Correct.

22    Q    And you know that you are facing a potential sentence

23    of up to life imprisonment, right?

24    A    Correct.

25    Q    And I think you discussed that yesterday.

1              And then there are some other sanctions that can
2    be imposed, such as, you know, a fine, and then if you don't
3    get life in prison you would have supervised release that
4    would be kind of like being on parole or probation after you
5    serve your time and get released, right?
6    A    Correct.
7    Q    And among some of the agreements in here there's an
8    agreement that the remaining counts against you would be
9    dismissed, that was Counts Three and Four of the indictment,
10   right?
11   A    Correct.
12   Q    And then there's an agreement that there would be no
13   other charges lodged against you that the Government was
14   aware of at the time this agreement was entered into, right?
15   A    Correct.
16   Q    And then here we also have an agreement that the
17   Government would recommend to the Court that you would
18   receive a sentence within your applicable guidelines range.
19   A    Correct.
20   Q    And you've, I assume, become familiar with the Federal
21   sentencing guidelines?
22   A    A little bit.
23   Q    Okay.  And you're aware that a lot of factors are
24   computed in there, but ultimately you end up with a
25   recommended sentencing range, right?

1   A    Correct.

2   Q    And ultimately the Court is able to give you really any

3   sentence in your case up to the statutory maximum, which is

4   life, or any sentence, potentially below the guidelines,

5   right?

6   A    Correct.

7   Q    And assuming you would score below the guidelines, the

8   Government would recommend that you be sentenced within that

9   guideline range and not any higher, right?

10  A    Correct.

11  Q    And then going back to these guidelines, in this

12  section we see that the Government is agreeing that they

13  would recommend that you receive three levels off that

14  guidelines calculation for your acceptance of

15  responsibility.

16  A    Correct.

17  Q    And that's something I assume you became aware of

18  before you entered into this agreement?

19  A    Yes.

20  Q    And more importantly, we go to paragraph 8, or

21  Section 8, which is cooperation and substantial assistance

22  to be considered, and you have come to learn about something

23  called a 5K motion, right, 5K1 motion?

24  A    Yes.

25  Q    Or potentially what could be referred to as a Rule 35

1    motion if it happens after your sentence, correct?

2    A    Correct.

3    Q    And what that means is that is a -- that is a motion

4    that the Government could file that would recommend that you

5    get a downward departure below your guidelines range,

6    correct?

7    A    Correct.

8    Q    And if you have a minimum mandatory sentence in place,

9    that could even -- that could even allow the Judge to go

10   below whatever your minimum mandatory is, right?

11   A    Correct.

12   Q    And that's a pretty critical document for you, wouldn't

13   you agree?

14   A    Yes.

15   Q    It's pretty important that you get that 5K motion,

16   right?

17   A    Yes.

18   Q    And the only person or the only party that has the

19   ability to file that 5K motion is sitting over here at this

20   table, right?

21   A    Yes.

22   Q    The Government?

23   A    Yes.

24   Q    The U.S. Attorney?

25   A    Yes.

1    Q    And they are the ones who will decide whether or not

2    they think you have completed cooperation that qualifies as

3    substantial assistance, correct?

4    A    Correct.

5    Q    And you agree in here that if -- that they are the only

6    party who has the authority to make that decision, and if

7    they decide that your assistance was not substantial, that

8    you really can't do anything about it, right?

9    A    Correct.

10   Q    So your fate more or less rests in the hands of the

11   U.S. Attorney's Office at this point, right?

12   A    I understand that.

13            THE COURT:  Yes or no?

14            THE WITNESS:  Yes, Your Honor.

15   BY MR. WISE:

16   Q    You have a lot of reasons to tell the United States

17   Attorney's Office what you think they want to hear about

18   this case, right?

19   A    Correct.

20   Q    Because they're the ones who will decide whether that

21   5K motion gets filed?

22   A    Yes, sir.

23   Q    I assume you do not want to do life in prison, right?

24   A    Correct.

25   Q    You want that 5K motion to be filed?

1   A    Yes, sir.

2   Q    So you would have plenty of reasons to -- if you're not

3   telling us the truth, you would have plenty of reasons to

4   lie to tell us whatever the Government wanted to --

5              MR. GAMMONS:  Asked and answered, Your Honor.

6              THE COURT:  Sustained.

7              MR. WISE:  No further questions, Your Honor.

8              THE COURT:  Ms. Borghetti?

9              MS. BORGHETTI:  Yes, Your Honor.

10             THE COURT:  Have you made a decision about the

11  issue we discussed yesterday?

12             MS. BORGHETTI:  I believe after my first couple of

13  questions.

14             THE COURT:  All right.

15             MS. BORGHETTI:  May I approach?

16             THE COURT:  Yes.

17             MS. BORGHETTI:  Good morning, Mr. Guinto.

18             THE WITNESS:  Good morning, ma'am.

19             MS. BORGHETTI:  My name is attorney Anne Borghetti

20  and I represent Michael Mencher.

21             THE WITNESS:  Yes, ma'am.

22             MS. BORGHETTI:  Did I pronounce your name

23  correctly?

24             THE WITNESS:  Yes, ma'am.

25

### CROSS-EXAMINATION OF ALLAN GUINTO

**BY MS. BORGHETTI:**

Q     Now, yesterday on direct examination you told this jury that the first time you met my client, Michael Mencher, was at a New Year's Eve party on twenty -- New Year's Eve of 2016; is that correct?

A     Yes, ma'am.

Q     And where exactly was that party?  I don't believe you said where the party was.

A     At the Orlando chapter clubhouse.

Q     And that party -- you said it was New Year's Eve, so is that December 31st?

A     I don't recall the exact date.

Q     So you would agree with me that usually a New Year's Eve party is December 31st, correct?

A     Correct.

Q     Because that is New Year's Eve.

A     Correct.

Q     I'm going to show you on this ELMO or attempt to show you on this ELMO exhibit -- Government Exhibit 310-3.  Do you see that?

A     Yes.  Yes, ma'am.

Q     Okay.  And is this a picture -- this picture came from your phone, correct?

A     Yes, ma'am.

ALLAN GUINTO - JULY 31, 2019          153
Cross-Examination by Ms. Borghetti

1   Q     And is this a picture of the New Years Eve party?

2   A     I believe so.

3   Q     And I think you testified -- and I'm pointing over

4   here -- that you identified Michael Mencher.

5   A     Yes, ma'am.

6   Q     Now, I'm pointing to him here.  You would agree with me

7   he has on a T-shirt, correct?

8   A     Yes, ma'am.

9   Q     And it does not say 1 percent, correct?

10  A     Correct.

11  Q     It has brass knuckles on it; is that right?

12  A     Correct.

13  Q     So the time you meet my client is New Years Eve of

14  2016?

15  A     Yes, ma'am.

16  Q     And would you agree with me that the next time that you

17  meet with Michael Mencher or see Michael Mencher is

18  approximately November 1st of 2017?  Correct?

19  A     It's whenever he came to move to the -- move in with

20  Christopher Cosimano and Erick in the house.

21  Q     And can you tell me when that was?

22  A     I don't remember exactly, ma'am.

23  Q     What time of year it was?

24  A     It was in the fall of 2017.

25  Q     Would you agree with me it was in end of October,

1    beginning of November?

2    A    Maybe.

3    Q    Well, it was a good --

4    A    A good time.

5    Q    -- ten months you hadn't seen him, correct?

6    A    Correct.

7    Q    Now, let's talk about what you just said.

8         You learned that Mr. Mencher had come -- had been

9    living -- well, originally he was living in New York,

10   correct?

11   A    Correct.

12   Q    He's from New York.

13   A    Correct.

14   Q    And then he -- before he came to rent the room from

15   Mr. Cosimano and Mr. Robinson, he was living in

16   Fort Lauderdale, Florida, correct?

17   A    Correct.

18   Q    And he was living with his girlfriend, correct?

19   A    I don't know who he was living with.  I just know he

20   was from down there.

21   Q    All right.  Now, I'm going to show you Government

22   Exhibit 310-5, if I could -- thank you.

23        This photograph came off of your phone, correct?

24   A    Correct.

25   Q    And I'm trying to zoom in.  Do you see the television

1    up there?

2    A    Yes.

3    Q    Okay.  That's the Bulls game, isn't it?

4    A    I don't know whose -- what game that -- that is.

5    Q    Well, this comes from your phone, correct?

6    A    Yes.

7    Q    Okay.  And are you in this photo or are you taking this

8    photo?  Can you see it?

9    A    Yes.

10   Q    Okay.  Are you -- you can see it, but are you in the

11   photo?

12   A    No, ma'am.

13   Q    So are you taking the photo?

14   A    Most likely.

15   Q    Okay.  And this appears to be a bar; is that correct?

16   A    Yes.

17   Q    Okay.  And the basketball game, can you see -- you're

18   saying you don't know whether it was the big upset, the Duke

19   upset, on November 24th of 2017?

20   A    I don't know what game specifically it is, that's what

21   I'm saying.

22   Q    But you do -- do you recall going to the bar to see a

23   game, a basketball game?

24   A    No, ma'am.

25   Q    So you don't know under what circumstances this

1    photograph was taken?

2    A    Honestly, it might have just been a phone -- a picture

3    I saved on my phone.  It could have been sent to me.  But I

4    don't recall this evening.

5    Q    Okay.  So when you just told this jury that you took

6    the photo, that wasn't true?

7    A    I said I could have.  I could have.

8    Q    But in any event, that photograph would have been after

9    the second time that you met Michael Mencher, approximately

10   October, November of 2017, correct?

11   A    Correct.

12   Q    And I believe -- I'm going to show you another

13   photograph, Government Exhibit 310-1.  We saw this

14   yesterday, correct?

15   A    Correct.

16   Q    And I'm going to attempt to zoom out.

17          And I believe yesterday you said that the date on

18   this is incorrect; is that right?

19   A    Yes.

20   Q    And that you testified it was 1-6 of '17.

21   A    Correct.

22   Q    And would you agree with me my client, Michael Mencher,

23   is not in that photograph?

24   A    Correct.

25   Q    And that purported to be the grand opening of the Tampa

1  chapter; is that correct?

2  A    Yes, ma'am.

3  Q    Now, you knew my client, Michael Mencher, by a

4  nickname, correct?

5  A    Yes, ma'am.

6  Q    Punken?

7  A    Punken, yes, ma'am.

8  Q    And would you agree with me that's pulled P-N-K-E-N?

9  A    I don't know how it's spelled.  People would often

10 mistake it for Pumpkin.  Punken.

11 Q    But you also called him The Village Idiot, didn't you?

12 A    Yes, ma'am.

13 Q    And you called him that behind his back, didn't you?

14 A    Yes, ma'am.

15 Q    As you sit here today, you're 28 years old; is that

16 right?

17 A    Yes, ma'am.

18 Q    All right.  So back in 2017, you were 26 years old,

19 correct?

20 A    Correct.

21 Q    Now, let's go to the -- I think we're talking about on

22 December 21st of 2017, all right?

23 A    Yes, ma'am.

24 Q    All right.  Now, you testified on Direct that you were

25 eating lunch; is that right --

1   A    Yes, ma'am.

2   Q    -- that day?

3        And you said that you were eating lunch with

4   Erick Robinson and Cody Wesling; is that right?

5   A    Yes, ma'am.

6   Q    But Erick Robinson's girlfriend was also there,

7   correct?

8   A    Yes, ma'am.

9   Q    Okay.  You left her out yesterday --

10  A    Yes, ma'am.

11  Q    -- is that right?  Okay.

12       And I believe you testified that Christopher

13  Cosimano FaceTimed you?

14  A    He FaceTimed Erick Robinson.

15  Q    Okay.  He FaceTimed Erick during the lunch and asked

16  you guys to go for a ride; is that right?

17  A    Asked us to come back to the clubhouse.

18  Q    He didn't say anything about a ride at that point?

19  A    No, ma'am.

20  Q    Okay.  Just come back to the clubhouse.

21       But was it Erick or you that asked, well, can we

22  finish our lunch or do we have to come right away?

23  A    I asked Erick if we had to go right away or if we could

24  finish our lunch, and Erick said that we were going to

25  finish our lunch.

ALLAN GUINTO - JULY 31, 2019                    159
Cross-Examination by Ms. Borghetti

1    Q    When you got back to the Riverview address, you

2    testified that Michael Mencher and Christopher Cosimano

3    already had their bikes pulled out of the garage, correct?

4    A    Yes, ma'am.

5    Q    And yesterday you testified that Mr. Mencher had

6    something over his face; do you recall that?

7    A    Yes, ma'am.

8    Q    And do you also recall yesterday that you said that

9    this wasn't normal?

10   A    Yes, ma'am.

11   Q    But it was normal, wasn't it?

12   A    Yes, ma'am.

13   Q    So that wasn't true, what you said yesterday?

14   A    The way they were dressed wasn't normal.

15   Q    Excuse me?

16   A    The way they were dressed going for a normal ride was

17   not normal.

18   Q    It was not normal you're saying today?

19   A    No, ma'am.

20   Q    Okay.  So you just said on cross-examination that it

21   was normal.

22   A    It was normal for them -- what the other attorney said,

23   them wearing face gear and head gear in that time of the

24   year to prevent bugs and other debris hitting you, yes, it's

25   normal; but for them to do that and not wear their vests and

1   their colors was not normal.

2   Q    Okay.  Well, you added that.  What I'm asking you is:

3   Is the -- to go for a ride -- well, you don't always wear

4   your vests when you go for a ride, correct?

5   A    We did.

6   Q    You all always wore your vests?

7   A    Yes, ma'am.

8   Q    Sir --

9   A    Unless -- unless I had my girlfriend with me, yes.

10  Q    So do you remember giving a sworn statement on

11  Thursday, February 8th, 2018?

12  A    Yes.

13  Q    You've been shown that statement, and I'll show it to

14  you again if you need to see it.

15  A    Yes.

16  Q    You do need to see it?

17  A    At this time I don't know if I need to see it.

18  Q    Okay.

19          THE COURT:  Well, do you need to see it to confirm

20  that you gave a statement on that date?

21          THE WITNESS:  No, Your Honor.

22          THE COURT:  All right.

23  BY MS. BORGHETTI:

24  Q    And you were in the Pinellas County Jail, correct?

25  A    Correct.

1    Q    And there was a reporter, somewhat like today, taking

2    down what you said, correct?

3    A    Correct.

4    Q    And there was a State Attorney there, correct?

5    A    Correct.

6    Q    All right.  And you had lawyers there, correct?

7    A    Correct.

8    Q    And actually Mr. Gammons was there, correct?

9    A    Correct.

10   Q    And a Detective Roque from the Pasco County Sheriff's

11   Office was there?

12   A    Correct.

13   Q    And also Agent Blake Childress was there, correct?

14   A    Yes, ma'am.

15   Q    And you were sworn to tell the truth, correct?

16   A    Yes, ma'am.

17   Q    And if you need to see this, I'm going to refer you to

18   page 16, line 20, where you said:  "They had masks and

19   gloves on, but that's their normal thing for them to wear

20   when they ride, so I didn't think anything of it."

21           Isn't that true, sir?

22   A    Yes, ma'am.

23   Q    And you said yesterday and today that you were never

24   told that you were going to kill an Outlaw, correct?

25   A    Correct.

ALLAN GUINTO - JULY 31, 2019          162
Cross-Examination by Ms. Borghetti

1   Q    And I'm going to refer you back to that statement, and
2   if you need to refer to it, I will let you, okay?
3   A    Yes, ma'am.
4   Q    When they were talking to you -- well, actually,
5   excuse me, strike that.
6          The conversation that you had with Christopher
7   Cosimano saying "I don't have time for this," correct?
8   A    Yes, ma'am.
9   Q    Okay.  Mr. Mencher wasn't present during that
10  conversation, correct?
11  A    Correct.
12  Q    Okay.  Now, you testified on direct examination that
13  you traveled to a powder coating facility; is that right?
14  A    Gene Lasker's facility, yes, ma'am.
15  Q    And that's a powder coating facility?
16  A    Yes, ma'am.
17  Q    And you were familiar that it was owned by a man named
18  Gene Lasker?
19  A    That's what I was told on the way over.
20  Q    And you were told that by Christopher Cosimano,
21  correct?
22  A    Erick Robinson.
23  Q    And he's in the car with you, right?
24  A    Yes, ma'am.
25  Q    As a matter of fact, let's talk about the phone calls.

ALLAN GUINTO - JULY 31, 2019          163
Cross-Examination by Ms. Borghetti

1         You said that on cross-examination that Erick --
2   well, you were driving the car, right?
3   A    Yes, ma'am.
4   Q    And Erick was the passenger?
5   A    Yes, ma'am.
6   Q    And you said on cross-examination that Erick tried to
7   call Chris five times; is that right?
8   A    Yes, ma'am.
9   Q    Okay.  And wasn't getting through; is that right?
10  A    Yes, ma'am.
11  Q    And this is prior to the shooting, correct?
12  A    Yes, ma'am.
13  Q    Okay.  But ultimately calls Michael Mencher, correct?
14  A    Yes, ma'am.
15  Q    And Michael Mencher hands the phone to Christopher
16  Cosimano, correct?
17  A    I have no idea.
18  Q    Well, you hear Erick talking to Chris; is that correct?
19  A    I hear -- I don't know who Erick is talking to.
20  Q    Erick didn't tell you who -- that he was talking to
21  Chris?
22  A    He told me that they got -- he got in contact with them
23  and they're -- they're on their way.
24  Q    So you don't know whether it was Chris or Michael?
25  A    Correct.

ALLAN GUINTO - JULY 31, 2019                   164
Cross-Examination by Ms. Borghetti

1    Q    And yesterday you said that you could not see the
2    actual shooting, correct?
3    A    Correct.
4    Q    And you were totally surprised that Paul Anderson was
5    killed, correct?
6    A    Correct.
7    Q    And in fact Erick made you turn around to check the
8    fact that the man had been killed, correct?
9    A    Correct.
10   Q    All right.  Now, let's go to this statement where you
11   say -- you testified that after the shooting Chris gave you
12   his firearm, his helmet and his sweater; is that right?
13   A    Yes, sir.
14   Q    Okay.  But you say that -- yesterday that Mencher tried
15   to give you his gun but you said no; is that right?
16   A    Yes, ma'am.
17   Q    Prior to that you told law enforcement on that
18   February 8th statement, and I will refer you if you need to
19   page 35, line 8.  "I don't know if he was carrying a gun,"
20   and you were referring to Michael Mencher, correct?
21   A    Correct.
22   Q    Isn't it also true that you referred to my client,
23   Michael Mencher, as Cosimano's bitch, correct?
24   A    Yes, ma'am.
25   Q    All right.  Let's talk about the drugs.

ALLAN GUINTO - JULY 31, 2019                    165
Cross-Examination by Ms. Borghetti

1              You use drugs, correct?

2    A    Yes, ma'am.

3    Q    Or you used drugs.  I'm sorry.

4    A    Yes, ma'am.

5    Q    Cocaine?

6    A    Yes, ma'am.

7    Q    Marijuana?

8    A    Yes, ma'am.

9    Q    And steroids?

10   A    Yes, ma'am.

11   Q    You testified yesterday that you saw Erick Robinson

12   with large amounts of drugs, correct?

13   A    Yes, ma'am.

14   Q    Large amounts of cocaine?

15   A    Yes, ma'am.

16   Q    Large amounts of marijuana?

17   A    Yes, ma'am.

18   Q    And large amounts of heroin, correct?

19   A    I've seen him with heroin, but not large amounts of

20   heroin.

21   Q    Okay.  And yesterday I believe you said that twice you

22   were with Mr. Mencher when he sold drugs; is that right?

23   A    I believe I was with him when he sold drugs, yes,

24   ma'am.

25   Q    But I believe you said twice, no?

1   A    I don't remember.

2   Q    Well, how many times were you there then, sir, and

3   where were you exactly?

4        THE COURT:  Ask one question at a time.

5        MS. BORGHETTI:  Okay.  I'll back up.  I apologize.

6   BY MS. BORGHETTI:

7   Q    Okay.  First time, exactly where were you when you saw

8   my client selling drugs?

9   A    I was with him at the bar in Gibsonton.

10  Q    And what's the date?

11  A    I don't recall.  We went out a lot.

12  Q    And do you recall what you were wearing?

13  A    No, ma'am.

14  Q    Were you drinking?

15  A    No, ma'am.

16  Q    You're at a bar?

17  A    Yes, ma'am.

18  Q    And you're not drinking?

19  A    Yes, ma'am.

20  Q    Are you doing drugs?

21  A    Yes, ma'am.

22  Q    And in fact my client did drugs, correct?

23  A    Yes, ma'am.

24  Q    He was an addict, wasn't he?

25  A    Yes, ma'am.

1   Q    He shot heroin, didn't he?

2   A    Yes, ma'am.

3   Q    So that bar in Gibsonton, do you know the name?

4   A    Showtown or Showtime, something like that.

5   Q    And what time of the day is this?

6   A    At nighttime.

7   Q    What time at night?

8   A    I don't recall.

9   Q    So you don't recall the day, the date, and you don't

10  recall the time; is that correct?

11  A    Yes, ma'am.

12  Q    And you actually saw drugs?

13  A    No, ma'am.

14  Q    When is the next time?

15  A    I don't -- I don't recall.

16  Q    Let's talk about your plea agreement.  And if you need

17  to see it, I have a copy for you.

18  A    Yes, ma'am.

19  Q    As you sit here today, you are a convicted felon,

20  correct?

21  A    Yes, ma'am.

22  Q    Actually you have three felony convictions, correct?

23  A    Yes, ma'am.

24  Q    The first would be Count One, the conspiracy to commit

25  murder in aid of racketeering activity, correct?

ALLAN GUINTO - JULY 31, 2019                 168
Cross-Examination by Ms. Borghetti

1    A    Yes, ma'am.

2    Q    And the second would be Count Two, the murder in aid of

3    racketeering activity, correct?

4    A    Yes, ma'am.

5    Q    And the third would be Count Eight, the accessory after

6    the fact, correct?

7    A    Yes, ma'am.

8    Q    Now, in that plea agreement the Government agreed to

9    dismiss two counts against you; is that right?

10   A    Yes, ma'am.

11   Q    Okay.  So it was Count Three, the use of a firearm

12   during and in relation to a crime of violence, correct?

13   A    Yes, ma'am.

14   Q    And that had a maximum of ten years, correct, statutory

15   max of ten years?

16   A    I don't know what --

17   Q    Okay.  Your attorney -- you never discussed this --

18   A    I don't remember.

19   Q    -- indictment with your attorney?

20   A    Yes, ma'am, I have.  Right now I don't know what the --

21   what the maximums are or the specifics on the two charges.

22   Q    That were dismissed?

23   A    Yes, ma'am.

24   Q    So you didn't know what you were getting in return for

25   entering a plea of guilty, sir?

```
 1    A    I -- that's not what I said, ma'am.

 2    Q    Okay.  Did you know what you were getting in entering a

 3    plea of guilty?

 4    A    Yes, ma'am.

 5    Q    You were getting charges dismissed?

 6    A    Yes, ma'am.

 7    Q    Correct?

 8    A    Yes, ma'am.

 9    Q    And one of them was a life felony, correct?

10    A    Correct.

11    Q    And that was Count Four, correct?

12    A    Yes, ma'am.

13    Q    So as you said, you were looking at several lives plus

14    20 years, correct?

15    A    Yes, ma'am.

16    Q    In addition to fines and supervised release, correct?

17    A    Yes, ma'am.

18    Q    Okay.  And you're cooperating with the Government in

19    the hopes that they will file this 5K1.1 motion, correct?

20    A    Yes, ma'am.

21    Q    And the only person that can do that is the Federal

22    Government, correct?

23    A    Yes, ma'am.

24    Q    And it's up to the Government if they feel that you

25    have lived up to your agreement with them, correct?
```

```
 1   A    Yes, ma'am.

 2   Q    And it's up to the Government to assess what your

 3   testimony is, correct?

 4   A    Yes, ma'am.

 5   Q    If you lie while under oath, as far as your

 6   plea agreement goes, they could charge you with perjury,

 7   correct?

 8   A    Yes, ma'am.

 9   Q    But it's up to the Government to decide whether to

10   charge you with the perjury, correct?

11   A    Yes, ma'am.

12   Q    Now, when you were originally arrested you were in the

13   Pasco County Jail; is that right?

14   A    Yes, ma'am.

15   Q    And at that time you had a girlfriend named

16   Andrea King; is that right?

17   A    Yes, ma'am.

18   Q    And actually she was your fiancée at the time?

19   A    Yes, ma'am.

20   Q    And you would call her a lot, correct?

21   A    Yes, ma'am.

22   Q    And she would visit you a lot?

23   A    Yes, ma'am.

24   Q    And isn't it true, sir, that on the morning of

25   January 3rd of 2018, during a video visitation with her, you
```

1    told her:  "I don't want to continue with the bullshit.

2    They know who the shooter is.  They have the shooter in

3    custody.  He did this shit on his own.  Punken and I did not

4    shoot anyone.  Chris needs to eat this up because no one

5    knew what was going to happen, he acted all on his own."

6    Correct?

7    A    Yes, ma'am.

8    Q    And you have a brother named Alvin; is that right?

9    A    Yes, ma'am.

10   Q    And on that same day -- you would talk to him also --

11   A    Yes, sir.

12   Q    -- while you were incarcerated; is that correct?

13   A    Yes, ma'am.

14   Q    And on that same day isn't it true, sir, that you told

15   your brother on a -- in a message to get a hold of Punken,

16   you weren't sure of his real name, correct?

17   A    Yes, ma'am.

18   Q    And that you felt that they were going to -- excuse me,

19   Judge -- fuck him, correct?

20   A    Yes, ma'am.

21   Q    Fuck him by saying he was the shooter, correct?

22   A    Yes, ma'am.

23   Q    And isn't it true, sir, that while you've been

24   incarcerated there have been multiple attempts by

25   Mr. Cosimano to reach out to you to blame Mr. Mencher?

1    A     Yes, ma'am.

2           MS. BORGHETTI:  I have nothing further,

3    Your Honor.

4           THE COURT:  And who is the "they" you were

5    referring to in the conversation with your brother?

6           THE WITNESS:  I was referring to Erick Robinson

7    and Christopher Cosimano.

8           THE COURT:  Cross?  I mean, Redirect.

9           MR. GAMMONS:  May I approach the Clerk's table,

10   Your Honor?

11          THE COURT:  Yes, sir.

12          MR. GAMMONS:  Good morning, Mr. Guinto.

13          THE WITNESS:  Good morning, sir.

14              **REDIRECT EXAMINATION OF ALLAN GUINTO**

15   **BY MR. GAMMONS:**

16   Q     Yesterday when you testified, you mentioned that you

17   commonly used FaceTime encrypted communication to speak to

18   other members of the Killsborough chapter.  Why was that

19   done?

20   A     That's what we were instructed to do.

21   Q     Who instructed you to do that?

22   A     Sean Leonard and Christopher Cosimano.

23   Q     Was it ever explained to you why you were instructed to

24   do that?

25   A     No.

1    Q    We talked about a few individuals yesterday involved in

2    the Local Brewing Company incident.  Paul Anderson, do you

3    know if he had any affiliation with the Outlaws?

4    A    Yes.

5    Q    What was that?

6    A    He was the -- what they told me is he was in charge of

7    the One Ton Crew.

8    Q    Was he a member of the Outlaws?

9    A    Yes.

10   Q    Was he associated with any particular chapter?

11   A    The Pasco County chapter.

12   Q    And did he hold a position with the Pasco County

13   chapter?

14   A    Yes.

15   Q    What was that?

16   A    The Chapter President.

17   Q    The individual you identified as Slider at the

18   Local Brewing Company, did he have any affiliation with the

19   Outlaws?

20   A    Yes.

21   Q    And what was that?

22   A    He was a member.

23   Q    Was he a full patch member?

24   A    Yes.

25   Q    And the individual you identified as Boston Mike, did

ALLAN GUINTO - JULY 31, 2019                174
Redirect Examination by Mr. Gammons

1   he have any affiliation with the Outlaws?

2   A    Yes.

3   Q    What was that?

4   A    He was a member.

5   Q    Was he a full patch member?

6   A    Yes.

7   Q    On cross-examination you said that you referred to

8   Mr. Mencher as Mr. Cosimano's bitch.  What did you mean by

9   that?

10  A    That he did whatever Chris would tell him to do.  He

11  would -- every time Chris called, he would answer, and he

12  would just do whatever Chris said.

13  Q    You were asked questions about the clothes that you

14  were given after the Costa shooting; do you remember that?

15  A    Yes.

16  Q    Who did you provide those clothes to?

17  A    The clothes?

18  Q    Where did you take those clothes to?

19  A    I took them to the house, to my house.

20  Q    And do you know where those clothes currently are?

21  A    I believe I gave them -- I was confused for a while.

22  I thought I gave them back to --

23          THE COURT:  The question is do you know where they

24  are right now.

25          THE WITNESS:  No.

Redirect Examination by Mr. Gammons

1    BY MR. GAMMONS:

2    Q    There's been some questions regarding a few jail calls

3    that you made.  The jail call -- or, sorry, let me talk --

4    let me ask that question.

5         When you spoke to Sean Leonard the night of the

6    Paul Anderson shooting, you made some statements to him

7    about wanting to be the actual shooter; isn't that true?

8    A    Yes.

9    Q    Why did you make those states to Sean Leonard?

10   A    He was -- he was -- he was my big brother.  I -- me and

11   him have similar backgrounds in the military and I wanted to

12   impress him.  I felt bad about what happened at LBC, I feel

13   like I didn't do enough when we got our vests taken, and

14   I just always tried to impress Sean.

15   Q    So those things that you were saying to him, were they

16   in fact true?

17   A    Some of it, yes.

18   Q    Which parts?

19   A    That -- that I was proud of Chris and that -- yeah,

20   that part.

21   Q    I want to talk about the statements that you made when

22   you were in the jail.  There was a discussion about a jail

23   call conversation with Cody Wesling before Mr. Wesling was

24   in custody, and I believe you told him that you buried that

25   thing and gave it to who it needed to go to.  Why did you

1  make that statement to Mr. Wesling?

2  A    I -- I was trying to talk to him in code, but he knew

3  what I was talking about because we did it together.

4  Q    Let me tell you what -- you were trying to code what

5  you were saying, but what were you trying to say to him?

6  A    I was trying to say to him that I already told the ATF

7  and the Government that we had -- that we buried it in his

8  back yard.

9  Q    And the jail call conversation, I believe, in early

10  2018 with your brother and with your then fiancé where you

11  said that essentially Mr. Cosimano needs to take

12  responsibility, did you believe Mr. Cosimano taking

13  responsibility for being the shooter would result in your

14  release from jail?

15  A    I wouldn't say that it would result in a release from

16  jail, but I knew that we would be charged with charges, but

17  not necessarily the murder of Paul Anderson.

18  Q    You thought Mr. Cosimano confessing might mitigate your

19  exposure?

20  A    Yes.

21        THE COURT:  Counsel, that's a leading question.

22  BY MR. GAMMONS:

23  Q    Mr. Guinto, is it your belief that Mr. Mencher --

24        THE COURT:  Counsel, ask him a Direct question.

25  Q    Mr. Guinto, to your knowledge, did Mr. Mencher pull the

1  trigger on the firearm that killed Mr. Anderson?

2  A    No.

3  Q    I'm going to show you Government Exhibit 601, which is

4  your plea agreement.  You've seen that document?

5  A    Yes.

6  Q    I'm going to go to page 7 of Government's Exhibit 601,

7  under the cooperation responsibilities of parties, towards

8  the bottom of the page.  And it reads:  The Government will

9  make known to the Court and other relevant authorities the

10  nature and extent of the defendant's cooperation and any

11  other mitigating circumstances indicative of the defendant's

12  rehabilitative intent by assuming the fundamental civic duty

13  of reporting crime; however, the defendant understands that

14  the Government can make no representation that the Court

15  will impose a lesser sentence solely of, or in consideration

16  of, such cooperation.

17        Do you understand that to be a part of your

18  plea agreement, Mr. Guinto?

19  A    Yes, sir.

20  Q    Moving on to B, it says:  It's understood that the

21  defendant should knowingly provide -- it is understood that

22  should the defendant knowingly provide incomplete or

23  untruthful testimony, statements or information pursuant to

24  this agreement, or should the defendant falsely implicate or

25  incriminate any person, or should the defendant fail to

1  voluntarily and unreservedly disclose and provide full,

2  complete, truthful and honest knowledge, information and

3  cooperation regarding any of the matters noted herein, the

4  following conditions will apply.  One, the defendant may be

5  prosecuted for any perjury or false declarations, if any,

6  committed while testifying pursuant to this agreement, or

7  for obstruction of justice.  Do you understand that?

8  A    Yes.

9  Q    Two, the United States may prosecute the defendant for

10 the charges which are dismissed pursuant to this agreement.

11 Do you understand that to be a part of your plea agreement?

12 A    Yes.

13 Q    And as Ms. Borghetti mentioned, there are two felonies,

14 one of which is a life felony, which have been dismissed

15 pursuant to your plea agreement?

16 A    Yes.

17 Q    Showing you what's already come into evidence as

18 Government's Exhibit 310-9, do you recognize that

19 photograph?

20 A    Yes.

21 Q    Where is this photograph taken?

22 A    At the Hillsborough chapter clubhouse.

23         MS. BORGHETTI:  Beyond the scope, Your Honor.

24 Objection.

25         THE COURT:  Overruled.

ALLAN GUINTO - JULY 31, 2019                   179
Redirect Examination by Mr. Gammons

1   BY MR. GAMMONS:

2   Q     What position did the individual that I'm identifying

3   in the middle of the photograph serve in the 69'ers

4   Motorcycle Club?

5   A     At the time he was a nomad.

6   Q     Did he have any leadership position within the 69'ers?

7   A     At that time I believe him to be the State Boss.

8   Q     I'm pointing at the individual second from the left.

9   Do you know who that is?

10  A     Yes.

11  Q     At that time did he hold any position within the

12  69'ers?

13  A     Yes.

14  Q     What was that?

15  A     He was the Regional Boss.

16  Q     I'm pointing at the individual to the far left.  Who is

17  that?

18  A     Christopher Cosimano.

19  Q     At time was Mr. Cosimano the President of the

20  Killsborough chapter?

21  A     Yes.

22        MS. BORGHETTI:  I'm going to object.  I'd ask for

23  what time frame, what date.

24        THE COURT:  Overruled.

25

ALLAN GUINTO - JULY 31, 2019                    180
Redirect Examination by Mr. Gammons

1    BY MR. GAMMONS:

2    Q    Mr. Guinto, if you know, what timeframe was this photo

3    taken?

4    A    This -- in late 2017, November.  Either November or

5    December.

6    Q    And three from the left, is that Mr. Mencher?

7    A    Yes.

8    Q    And is he wearing soft colors of the 1 percenter in

9    this photograph?

10   A    Yes.

11        MR. GAMMONS:  I have no further questions,

12   Your Honor.

13        THE COURT:  All right.  That concludes the

14   testimony of Mr. Guinto in these proceedings.

15        Sir, other people may testify in this case.  You

16   are not at liberty to discuss your testimony or anything

17   that transpired in this trial while you were present until

18   the case is over.  Do you understand that?

19        THE WITNESS:  Yes, Your Honor.

20        THE COURT:  Thank you, sir.  You may step down.

21             - - - o0o - - -

22   *(Excerpt concludes at 10:23 a.m. on July 31, 2019.)*

23             - - - o0o - - -

24

25

1         C E R T I F I C A T E

2

3         This is to certify that the foregoing excerpt

4    transcript of proceedings taken in a jury trial in the

5    United States District Court is a true and accurate

6    transcript of the proceedings taken by me in machine

7    shorthand and transcribed by computer under my supervision,

8    this the 22nd day of August, 2019.

9

10

11                              /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25